JUDGE BRODERICK

## 18 CV 3196

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FAIR HOUSING JUSTICE CENTER, INC.,
JANE DOE and JOHN DOE,

            Plaintiffs,

                  v.

ANDREW M. CUOMO, in his official capacity
as Governor of the State of New York,
HOWARD A. ZUCKER, in his official capacity
as Commissioner of the New York State
Department of Health, THE NEW YORK STATE
DEPARTMENT OF HEALTH, ELM YORK
LLC, MADISON YORK ASSISTED LIVING
COMMUNITY, LLC,  MADISON YORK REGO
PARK LLC, and VILLAGE HOUSING
DEVELOPMENT FUND CORPORATION,

            Defendants.

_____ Civ. _____ (      )

**COMPLAINT**

      Plaintiffs Fair Housing Justice Center, Jane Doe, and John Doe, by their attorneys, AARP

Foundation and Mobilization for Justice, allege the following for their Complaint against

Defendants Andrew Cuomo in his official capacity as Governor of the State of New York, the

New York State Department of Health ("DOH") and Howard A. Zucker in his official capacity

as the Commissioner of the DOH (collectively "State Defendants"), and Elm York LLC,

Madison York Assisted Living Community LLC, Madison York Rego Park LLC, and Village

Housing Development Fund Corporation (collectively "Adult Care Facility Defendants" or

"ACF Defendants"):

## Introduction

1.      The owners and operators of four adult care facilities (ACFs)[1] in New York City discriminate against prospective and current residents who use wheelchairs.[2] They refuse to admit applicants who use wheelchairs regardless of their particular needs or abilities.   The ACF Defendants prohibit current residents from sitting in wheelchairs in common areas.  Staff tell current residents that they will have to go to a nursing home if they start using a wheelchair. Residents have faced eviction because they use wheelchairs.

2.      The ACF Defendants make it clear to prospective and current residents that they prefer to admit and retain people who are "ambulatory." They steer prospective and current residents who use wheelchairs to more segregated and restrictive nursing homes.

3.      The ACF Defendants are licensed by the NYS Department of Health (DOH) to provide housing and services, including healthcare services, to people with disabilities.

4.      Disability discrimination by ACFs stems in part from State regulations, policies, and practices.  For instance, the DOH has promulgated discriminatory regulations that employ outdated language for people who use wheelchairs (such as the term "chairfast").  The DOH requires ACFs to comply with these discriminatory regulations.  Applicants to ACFs have complained to the DOH about the blanket discrimination against people who use wheelchairs. The DOH tells them that ACFs have every right to ban people who use wheelchairs, regardless of an applicant's specific needs or abilities.

---

[1] Under New York law, an adult care facility "provides temporary or long-term residential care and services to adults who, though not requiring continual medical or nursing care . . ., are by reason of physical or other limitations associated with age, physical or mental disabilities or other factors, unable or substantially unable to live independently." N.Y. Soc. Serv. Law § 2 (McKinney).
[2] The Adult Care Facility Defendants discriminate against people who use wheelchairs of all types, including but not limited to manual wheelchairs and power or motorized wheelchairs.

5.     The DOH's regulations, policies and practices result in a categorical ban on people who use wheelchairs from many ACFs, without an individualized assessment of their eligibility and qualification for ACF housing and services.

6.     The Fair Housing Act, the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act ("the Rehabilitation Act"), and Section 1557 of the Patient Protection and Affordable Care Act (ACA) have the fundamental goal of eradicating discrimination, ending segregation, and fully integrating people with disabilities into the community.  In direct violation of these laws, Defendants' policies and practices, by relying on stereotypes and false assumptions about people with disabilities, fail to treat people as individuals, and relegate people who use wheelchairs to segregated, restrictive nursing homes solely because of their disability.

7.     Defendants' discriminatory practices deny people who use wheelchairs the dignity to age in place, to remain in their communities, and to receive the services to which they are entitled.

### Jurisdiction and Venue

8.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343 and 2201, 29 U.S.C. § 794(a), and 42 U.S.C. §§ 3613.

9.     Declaratory relief is authorized by 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.  Injunctive relief is authorized by 28 U.S.C. §§ 2201, 42 U.S.C. § 12133, 42 U.S.C. § 12188(a), and Rule 65 of the Federal Rules of Civil Procedure.

10.     Venue in the Southern District of New York is proper pursuant to 28 U.S.C. § 1391(b)(1) because Plaintiff Jane Doe and several defendants reside within the district and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events or omissions giving rise to the claims occurred here.

## The Parties

### Fair Housing Justice Center

11.     Plaintiff Fair Housing Justice Center (FHJC) is a nonprofit organization dedicated to ensuring that all people have equal access to housing opportunities in the greater New York City region by eliminating housing discrimination and creating open, accessible, and inclusive communities.

12.     Among other things, the FHJC:  a) provides information to the public and other nonprofit organizations in the New York City regional area about fair housing laws, b) provides intake counseling to individuals and organizations who are potentially facing housing discrimination, c) conducts testing and other investigations of allegations of housing discrimination, d) makes legal referrals to cooperating attorneys, e) assists with the preparation and filing of administrative housing discrimination complaints, and f) provides post-referral litigation support services.  The FHJC provides these services free of charge and without regard to income.

13.     The FHJC also conducts testing investigations for government law enforcement agencies, provides technical assistance to nonprofit organizations engaging in fair housing enforcement activities, and engages in policy initiatives that further the FHJC's mission, including the publication and dissemination of reports and educational materials.

14.     The FHJC employs individuals as "testers," who are people who pose as renters or homebuyers to obtain information about the conduct of local governments, landlords, real estate companies, agents, and others to determine whether illegal housing discrimination is taking place.

15.     The FHJC expended staff time and other resources to investigate and respond to Defendants' discriminatory practices, which diverted resources away from other FHJC activities.

16.     Defendants' discriminatory practices frustrated the FHJC's mission to ensure that all people have equal access to housing opportunities in the greater New York City region by, among other things, making housing unavailable because of disability.

### Jane Doe

17.     Plaintiff Jane Doe is over 60 years old and a person with a disability.  She has been a resident of VillageCare 46 and Ten ("VillageCare"), an ACF, for more than five years and has received services in its assisted living program (ALP) during that time.  Jane Doe uses both a rollator and wheelchair for mobility.  She is currently staying in a nursing home, where she went for rehabilitation, and hopes to return to VillageCare.  VillageCare is located in the Southern District of New York.

### John Doe

18.     Plaintiff John Doe is Jane Doe's brother, power of attorney, and healthcare proxy. He provides significant support to Jane Doe in managing her housing, healthcare and finances. John Doe lives in Florida and regularly visits his sister in New York City.

### The Adult Care Facility Defendants

19.     Upon information and belief, Defendant Elm York LLC is the operator of Elm York Assisted Living ("Elm York"), an ACF located at 100-30 Ditmars Blvd, East Elmhurst, NY 11369. Elm York is licensed to house up to 262 residents, including 200 residents in its ALP.

20.     Upon information and belief, Defendant Madison York Assisted Living Community, LLC operates Madison York Assisted Living ("MYAL"), an ACF located at 112-14

Corona Avenue, Corona, New York 11368.  MYAL is licensed to house up to 226 residents, including 200 residents in its ALP.

21.     Upon information and belief, Defendant Madison York Rego Park LLC operates Madison York Home for Adults ("MYHA"), an ACF located at 61-80 Woodhaven Blvd, Rego Park, NY 11374.  MYHA is licensed to house up to 202 residents, including 200 residents in its ALP.

22.     Upon information and belief, Defendants Elm York LLC, Madison York Assisted Living Community, LLC, and Madison York Rego Park LLC are separate legal entities with common ownership interests.

23.     Upon information and belief, Defendant Village Housing Development Fund Corporation operates VillageCare, an ACF located in Manhattan at 510 West 46th Street. VillageCare is licensed to house up to 89 residents, including 80 residents in its ALP.

### The State Defendants

24.     Andrew M. Cuomo is the Governor of the State of New York, a public entity covered by the Fair Housing Act, the ADA, the Rehabilitation Act, and Section 1557 of the ACA.  Governor Cuomo is ultimately responsible for ensuring that New York operates its service systems in conformity with these laws.  He is sued in his official capacity.

25.     The DOH is an agency of New York State.  It licenses, supervises and enforces the laws and regulations applicable to ACFs and ALPs, and is responsible for protecting the rights of residents.  DOH regulations are compiled in Titles 10 and 18 of the New York Codes, Rules and Regulations.  The DOH is a program of New York State government and receives federal funds.  It is a public entity covered by the Fair Housing Act, the ADA, and the Rehabilitation Act.

6

26.     Howard A. Zucker, M.D., is Commissioner of Health for New York State.  The State of New York receives funding from the federal Medicaid program to provide medical assistance to residents who meet eligibility requirements.  As Commissioner, Dr. Zucker presides over the State's Medicaid program.  He also oversees the State's healthcare workforce, healthcare facilities, and long-term care facilities.  He is responsible for the operation and administration of the DOH, including its oversight over ACFs and ALPs.  Commissioner Zucker was appointed by Governor Cuomo and confirmed by the State Senate on May 5, 2015.  He is sued in his official capacity.

**Factual Allegations**

**The Adult Care Facility Defendants: Background**

27.     ACFs in New York State are specifically intended to serve people with disabilities.  They were established by statute to provide housing and services to people who are "by reason of physical or other limitations associated with age, physical or mental disabilities or other factors, unable or substantially unable to live independently."  N.Y. Soc. Serv. Law § 2.

28.     Upon information and belief, residents of ACFs in New York City have a range of disabilities, including mobility impairments, mental illness, and complex medical conditions.

29.     ACFs are required to provide a broad range of services to residents, including supervision, personal care, medication management, and case management. *See* N.Y. Comp. Codes R. & Regs. tit. 18, § 487.7.

30.     ACFs are required to establish disaster and emergency preparedness plans. *See* N.Y. Comp. Codes R. & Regs. tit. 18, § 487.12.

31.     Consistent with industry standards on disaster and emergency preparedness, which provide for sheltering people with disabilities in place, there is no statutory or regulatory requirement that ACFs evacuate every resident in an emergency.

32.     ACFs have agreements with their residents that state the services to be provided and the resident's monthly payment amount for those services, room, and board.

33.     ACFs receive state subsidies through the State Supplemental Payment program. ACF residents who receive federal Supplemental Security Income qualify for a state supplement at a higher rate than individuals living on their own in the community. A person living alone in the community receives a state supplement of $87, bringing their monthly income to $837. *See* N.Y. Soc. Serv. Law § 209(a) and (f). ACF residents receive a state supplement of $694, which provides ACFs with a minimum monthly facility payment of $1,246. *See id.* at § 209(2)(e)-(f); § 131-o. Residents who have other forms of income may make a higher monthly facility payment.

34.     ACFs also receive state subsidies through the Enhancing the Quality of Adult Living program (EQUAL). *See* N.Y. Soc. Serv. Law § 461-s. Although the program is intended to benefit residents, the funds are given to the facilities themselves. Upon information and belief, the funds are often used to make capital improvements to the facilities. The program allows ACFs to use EQUAL funds for corrective action that addresses regulatory violations. *See id.* at § 461(4).

35.     An ACF may operate an ALP for some or all of its residents. An ACF must receive approval from the DOH to operate an ALP.

36.     ALPs are licensed to serve people who might otherwise require placement in a nursing home. *See* N.Y. Soc. Serv. Law § 461-l.

37.     An ALP may admit a person who:

(i) requires more care and services to meet his or her daily health or functional needs than can be directly provided by an adult care facility and although medically eligible for placement in a residential health care facility, can be appropriately cared for in an assisted living program and who would otherwise require placement in a residential health care facility due to factors which may include but need not be

8

limited to the lack of a home or a home environment in which to live and receive services safely; and

(ii) is categorized by the long-term care patient classification system as defined in regulations of the department of health as a person who has a *stable medical condition and who is able, with direction, to take action sufficient to assure self-preservation in an emergency.* In *no event shall* an eligible person *include* anyone in need of continual nursing or medical care, a *person who is chronically bedfast,* or anyone who is cognitively, physically or medically impaired *to such a degree that his or her safety would be endangered.*

N.Y. Soc. Serv. Law § 461-l(1)(d) (emphasis added).

38.     ALPs are required to provide "at a minimum: room, board, housekeeping, supervision, personal care, case management activities and home health services." N.Y. Comp. Codes R. & Regs. tit. 18, § 494.5(b). The following services are included in the "medical assistance capitated rate": home health aide services; personal emergency response services; nursing services; physical therapy; occupational therapy; speech therapy; medical supplies and equipment not requiring prior authorization; and adult day health care. *Id.*; N.Y. Soc. Serv. Law § 461-l(e).

39.     In addition to the monthly facility rate that the resident pays for basic services, room, and board, the Medicaid program pays ALPs a daily rate for each resident. *See* N.Y. Soc. Serv. Law § 461-l(1); N.Y. Pub. Health Law § 3614.

40.     The Medicaid payments take into account the level of services that the resident is likely to need.

41.     Medicaid pays ALPs between approximately $90.26 and $151.87 per resident per day. *See* https://www.health.ny.gov/facilities/long_term_care/reimbursement/alp/2018-01-01_alp_min_wage_rates.htm. That is between approximately $33,000 and $55,000 per year.

**The Adult Care Facility Defendants: Common Discriminatory Policies and Practices Against People Who Use Wheelchairs**

42.     All of the ACF Defendants' facilities have elevators.

9

43. Each of the ACF Defendants refuses to accept applications from prospective residents who use wheelchairs.

44. Each of the ACF Defendants denies prospective and current residents the opportunity to receive assisted living services based on their use of wheelchairs.

45. Each of the ACF Defendants denies reasonable accommodation requests by prospective and current residents who have mobility impairments, including requests to use their wheelchairs when they need to, thereby denying them equal or continued enjoyment of and access to the facilities.

46. The ACF Defendants steer prospective and current residents who use wheelchairs to more segregated nursing homes, regardless of individual needs or abilities.

47. The ACF Defendants cite DOH regulations, policies, and practices as justification for their refusal to admit or retain people who use wheelchairs.

48. Each of the ACF Defendants makes oral and written statements that indicate a preference for people who are "ambulatory" and discrimination against people who use wheelchairs.

49. Each of the ACF Defendants discriminates against people who use wheelchairs in the terms, conditions, and privileges of the housing and services offered at their ACFs.

**The Adult Care Facility Defendants: The FHJC's Investigation**

50. Over the past year, the FHJC has received complaints of disability discrimination from residents of the ACF Defendants' facilities. Some residents complained they were prohibited from using their wheelchairs or other mobility devices throughout their homes or in common areas. Other residents reported that the ACF Defendants' staff warned them that they would be placed in a nursing home if they became too reliant on their wheelchairs.

10

51.     FHJC determined that discrimination by ACFs against people who use wheelchairs fell within its mission because ACFs are dwellings within the definition of the Fair Housing Act and the complained of actions furthered segregation and steered persons with disabilities away from more integrated housing in the community.  In addition, people who use wheelchairs and other mobility devices are clearly individuals with disabilities under the Fair Housing Act, ADA, the Rehabilitation Act, and Section 1557 of the ACA because they have either: a) a physical or mental impairment; b) a perceived impairment; or c) a record of impairment.

52.     In response to residents' complaints, and consistent with its mission, the FHJC conducted testing at the facilities operated by the ACF Defendants—MYHA, MYAL, Elm York, and VillageCare.

53.     The FHJC gathered and reviewed background information regarding MYHA, MYAL, Elm York, and VillageCare from numerous sources, including their websites, brochures, and other print and internet-based promotional materials.

54.     Based on the complaints and the background investigation, the FHJC conducted testing investigations at MYHA, MYAL, Elm York, and VillageCare.

55.     Audio recordings were made of contacts between the testers and agents for the ACF Defendants.

56.     The FHJC had testers pose as family members of older adults seeking assisted living housing and services.  The FHJC's testing evidence demonstrates a pattern and practice of discrimination against people who use wheelchairs, by each of the ACF Defendants.

**Testing of Madison York Home for Adults in Rego Park**

57.     On March 9, 2017, the FHJC sent a tester, AJ, to visit MYHA and inquire about

placement for her mother-in-law who uses a wheelchair.  AJ met with Greyson Soukup, who

identified himself as the "Admissions Coordinator."

58.     AJ told Mr. Soukup that her mother-in-law was in "good shape overall" and

mostly independent.  AJ and Mr. Soukup discussed the services her mother-in-law would need,

including bathing and dressing, and Mr. Soukup stated that MYHA could provide those services.

Mr. Soukup told AJ that MYHA applied for Medicaid on behalf of residents so that they could

receive assisted living services.

59.     During the discussion, AJ mentioned that her mother-in-law had rheumatoid

arthritis.  Mr. Soukup asked AJ whether her mother-in-law could "ambulate outside of a

wheelchair."  AJ responded that her mother-in-law could not walk right now because she was

recovering from hip surgery.

60.     Mr. Soukup told AJ, "wheelchairs are not allowed in the facility" and "[y]ou have

to be out of a wheelchair." He elaborated that, "for assisted living homes, it's walker, canes,

rollators, hemi-canes, something like that is acceptable, but a wheelchair is a hallmark of a

nursing home." He stated that "private, non-subsidized" facilities might be able to accommodate

wheelchairs, but "in our case, because we're not, we cannot accommodate a wheelchair-bound

patient."

61.     At the conclusion of their meeting, Mr. Soukup told AJ that he would be willing

to meet with her mother-in-law to try to help her get out of her wheelchair:

> In my experience, I've found some people need a little bit of a kick in the pants
> just in the right direction.  If you explain to her what services we provide, if she
> really likes this, and if I speak with her and say, 'Listen, you need to get out of the
> chair, go to your physical therapy, practice, do work.'" Sometimes I've found that

12

to be beneficial to help get them a little bit more motivated to do what they need to do . . .

62.     On March 15, 2017, the FHJC sent another tester, CW, to inquire about placement for his uncle, who did not use a wheelchair.  CW also met with Mr. Soukup.

63.     One of the first questions that Mr. Soukup asked CW about his uncle was: "Is he able to ambulate on his own?" CW responded that his uncle could.

64.     In giving an overview of long-term care, Mr. Soukup stated that assisted living is a "community setting . . . usually a step before someone has to go to a nursing home."  Mr. Soukup asked CW about his uncle's health conditions, and CW stated that his uncle had diabetes and was on heart medication.

65.     CW asked Mr. Soukup if there was a waitlist to move in. Mr. Soukup responded:

So we have rolling admissions and rolling discharges. And what that means is, as we have the space, we do admissions and discharges. So residents need to be able to perform certain tasks to stay in facility – they must be able to walk. They can use a cane, a rollator, a hemi cane, anything like that, assisted devices are totally fine, but no wheelchairs. So, if someone becomes unable to walk completely, then, unfortunately, they would have to go to a nursing home setting. Because they can accommodate a wheelchair-bound patient. Residents must also display some ability. So, obviously we have some residents here who are sicker than others so they can't perform certain tasks, but as long as they can show they're trying, that they're making an effort, then they're OK. But, if they're just going to lay in bed all day, do absolutely nothing, then we're going to classify them as bed bound, and they're not able to do this so they'd have to be transferred to a nursing home.

66.     Mr. Soukup told CW that, "what makes us so different is because of what our age bracket is." He explained:

we have younger and older population. But, because we do have a younger population, we screen our residents a little bit differently.  We want to make sure they're a little bit more active, a little bit more able bodied, just so they don't feel as excluded. We actually have another facility, located in Corona, it's called Madison York community, and their average age is about 87-88 years old.

13

67.     Mr. Soukup took CW on a tour of the facility and noted that because the elevators were cramped, they could not accommodate wheelchairs.  Later, he stated that there had been gut renovations in the facility and all of the elevators were replaced 8 or 9 years ago.

### Testing of Madison York Assisted Living in Corona

68.     On March 20, 2017, the FHJC sent a tester, KH, to visit MYAL to inquire about housing for her mother-in-law who uses a wheelchair.  KH met with Barbara Castellano, who identified herself as the Director of Community Relations.

69.     KH stated that her mother-in-law did not need a lot of services but had arthritis and used a wheelchair.  Ms. Castellano responded: "We don't have any wheelchairs here."  She explained: "That's the way the state has us, we can't look like a hospital, we're not set up for wheelchairs."  Ms. Castellano asked if the mother-in-law could use a walker, and KH responded that it was very painful for her to walk.

70.     Later Ms. Castellano said: "The wheelchair thing is a fire code thing.  So, it has to do with us with the fire department not allowing us to have it."

71.     Ms. Castellano said there was one floor for people who have "limited ambulation," are "blind," or "very slow" but that even that floor was not an option for someone who could not walk.  She noted that, as part of the admission process, "[KH's mother-in-law] has to walk for us."

72.     Ms. Castellano suggested that KH get her mother-in-law services through the senior center in Sunnyside, Queens, noting that they could pick her mother-in-law up from her apartment and that those services were covered by Medicaid.  She also suggested a facility in Manhattan that might allow wheelchairs, but noted that a lot of ALPs do not accept people who use wheelchairs.

14

73.     On March 22, the FHJC sent another tester, CW, to MYAL to inquire about placement for his uncle who is ambulatory. CW also met with Ms. Castellano. Ms. Castellano said that placement was possible in a month, but that the applicant would have to be interviewed.

74.     Ms. Castellano noted that they operated two other facilities, including Elm York, which is "more of a mental health setting" and asked CW if his uncle received mental health treatment for schizophrenia or bipolar disorder. When CW said his uncle did not, Ms. Castellano stated that MYAL was more of a "geriatric population."

75.     Ms. Castellano said the next step in the process was to bring his uncle for a visit to see "if he matches us and if we match him."

### Testing of Elm York

76.     On March 21, 2017, the FHJC sent a tester, KH, to Elm York to inquire about placement for her mother-in-law who uses a wheelchair. KH had previously tried to make telephone contact with Elm York's Admissions Coordinator, but did not reach him.

77.     KH met with Robert Amsel, who identified himself as the administrator and said he had been working at Elm York for 40 years.

78.     Mr. Amsel immediately asked KH about her mother-in-law's mobility: "First of all. Your mother-in-law, she's able to get around at this moment?" KH responded that she could get around pretty well in her wheelchair. Mr. Amsel said "Ok, so let me stop right there." He explained that ALPs "by law" cannot accept people in wheelchairs except on the first floor and that this facility does not have rooms on the first floor.

79.     Mr. Amsel explained that "[t]he Fire Department regulations are very clear. We're under 25 different agencies. Ok. You're not allowed. In case of an evacuation, you cannot have any wheelchairs. Walkers, canes, yes, but not wheelchairs."

15

80.     Mr. Amsel stated that nursing homes can have wheelchairs because they have nurses 24 hours a day to help residents in case of an emergency. He explained that Elm York had some nurses for residents who "need extra help," but not 24 hours a day. When KH stated that her mother-in-law did not need a nursing home, Mr. Amsel responded that home care or an ALP with a first floor room might work for her.

81.     On March 22, 2017, FHJC tester, CW, inquired about a placement for his uncle who was ambulatory.

82.     CW spoke to Norman Strenger, who identified himself as the Admissions Coordinator. Mr. Strenger stated that he would interview CW's uncle because, "I have to see if he's appropriate for our facility or not." He noted that "our doctors" would also do a medical evaluation.

83.     Regarding CW's uncle, Mr. Strenger asked: "Is he walking? How is he getting around?" CW responded that he was but might need a cane soon. Mr. Strenger encouraged CW to arrange a date for his uncle to visit.

### Testing of VillageCare 46 and Ten

84.     On October 31, 2017, an FHJC Tester, MP, spoke with VillageCare's Admissions Coordinator, Rosa Ortega, by telephone. MP asked for a tour of the facility for his uncle. Ms. Ortega indicated that she needed more information about MP's uncle before scheduling the tour. Ms. Ortega first asked MP how old his uncle is, and MP responded that he is 80 years old. She then told MP that his uncle must be enrolled in Medicaid, receive Social Security benefits, and not be in a wheelchair before she could even accept his application for the ALP.

16

85.     Ms. Ortega stated that MP's uncle "needs to ... [be] able to ambulate—no wheelchairs. He can use a walker, cane, or rollator." MP informed Ms. Ortega that his uncle could walk and sometimes used a cane.

86.     Ms. Ortega provided guidance on applying for Medicaid and said that while MP could schedule a tour, she could not accept an application until his uncle met the initial criteria.

87.     On November 2, 2017, MP went to VillageCare and Ms. Ortega provided a tour of the facility. During the tour, Ms. Ortega stated: "As you can see, our residents get around... they're active." She encouraged MP to have his uncle start the application process.

88.     MP received an application form from VillageCare. The application includes a series of questions about whether the applicant is "ambulatory" or uses a cane, walker, or wheelchair.

89.     On November 1, 2017, FHJC Tester KH contacted Ms. Ortega to inquire about placement for her mother-in-law. They first exchanged telephone messages. After being unable to make contact by phone, KH sent an email to Ms. Ortega. In the e-mail, KH stated that she was seeking "a suitable place for my mother-in-law who would benefit greatly from an assisted living arrangement" and requesting "the general criteria for enrollment in your program."

90.     On November 2, 2017, Ms. Ortega replied to KH's e-mail and stated that, before submitting an application, KH's mother-in-law had to meet three basic requirements:  1. be enrolled in Medicaid; 2. receive Social Security benefits; and 3. "must ambulate with walker/rolling walker or cane."   Ms. Ortega wrote: "We do not admit residents on wheelchairs."

91.     On November 3, 2017, FHJC Tester KH contacted Ms. Ortega by phone and asked several questions to obtain clarification on the policy against wheelchairs. KH explained that her mother-in-law had used a wheelchair for 60 years, but was very independent and can

17

transfer in and out of her wheelchair without assistance. Ms. Ortega responded it did not matter

because, "[e]ven though [your mother-in-law] can get around and can get off the chair and

transfer and all that, we could not accept anyone in a wheelchair." Ms. Ortega explained that

they could not accept someone who used a wheelchair under any circumstances.

92.     During the same conversation, FHJC Tester KH asked why VillageCare and other

ALPs have this policy. Ms. Ortega said that the requirement is in "DOH regulations… in case of

an emergency, [the residents] can all walk out. And all we have to do is to direct them to where

they have to go." Ms. Ortega repeatedly stated that this wheelchair ban was a legal requirement

beyond the facility's control and stated that other facilities licensed to provide assisted living

services would also not admit people in wheelchairs. When KH asked if there's "a particular

rule," Ms. Ortega responded:

> Yeah, a Department of Health. It's a program. It's an assisted living. If you're
> getting the same information from everyone, we're not making this up. That's
> part of the regulations. It's nothing against anyone. It's just that the program—
> that's one of the requirements of the program. It would almost be like saying if
> they don't meet the age requirement, it doesn't matter what condition they're in,
> they're not going to. We can't accept an application.

93.     Ms. Ortega stated that "[u]nfortunately, [KH's mother-in-law] is in one of those

situations where, she doesn't require nursing home and then she can't be at home either." Ms.

Ortega suggested that KH call the Department of Health to obtain further clarification on the

rule.

**VillageCare 46 and Ten: Discrimination against Jane Doe and John Doe**

94.     In April 2017, Jane Doe was transferred from VillageCare to a hospital due to

complications from a urinary tract infection. Afterwards, she went to a nursing home for

rehabilitation.

95.    Just two months later, Jane Doe received a Notice of Termination from VillageCare.

96.    The Notice of Termination stated that Jane Doe required "supervision and/or assistance with ambulation, transferring, dressing, grooming, toileting and bathing," that the operator was "not equipped to provide."

97.    The Notice of Termination stated that VillageCare had conducted a "visual assessment" of her needs and had determined that she required "extensive assistance" with her care.  It stated that the operator did "not have the resources to provide such care."

98.    As her next of kin, John Doe received a copy of Jane Doe's Notice of Termination from VillageCare.

99.    Around the same time, VillageCare staff told John Doe that they had done an assessment of his sister, saw that she was walking poorly, and determined that she was not mobile enough to continue living at VillageCare.

100.    In July 2017, John Doe submitted an objection and appeal of the Notice of Termination.  In response, counsel for Village Housing Development Fund wrote John Doe that, because more than 90 days had lapsed since Jane Doe's transfer, she was required to submit a new application for services at VillageCare.

101.    In a letter dated August 11, 2017, counsel for Village Housing Development Fund notified John Doe that his appeal was denied because Jane Doe required "supervision and/or services that VillageCare cannot provide."

102.    John Doe was aware of a general ban on wheelchairs at VillageCare, but believed his sister was eligible to live there again, because she was still able to walk with her rollator.

After consulting with an attorney about his sister's rights, he filed a complaint with the Fair Housing Justice Center.

103.    In August 2017, Defendant Village Housing Development Fund commenced an eviction proceeding against Jane Doe.

104.    After consulting with his sister, John Doe repeatedly asked Jane Doe's social worker at the nursing home to assist with discharge planning, including gathering the discharge paperwork necessary for Jane Doe to be readmitted to VillageCare. At one point, the social worker said she was unable to make a discharge plan because Jane Doe had no place to be discharged to.

105.    After creating a discharge plan, the nursing home refused to provide John Doe with copies of his sister's discharge paperwork unless he came in person to the nursing home.

106.    In October 2017, John Doe traveled from Florida to New York to obtain his sister's discharge paperwork and get his sister discharged back to VillageCare, in accordance with her wishes.

107.    During his October visit, after consulting with his sister, John Doe requested that the nursing home submit an application for a different nursing home where he believed his sister would receive better care. The social worker submitted a "Patient Review Instrument," the standardized application form, to another nursing home on behalf of Jane Doe.

108.    John Doe spoke with the Director of Admissions at the other nursing home about the application. She told him that she did not have any beds available, but in any event, Jane Doe's application would be rejected because she was too high functioning.

109.    In October 2017, Jane Doe's nursing home submitted a new application on her behalf admission to VillageCare. The application included evaluations by her medical providers

20

at the nursing home stating that she was medically and mentally appropriate to live at VillageCare.

110.    Based on the evaluations by her treatment providers, Jane Doe moved for summary judgment in her eviction proceeding, arguing she was eligible to return to VillageCare.

111.    In the course of her eviction proceeding, Jane Doe agreed to go to VillageCare for an interview and assessment.  The interview and assessment took place on December 22, 2017. John Doe traveled to New York in order to be present.

112.    The interview and assessment lasted approximately four hours.  During the assessment, Jane Doe was asked to walk, sit down, navigate hallways, take off and put on her shoes, and bend down.  She was asked to memorize three colors and three objects.  Five minutes later, and after many intervening questions, Jane Doe was asked to recite the three colors and three objects.

113.    A report was generated after Jane Doe's assessment.  The report stated that Jane Doe required assistance with a variety of activities of daily living, including extensive assistance with "locomotion."

114.    In January, Village Housing Development Fund informed John Doe that the assessment resulted in a Nursing Facility Level of Care (NFLOC) score of 25, which meant a nursing home level of care.   Counsel for Village Housing Development Fund informed counsel for Jane Doe that it would be proceeding with the eviction.

115.    John Doe observed that his sister became more despondent after learning that she "failed" the assessment at VillageCare.

21

116.    Village Housing Development Fund cross-moved for summary judgment in the eviction proceeding against Jane Doe, citing the assessment results and the NFLOC score as the basis for its motion.

117.    The parties' motions for summary judgment were heard on February 7, 2018. The court reserved decision on the motions.

118.    At the nursing home, Jane Doe is often told by staff to sit in a wheelchair, which she dislikes.  She is discouraged from walking and does not receive consistent physical therapy to maintain her strength.

119.    Jane Doe misses her friends at VillageCare and wants to go home.

120.    John Doe tries to advocate for his sister to receive the services that she needs to remain as independent as possible, but he worries that his sister's health is deteriorating because she is by being forced to sit in a wheelchair at the nursing home every day.

121.    As Jane Doe's eviction case drags on, the nursing home has repeatedly demanded that Jane Doe be moved to another floor of the nursing home where people are placed permanently.

122.    John Doe has been able to resist Jane Doe's transfer thus far, citing her ongoing treatment by the nursing home psychologist, who recommended that she work with Jane Doe for a month to psychologically prepare her for the move to another floor.

123.    John Doe fears that, if his sister is placed on a floor with people living at the nursing home permanently, she will deteriorate further and lose hope.

124.    John Doe fears that, if his sister is evicted from VillageCare, she will be forced to reside in a nursing home to the detriment of her health, well-being, and longevity.

125.   John Doe is distressed by seeing his sister subjected to discrimination on the basis of her disability.

126.   John Doe is distressed by the present detriment to his sister's health and well-being by her unnecessary institutionalization in a nursing home, where she is socially isolated and discouraged from walking.

**The State Defendants: Background**

127.   The DOH has promulgated a number of regulations that state that ACFs and ALPs should not admit or retain people with mobility impairments and people who use wheelchairs in particular.

128.   DOH regulations state that an ACF operator:

> shall not accept nor retain any person who … is chronically bedfast; is chronically chairfast and unable to transfer, or chronically requires the physical assistance of another person to transfer; chronically requires the physical assistance of another person in order to walk; chronically requires the physical assistance of another person to climb or descend stairs, unless assignment on a floor with ground-level egress can be made; [or] is dependent on medical equipment, unless it has been demonstrated that the equipment presents no safety hazard; use of the equipment does not restrict the individual to his room, impede the individual in the event of evacuation, or inhibit participation in the routine activities of the home . . .

N.Y. Comp. Codes R. & Regs. tit. 18, § 487.4(b)(9)-(11), (14).

129.   DOH regulations state that an ALP "operator must not accept nor retain any person who… is chronically bedfast and requires lifting equipment to transfer or the assistance of two persons to transfer; [or] is chronically chairfast and requires lifting equipment to transfer or the assistance of two persons to transfer…." N.Y. Comp. Codes R. & Regs. tit. 18, § 494.4(d)(2)-(3).

130.   DOH regulations state that an Enriched Housing operator:

> must not accept nor retain any person who . . . is chronically bedfast; is chronically chairfast and unable to transfer or chronically requires the physical assistance of another person to transfer; is chronically in need of the physical

assistance of another person in order to walk; is chronically in need of the physical assistance of another person to climb or descend stairs, unless assignment on a floor with ground-level egress can be made; is dependent on medical equipment unless it has been demonstrated that . . . the equipment presents no safety hazard . . . use of the equipment does not restrict the individual to his/her room, impede the individual in the event of evacuation, or inhibit participation in the routine activities of the home . . .

N.Y. Comp. Codes R. & Regs. tit. 18, § 488.4(b)(8)-(11), (14).

131.    These admission and retention regulations were promulgated in 1978, at a time when regulatory authority over ACFs belonged to another agency. [3]

132.    These regulations predate the Fair Housing Amendments Act (1988), promulgation of the Rehabilitation Act housing regulations (1989), the ADA (1990), and the ACA (2010).

133.    Despite these federal laws and directives that prohibit disability discrimination, the DOH has failed to revise the admission and retention regulations.

134.    Advocates serving on regulatory workgroups with the DOH have repeatedly told the DOH that these regulations violate federal civil rights laws, but the DOH has failed to take any action to change these regulations.

135.    These regulations unnecessarily limit the housing options for people who use wheelchairs and force them to move to nursing homes instead of ALPs—denying them equal access to and enjoyment of services and benefits and the ability to receive such services in the most integrated setting appropriate to their needs.

136.    Nursing homes are segregated settings and are more restrictive settings than ALPs. The State's own Olmstead Plan refers to nursing homes as "institutional settings." *See*

---

[3] On April 1, 1997, the DOH replaced the New York State Department of Social Services as the regulator of adult care facilities, pursuant to 1997 N.Y. Laws 436 § 122(e).

Report and Recommendation of the Olmstead Cabinet (2013), page 10, *available at* https://www.ny.gov/sites/ny.gov/files/atoms/files/Olmstead_Final_Report_2013.pdf.

137.    Nursing homes are more expensive than ALPs. According to the DOH, nursing homes in New York City cost approximately $405 per day per resident. *See* https://www.health.ny.gov/facilities/nursing/estimated_average_rates.htm. That is approximately $150,000 per year.

**The State Defendants: The FHJC's Investigation**

138.    When staff of the ACF Defendants indicated that their policies were based at least in part on state rules and regulations, the FHJC began conducting testing of the DOH. The FHJC had testers pose as family members of older adults seeking assisted living housing and services. The FHJC's testing evidence of the DOH demonstrates system-wide unlawful conduct by the State Defendants that supports the discriminatory policies and practices of the ACF Defendants.

### Testing of the Department of Health

139.    FHJC conducted testing of the DOH. Individual FHJC testers, posing as people seeking an assisted living placement for a parent who used a wheelchair, spoke with several DOH officials.

140.    On April 27, 2017, an FHJC tester, AD, called the DOH's Centralized Complaint Intake Program for Adult Care Facilities. Yvonne answered her call. AD told Yvonne that she was looking for an ALP for her dad who uses a wheelchair but who can get around and transfer without assistance. AD explained that her problem is that the ALPs she has contacted will not admit him because he uses a wheelchair.

141.    Yvonne told AD that there are certain qualifications to be in an ALP, including being on Medicaid and being qualified to be a resident of an ACF. Yvonne told AD that she can find more information on the DOH website, including more potential ALP locations.

142.    Yvonne also suggested that AD look into nursing homes.

143.    Yvonne said that she was not able to address the wheelchair issue, but she gave AD the number to the DOH's Metropolitan Area Regional Office.

144.    On the same day, AD called the DOH's Centralized Complaint Intake Program for Adult Care Facilities again.  This time, Sean answered her call.  Sean suggested that AD speak to Bobbie Barrington.

145.    AD asked Sean to transfer her to the DOH's regional office, and Sean transferred her call.

146.    Siobhan answered and said that she would transfer AD to one of the coordinators.

147.    AD reached Renald Paul's voicemail and hung up.

148.    On April 28, 2017, AD called the DOH's regional office again and was transferred to Renald Paul at the DOH's Metropolitan Area Regional Office.

149.    AD explained that she was trying to find an ALP for her father, who is very independent and does not need much assistance, but no one would accept him because he uses a wheelchair.

150.    Mr. Paul asked AD, "How important is the wheelchair to him being able to evacuate?" He explained that, "[a] part of being able to be in the home is that the person can kind of like evacuate or be able to move on their own in case they have to evacuate or something like that."

151.    Mr. Paul explains that the reason for this is that there are "no regulations that say that [ALPs] have to have enough people … if they have people who have problems ambulating during, you know, an evacuation or something like that."

152.    When AD noted that these facilities have elevators, Mr. Paul explained that elevators get turned off in disasters.

153.    AD told Mr. Paul that the different ALPs that she is contacting are all telling her different stories about her father needing to be able to walk a certain number of feet or from the elevator to the kitchen.

154.    In response, Mr. Paul said: "You don't want him to run over people in front of him with the wheelchair. I'm not saying he would do that on purpose."

155.    Mr. Paul, then explained that a person "can't really be dependent on the wheelchair in the social model. And that's probably why people are telling you the nursing home, because the nursing home is the medical model."

156.    AD asked Mr. Paul: "Are you saying that assisted living homes are not required to have a plan in place for things like that?" Mr. Paul responded, "They don't have to take in people, in other words they don't have to take in people with wheelchairs if they don't necessarily have the accommodations to do it."

157.    Mr. Paul encouraged the tester to consider facilities outside of New York City because those were more likely to have first floor rooms available.

158.    On May 16, 2017, AD called the DOH's Division of Adult Care Facility & Assisted Living Surveillance in Albany and asked to speak to the division's Director, Valerie Deetz.

159.    AD explained to the person who answered the phone, Christine, that she was calling about her search for an ACF for her father, who uses a wheelchair. Christine put AD on hold and Dorothy Persico came on the line.

160.    Dorothy Persico is the Director of Quality Assurance in the Division of Adult

Care Facility & Assisted Living Surveillance of the DOH.

161.    Ms. Persico put AD on speakerphone because Linda O'Connell was in the room

with her.

162.    Linda O'Connell is a Health Systems specialist in the Division of Adult Care

Facility & Assisted Living Surveillance of the DOH.

163.    AD told Dorothy Persico and Linda O'Connell ("the DOH Officials") that her

dad, a longtime wheelchair user who can transfer independently, was denied admission to ALPs

in NYC because he uses a wheelchair.

164.    Ms. Persico explained that ALPs:

> are required whenever [they] admit a resident to be able to state that they can
> safely evacuate that resident at any given time of the day or night. So, typically, in
> city, as Linda said, it becomes an issue if you have them on the higher floors
> because at night they usually don't have the staffing that they have during day.
> And, god forbid, if there was a situation, their disaster plan can't reflect that they
> can safely protect your father and evacuate. So that's probably why you're finding
> difficulty in the city.

165.    Ms. Persico goes on to explain why she thinks the ALPs are refusing to admit

AD's father:

> I think what you're seeing is, one of two things: Either they don't have a room on
> the first floor or they have several wheelchair residents right now and they feel
> that, if there was some type of emergency, they could not take on an additional
> resident in a wheelchair and be able to say, yes, we can safely evacuate them.

166.    When AD responded that the ACFs did not seem to be denying admission based

on their ability to evacuate but that, instead, some ALPS have "a blanket rule" prohibiting all

prospective residents who used wheelchairs, the DOH Officials responded: "And they can, and

they can do that. They can do that."

167. The DOH Officials suggested that the tester look at ACFs outside of New York City or get on the waitlist for a first floor room.

168. The policies and practices described by DOH are not only directed at those individuals who clearly meet the definition of disability under the Fair Housing Act, ADA, the Rehabilitation Act, and Section 1557 of the ACA (i.e., people who use wheelchairs), but also have a disproportionately adverse effect on individuals with disabilities for whom any justifiable safety concerns could easily be met with a far less restrictive alternative than complete rejection and exclusion.

**COUNT I**
Fair Housing Act:
Discrimination based on Disability by the Adult Care Facility Defendants
against FHJC

169. Plaintiff FHJC repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

170. The ACF Defendants own and lease dwellings, as defined by Section 802(b) of the Fair Housing Act, 42 U.S.C. § 3602(b), to include "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

171. The ACF Defendants' conduct, as described above, constitutes making, printing, or publishing, or causing to be made, printed, or published a notice, statement, or advertisement, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on disability, in violation of Section 804(c) of the Fair Housing Act, 42 U.S.C. § 3604(c).

172. The ACF Defendants' conduct, as described above, constitutes representations made because of disability that a dwelling is not available for inspection or rent when such

29

dwelling was in fact so available, in violation of Section 804(d) of the Fair Housing Act, 42 U.S.C. § 3604(d).

173.    The ACF Defendants' conduct, as described above, constitutes discrimination in the rental, or to otherwise make unavailable or deny, a dwelling to a renter because of disability, in violation of Section 804(f)(1) of the Fair Housing Act, 42 U.S.C. § 3604(f)(1).

174.    The ACF Defendants' conduct, as described above, constitutes discrimination against any person in the terms, conditions, or privileges of rental of a dwelling because of disability, in violation of Section 804(f)(2) of the Fair Housing Act, 42 U.S.C. § 3604(f)(2).

175.    The ACF Defendants' conduct, as described above, constitutes discrimination against persons with disabilities by refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling in violation of Section 804(f)(3)(B) of the Fair Housing Act, 42 U.S.C. § 3604(f)(3)(B).

176.    The ACF Defendants' conduct, as described above, constitutes discrimination against persons with disabilities by making unlawful inquiries into the nature and severity of an individual's disability in violation of 42 U.S.C. § 3604(f) as implemented by 24 C.F.R. §100.201(c).

177.    Plaintiff FHJC is an aggrieved person as defined in 42 U.S.C. § 3602(i).  Plaintiff FHJC has been injured by the ACF Defendants' discriminatory conduct and has suffered damages as a result.

178.    The ACF Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

179.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiff FHJC is entitled to actual

damages, punitive damages, injunctive relief, and reasonable attorney's fees and costs.

## COUNT II
Fair Housing Act:
Discrimination based on Disability by Defendant Village Housing Development Fund
against Jane Doe and John Doe

180.    Plaintiffs Jane Doe and John Doe repeat and reallege the foregoing paragraphs of

their complaint as though fully set forth herein.

181.    Plaintiff Jane Doe is a person with a disability ("handicap") pursuant to 42 U.S.C.

§ 3602(h).

182.    Plaintiffs Jane Doe and John Doe are "aggrieved persons" pursuant to 42 U.S.C. §

3602(i).  Plaintiffs Jane Doe and John Doe have been and are being injured by Defendant Village

Housing Development Fund's discriminatory conduct and have suffered and are suffering

damages as a result.

183.    Defendant Village Housing Development Fund owns and leases a dwelling, as

defined by Section 802(b) of the Fair Housing Act, 42 U.S.C. § 3602(b) to include "any building,

structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a

residence by one or more families."

184.    Defendant Village Housing Development Fund's conduct constitutes

discrimination against Plaintiffs Jane Doe and John Doe in the sale or rental, or in otherwise

making unavailable or denying, a dwelling to any renter because of a disability (handicap)

pursuant to 42 U.S.C. § 3604(f)(1).

185.    Defendant Village Housing Development Fund's conduct constitutes

discrimination against Plaintiffs Jane Doe and John Doe in the terms, conditions, or privileges of

31

rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap pursuant to 42 U.S.C. § 3604(f)(2).

186.   Defendant Village Housing Development Fund's conduct constitutes discrimination against a person with a disability (handicapped person) in refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling pursuant to 42 U.S.C. § 3604(f)(3)(B).

187.   Plaintiffs Jane Doe and John Doe have been injured by Defendant Village Housing Development Fund's discriminatory conduct, and have suffered damages as a result.

188.   Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs Jane Doe and John Doe are entitled to actual damages, punitive damages, injunctive relief, and reasonable attorney's fees and costs.

## COUNT III
### Fair Housing Act:
### Discrimination based on Disability by the State Defendants
### against all Plaintiffs

189.   Plaintiffs repeat and reallege the foregoing paragraphs of their complaint as though fully set forth herein.

190.   The State Defendants regulate dwellings, as defined by Section 802(b) of the Fair Housing Act, 42 U.S.C. § 3602(b), to include "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families."

191.   The State Defendants' conduct, as described above, constitutes making, printing, or publishing, or causing to be made, printed, or published a notice, statement, or advertisement, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on disability, in violation of Section 804(c) of the Fair Housing Act, 42 U.S.C. § 3604(c).

32

192.    The State Defendants' conduct, as described above, intentionally, by its discriminatory effects, and by furthering the segregation of people with disabilities, constitutes discrimination in the rental, or to otherwise make unavailable or deny, a dwelling to a renter because of disability, in violation of Section 804(f)(1) of the Fair Housing Act, 42 U.S.C. § 3604(f)(1).

193.    The State Defendants' conduct, as described above, intentionally, by its discriminatory effects, and by furthering the segregation of people with disabilities, constitutes discrimination against any person in the terms, conditions, or privileges of rental of a dwelling because of disability, in violation of Section 804(f)(2) of the Fair Housing Act, 42 U.S.C. § 3604(f)(2).

194.    The State Defendants' conduct as described above, intentionally, by its discriminatory effects, and by furthering the segregation of people with disabilities, steers people from housing in an ACF in the neighborhood of their choice to a more restrictive setting such as a nursing home or to a facility in a neighborhood or city with other adverse effects in violation of Section 804(f)(1) of the Fair Housing Act, 42 U.S.C. § 3604(c).

195.    Plaintiffs FHJC, Jane Doe, and John Doe are aggrieved persons as defined in 42 U.S.C. § 3602(i). Plaintiffs have been and are being injured by the State Defendants' discriminatory conduct and have suffered and are suffering damages as a result.

196.    The State Defendants' conduct was intentional, willful, and made in disregard for the rights of others.

197.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to injunctive relief, and reasonable attorney's fees and costs.

## COUNT IV
### Americans with Disabilities Act:
### Discrimination based on Disability by the State Defendants
### against all Plaintiffs

198.    Plaintiffs repeat and reallege the foregoing paragraphs of their complaint as though fully set forth herein.

199.    Title II of the ADA prohibits State Defendants from discriminating against individuals with disabilities and states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132.

200.    The ADA specifically prohibits a public entity from "utiliz[ing] criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities . . . ." 28 C.F.R. § 35.130(b)(3).

201.    The ADA also requires that "a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *See* 28 C.F.R. § 35.130(d).

202.    State Defendants' conduct, as described above, discriminates against individuals who have mobility impairments, including people who use wheelchairs.

203.    Serving qualified individuals with disabilities who use wheelchairs or other mobility devices in ACFs would not fundamentally alter the state's ACF program.

204.    Plaintiffs are "persons alleging discrimination" as set forth in the ADA. 42 U.S.C. § 12133 (Enforcement).

34

205.    Plaintiffs have suffered damages because the State Defendants administer the State's ACF program in a manner that discriminates against qualified individuals with disabilities who use wheelchairs or other mobility devices.

206.    Plaintiffs are therefore entitled to injunctive relief and reasonable attorney's fees, including litigation expenses and costs.  42 U.S.C. § 12133; 28 C.F.R. § 35.175.

**COUNT V**
Rehabilitation Act:
Discrimination based on Disability by the Adult Care Facility Defendants
against FHJC

207.    Plaintiff FHJC repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

208.    The Rehabilitation Act prohibits entities that receive federal financial assistance from discriminating against people with disabilities. 29 U.S.C. § 794a (as amended).

209.    The Rehabilitation Act applies to the ACF Defendants' programs and activities, because they receive federal financial assistance through the Medicaid program.

210.    The Rehabilitation Act requires, *inter alia*, that the ACF Defendants administer their programs in a manner that does not discriminate against people with disabilities and provide people with disabilities equal access to benefits and services.

211.    The Rehabilitation Act also prohibits the ACF Defendants from "utiliz[ing] criteria or methods of administration the purpose or effect of which would … [d]efeat or substantially impair the accomplishment of the objectives of the recipient's federally assisted program or activity for qualified individuals with a particular handicap …." 24 C.F.R. § 8.4(b)(4).

212.    The ACF Defendants discriminated and continue to discriminate against qualified

individuals with disabilities who use wheelchairs or other mobility devices, by refusing to admit

them to or retain them in their ACFs.

213.    The ACF Defendants are required to make reasonable accommodations in

policies, practices, or procedures when accommodations are necessary to avoid discrimination on

the basis of disability.  29 U.S.C. § 794; 24 C.F.R. §§ 8.3, 8.4, and 8.20.

214.    The ACF Defendants discriminated and continue to discriminate against people

who have mobility impairments, including those who use wheelchairs, by failing to make

reasonable accommodations to their policies, practices, or procedures that are necessary for them

to participate in and enjoy the benefits of their ACFs and ALPs.

215.    Plaintiff FHJC is a "person aggrieved" under the Rehabilitation Act, 29 U.S.C. §

794a(a)(2), and have been injured by the ACF Defendants' discriminatory conduct and has

suffered damages as a result.

216.    Plaintiff FHJC is therefore entitled to compensatory damages, injunctive relief,

and reasonable attorney's fees, including litigation expenses and costs.  29 U.S.C.A. § 794a.

### COUNT VI
Rehabilitation Act:
Discrimination based on Disability by the Village Housing Development Fund
against Jane Doe and John Doe

217.    Plaintiffs Jane Doe and John Doe repeat and reallege the foregoing paragraphs of

their complaint as though fully set forth herein.

218.    The Rehabilitation Act prohibits entities that receive federal financial assistance

from discriminating against people with disabilities. 29 U.S.C. § 794a (as amended).

219.    Plaintiff Jane Doe is a qualified individual with a disability under the

Rehabilitation Act.  29 U.S.C.A. §§ 705(20), 794

220.    The Rehabilitation Act applies to Village Housing Development Fund's programs and activities, because it receives federal financial assistance through the Medicaid program.

221.    The Rehabilitation Act requires, inter alia, that Village Housing Development Fund administers its programs in a manner that does not discriminate against people with disabilities and provides people with disabilities equal access to benefits and services.

222.    The Rehabilitation Act also prohibits Village Housing Development Fund from "utiliz[ing] criteria or methods of administration the purpose or effect of which would … [d]efeat or substantially impair the accomplishment of the objectives of the recipient's federally assisted program or activity for qualified individuals with a particular handicap …." 24 C.F.R. § 8.4(b)(4).

223.    Village Housing Development Fund discriminated and continues to discriminate against Jane Doe by refusing to retain Jane Doe as a resident and attempting to evict her from VillageCare based on her disability.

224.    Defendant Village Housing Development Fund is required to make reasonable accommodations in policies, practices, or procedures when accommodations are necessary to avoid discrimination on the basis of disability. 29 U.S.C. § 794; 24 C.F.R. §§ 8.3, 8.4, and 8.20.

225.    Village Housing Development Fund discriminated and continues to discriminate against Jane Doe, by failing to make reasonable accommodations to its policies, practices, or procedures that are necessary for Jane Doe to participate in and enjoy the benefits of its ACF and ALP.

226. Plaintiffs Jane Doe and John Doe are "persons aggrieved" under the Rehabilitation Act, 29 U.S.C. § 794a(a)(2), and have been injured by Village Housing Development Fund's discriminatory conduct and have suffered damages as a result.

227. Plaintiffs Jane Doe and John Doe are therefore entitled to compensatory damages, injunctive relief, and reasonable attorney's fees, including litigation expenses and costs. 29 U.S.C.A. § 794a.

## COUNT VII
Rehabilitation Act:
Discrimination based on Disability by the State Defendants
against all Plaintiffs

228. Plaintiffs repeat and reallege the foregoing paragraphs of their complaint as though fully set forth herein.

229. The Rehabilitation Act prohibits entities that receive federal financial assistance from discriminating against people with disabilities. 29 U.S.C. § 794a (as amended).

230. The Rehabilitation Act applies to the State Defendants' programs and activities, because they receive federal financial assistance through, inter alia, the Medicaid program.

231. The Rehabilitation Act requires, inter alia, that the State Defendants administer their programs in a manner that does not discriminate against people with disabilities and provide people with disabilities equal access to benefits and services.

232. The Rehabilitation Act also prohibits the State Defendants from "utiliz[ing] criteria or methods of administration the purpose or effect of which would … [d]efeat or substantially impair the accomplishment of the objectives of the recipient's federally assisted program or activity for qualified individuals with a particular handicap …." 24 C.F.R. § 8.4(b)(4).

233.    The State Defendants discriminated and continue to discriminate against people who have mobility impairments by refusing to allow ACFs to admit or retain residents who have mobility impairments, including those who use wheelchairs, and/or by failing to require ACFs to admit or retain residents who have mobility impairments, including those who use wheelchairs.

234.    The State Defendants also violate the Rehabilitation Act by failing to administer services to people with mobility impairments, including those who use wheelchairs, in the most integrated setting appropriate to their needs.

235.    Serving people with disabilities, including people who use wheelchairs or other mobility devices, in the ACF program would not fundamentally alter the ACF program.

236.    Plaintiffs are "persons aggrieved" under the Rehabilitation Act, 29 U.S.C. § 794a(a)(2), and have been injured by the State Defendants' discriminatory conduct and have suffered damages as a result.

237.    Plaintiffs are therefore entitled to compensatory damages, injunctive relief, and reasonable attorney's fees, including litigation expenses and costs.  29 U.S.C.A. § 794a.

### COUNT VIII
Patient Protection and Affordable Care Act:
Disability Discrimination by Adult Care Facility Defendants
Against FHJC

238.    Plaintiff FHJC repeats and realleges the foregoing paragraphs of its complaint as though fully set forth herein.

239.    Section 1557 of the ACA prohibits discrimination against people with disabilities in any health program or activity that receives any federal financial assistance.  42 U.S.C. § 18116(a) (referencing and incorporating the legal standards and enforcement mechanisms available under Section 504 of the Rehabilitation Act); 45 C.F.R. § 92.4 (definitions); 45 C.F.R. § 92.301 (enforcement mechanisms).

240.   Section 1557 applies to the ACF Defendants because they administer health programs or activities and receive federal financial assistance through the Medicaid program.  45 C.F.R. § 92.4 (defining "federal financial assistance" to include Medicaid funds and defining "health program or activity" to include a "residential or community-based treatment facility, or other similar entity").

241.   Section 1557 requires, inter alia, that the ACF Defendants administer their programs in a manner that does not discriminate against people with disabilities and provide people with disabilities equal access to benefits and services.

242.   The ACF Defendants discriminated and continue to discriminate against qualified individuals with disabilities who use wheelchairs or other mobility devices, by refusing to admit them to or retain them in their ACFs.

243.   The ACF Defendants are required to make reasonable accommodations in policies, practices, or procedures when accommodations are necessary to avoid discrimination on the basis of disability.  45 C.F.R. § 92.205.

244.   The ACF Defendants discriminated and continue to discriminate against people who have mobility impairments, including those who use wheelchairs, by failing to make reasonable accommodations to their policies, practices, or procedures that are necessary for them to participate in and enjoy the benefits of their ACFs and ALPs.

245.   Plaintiff FHJC is an "aggrieved" person under Section 1557, and has been injured by the ACF Defendants' discriminatory conduct and has suffered damages as a result.  42 U.S.C. § 18116(a); 45 C.F.R. § 92.301(a).

246.    Plaintiff FHJC is therefore entitled to compensatory damages, injunctive relief,

and reasonable attorney's fees, including litigation expenses and costs.  42 U.S.C. § 18116(a); 45

C.F.R. § 92.301(b).

### COUNT IX
Patient Protection and Affordable Care Act:
Disability Discrimination by Village Housing Development Fund
against Jane Doe and John Doe

247.    Plaintiffs Jane Doe and John Doe repeat and reallege the foregoing paragraphs of

their complaint as though fully set forth herein.

248.    Section 1557 of the ACA prohibits discrimination against people with disabilities

in any health program or activity that receives any federal financial assistance.   42 U.S.C. §

18116(a) (referencing and incorporating the legal standards and enforcement mechanisms

available under Section 504 of the Rehabilitation Act); 45 C.F.R. § 92.4 (definitions); 45 C.F.R.

§ 92.301 (enforcement mechanisms).

249.    Plaintiff Jane Doe is a qualified individual with a disability under Section 1557.

42 U.S.C. § 18116(a) (referencing and incorporating the legal standards and enforcement

mechanisms available under Section 504 of the Rehabilitation Act); 45 C.F.R. § 92.4 (definition

of "qualified individual with a disability").

250.    Section 1557 applies to Village Housing Development Fund because its health

programs or activities receive federal financial assistance through the Medicaid program.  45

C.F.R. § 92.4 (defining "federal financial assistance" to include Medicaid funds and defining

"health program or activity" to include a "residential or community-based treatment facility").

251.    Section 1557 requires, inter alia, that Village Housing Development Fund

administer its health programs and activities in a manner that does not discriminate against

people with disabilities and provide people with disabilities equal access to benefits and services.

41

252.    Defendant Village Housing Development Fund discriminated and continues to discriminate against Jane Doe by refusing to retain Jane Doe as a resident and attempting to evict her from VillageCare based on her disability.

253.    Defendant Village Housing Development Fund is required to make reasonable accommodations to its policies, practices, or procedures when accommodations are necessary to avoid discrimination on the basis of disability. 45 C.F.R. § 92.205.

254.    Defendant Village Housing Development Fund discriminated and continues to discriminate against Jane Doe by failing to make reasonable accommodations to its policies, practices, or procedures that are necessary for Jane Doe to participate in and enjoy the benefits of its ACF and ALP.

255.    Plaintiffs Jane Doe and John Doe are "aggrieved" persons under Section 1557, and have been injured by Defendant Village Housing Development Fund's discriminatory conduct and have suffered damages as a result. 42 U.S.C. § 18116(a); 45 C.F.R. § 92.301(a).

256.    Plaintiffs Jane Doe and John Doe are therefore entitled to compensatory damages, injunctive relief, and reasonable attorney's fees, including litigation expenses and costs. 42 U.S.C. § 18116(a); 45 C.F.R. § 92.301(b).

## COUNT X
### Patient Protection and Affordable Care Act:
### Disability Discrimination by State Defendants
### Against All Plaintiffs

257.    Plaintiff Jane Doe repeats and realleges the foregoing paragraphs of her complaint as though fully set forth herein.

258.    Section 1557 of the ACA prohibits discrimination against people with disabilities in any health program or activity that receives any federal financial assistance. 42 U.S.C. § 18116(a) (referencing and incorporating the legal standards and enforcement mechanisms

available under Section 504 of the Rehabilitation Act); 45 C.F.R. § 92.4 (definitions); 45 C.F.R. §92.301 (enforcement mechanisms).

259.    Section 1557 applies to the State Defendants because its health programs or activities receive federal financial assistance through, inter alia, the Medicaid program.  45 C.F.R. § 92.4 (defining "federal financial assistance" to include a State Medicaid program).

260.    State Defendants may not "utilize criteria or methods of administration the purpose or effect of which would … [d]efeat or substantially impair the accomplishment of the objectives of the recipient's federally assisted program or activity for qualified individuals with a particular handicap …." 24 C.F.R. § 8.4(b)(4); 42 U.S.C. § 18116(a) (referencing and incorporating the legal standards and enforcement mechanisms available under Section 504 of the Rehabilitation Act); 45 C.F.R. § 92.4 (definitions); 45 C.F.R. § 92.301 (enforcement mechanisms).

261.    The State Defendants discriminated and continue to discriminate against people who have mobility impairments in violation of Section 1557 by refusing to allow ACFs to admit or retain residents who have mobility impairments, including those who use wheelchairs, and/or by failing to require ACFs to admit or retain residents who have mobility impairments, including those who use wheelchairs.

262.    The State Defendants also violate Section 1557 by failing to administer services to people with mobility impairments, including those who use wheelchairs, in the most integrated setting appropriate to their needs.

263.    Serving people with disabilities, including people who use wheelchairs or other mobility devices, in the ACF program would not fundamentally alter the ACF program.

264.   Plaintiffs are "aggrieved" persons under Section 1557, and have been injured by Defendant Village Housing Development Fund's discriminatory conduct and have suffered damages as a result.  42 U.S.C. § 18116(a); 45 C.F.R. § 92.301(a).

265.   Plaintiffs are therefore entitled to compensatory damages, injunctive relief, and reasonable attorney's fees, including litigation expenses and costs.  42 U.S.C. § 18116(a); 45 C.F.R. § 92.301(b).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Defendants as follows:

(a)   Declaring that the ACF Defendants' discriminatory practices violate the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Section 1557 of the ACA, 42 U.S.C. § 18116;

(b)   Declaring that the State Defendants' discriminatory practices violate the Fair Housing Act, as amended, 42 U.S.C. § 3601 *et seq.*, Title II of the ADA, 42 U.S.C. § 12101 *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Section 1557 of the ACA, 42 U.S.C. § 18116;

(c)   Enjoining the ACF Defendants and their agents, employees, and successors, and all other persons in active concert or participation from discriminating on the basis of disability, including the following:

   (i)   Making, printing, or publishing, or causing to be made, printed, or published a notice, statement, or advertisement, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination;

      (ii)     Representing to any person that a dwelling is not available for inspection or rental when such dwelling is in fact so available;

      (iii)    Denying or withholding housing or otherwise making housing unavailable;

      (iv)    Discriminating in the terms, conditions, or privileges of rental;

      (v)     Refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford equal opportunity to use and enjoy a dwelling;

      (vi)    Refusing to administer their programs in a manner that does not discriminate against people with disabilities;

      (vii)   Refusing to administer their programs in a manner that provides people with disabilities equal access to benefits and services; and

      (viii)  Using criteria or methods of administration the purpose or effect of which would defeat or substantially impair the accomplishment of the objectives of their federally assisted program or activity for qualified individuals with a particular handicap.

(d)    Enjoining the ACF Defendants and their agents, employees, and successors, and all other persons in active concert or participation to take all affirmative steps necessary to remedy the effects of the illegal discriminatory conduct alleged in this Complaint and to prevent repeated occurrences in the future. Such affirmative steps should include, but are not limited to, the following:

(i)     Make all necessary modifications to their policies, practices, and procedures to comply with the Fair Housing Act, the Rehabilitation Act, and Section 1557 of the ACA;

(ii)    Eliminate the use of a "no wheelchair" policy;

(iii)   Develop appropriate criteria for pre-admission screening of ACF residents based solely on resident suitability factors (e.g., level of needed assistance with activities of daily living);

(iv)    Develop appropriate, non-discriminatory procedures for readmission of ACF residents who already have admission agreements;

(v)     Adopt a non-discrimination policy prohibiting discrimination based on disability, and in particular the use of wheelchairs and other mobility devices;

(vi)    Refrain from inquiring about a potential resident's use of a wheelchair during the application process;

(vii)   Train all management, agents, and employees on the Fair Housing Act, the Rehabilitation Act, and Section 1557 of the ACA;

(viii)  Advertise apartments and rooms available for rent and/or other available placements in a non-discriminatory manner, including displaying an Equal Housing Opportunity logo (or statement to that effect) on all print and internet advertisements and displaying in all offices and rental buildings appropriate fair housing law posters;

(ix)    Use human models on websites and in other marketing materials that depict residents with mobility impairments, including residents who use wheelchairs;

(x)    Allow monitoring of their application and rental process;

(xi)    Retain advertising and rental records to allow for appropriate monitoring;

(xii)    Develop written procedures on rental process and fair housing policy to be distributed to all employees, agents, tenants, and rental applicants; and

(xiii)    Establish a system for testing agents and employees for unlawful discriminatory practices;

(e)    Enjoining Defendant Village Housing Development Fund to restore Plaintiff Jane Doe to her apartment at VillageCare and resume providing all services, including those under the assisted living program;

(f)    Enjoining the State Defendants from discriminating on the basis of disability, including the following:

(i)    Making, printing, or publishing, or causing to be made, printed, or published a notice, statement, or advertisement, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination.

(ii)    Denying or withholding housing or otherwise making housing unavailable;

(iii)    Discriminating in the terms, conditions, or privileges of rental;

47

> (iv)   Excluding people with disabilities from participation in or denying them the benefits of the ACF program;
>
> (v)    Utilizing criteria or methods of administration that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;
>
> (vi)   Failing to administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities;
>
> (ix)   Refusing to administer their programs in a manner that does not discriminate against people with disabilities;
>
> (x)    Refusing to administer their programs in a manner that provides people with disabilities equal access to benefits and services; and
>
> (xi)   Using criteria or methods of administration the purpose or effect of which would defeat or substantially impair the accomplishment of the objectives of their federally assisted program or activity for qualified individuals with a particular handicap.

(g)   Enjoining the State Defendants to take all affirmative steps necessary to remedy the effects of the unlawful conduct alleged in this Complaint, including steps to ensure that nondiscriminatory application and screening processes occur, to prevent repeated occurrences in the future, and to require full compliance with the Fair Housing Act, the ADA, the Rehabilitation Act, and Section 1557 of the ACA.  Such affirmative steps should include, but are not limited to, the following:

(i)     Make all necessary modifications to their regulations, policies, practices, and procedures to comply with the Fair Housing Act, the ADA, the Rehabilitation Act, and Section 1557 of the ACA;

(ii)    Eliminate all language in ACF program-related policies and procedures that states or suggests that persons should or may be excluded from an ACF based on their mobility impairment alone, namely the use of a wheelchair or other mobility device;

(iii)   Adopt an appropriate nondiscrimination statement applicable to the ACF program;

(iv)    Train all the State Defendants' officials, personnel, and employees on the Fair Housing Act, the ADA,  the Rehabilitation Act, and Section 1557 of the ACA;

(v)     Provide guidance, oversight and training to ensure that ACFs comply with the Fair Housing Act, the Rehabilitation Act, and Section 1557 of the ACA when participating in or administering State programs, including conducting pre-admission and readmission screening, offering reasonable accommodations, and fielding reasonable accommodation requests; and

(vi)    Report on and allow monitoring of their affirmative activities to remedy unlawful conduct; and

(vii)   Retain records to allow for appropriate monitoring.

(h)     Awarding such damages to Plaintiff FHJC as will fully compensate for the diversion of resources and frustration of mission caused by the ACF Defendants' and the State Defendants' unlawful practices;

(i)     Awarding such damages to Plaintiff Jane Doe as will fully compensate her for her

loss of civil rights, and other damages, including personal injury, emotional

distress, and humiliation caused by Defendant Village Housing Development

Fund's and the State Defendants' unlawful practices;

(j)     Awarding such damages to Plaintiff John Doe as will fully compensate him for

his financial losses, and other damages caused by Defendant Village Housing

Development Fund's and the State Defendants' unlawful practices;

(k)     Awarding punitive damages to Plaintiffs;

(l)     Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses incurred in

prosecuting this action;

(m)    Granting Plaintiffs such other further relief as may be just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial on the merits by jury pursuant to Fed. R. Civ. P. 38.

Dated:  New York, New York
        April 11, 2018

                                              Respectfully submitted,

                                              Jon Borgmann, Esq. (JB-1227), of counsel to
                                              Jeanette Zelhof, Esq.
                                              Tanya Kessler (TK-0940)
                                              Kevin Cremin (KC-4319)
                                              MOBILIZATION FOR JUSTICE, INC.
                                              100 William Street, 6th Floor
                                              New York, New York 10038
                                              (212) 417-3717
                                              jborgmann@mfjlegal.org

                                              Susan Ann Silverstein, *SDNY admission pending*
                                              AARP FOUNDATION LITIGATION, INC.
                                              601 E Street NW
                                              Washington, DC 20049
                                              (202) 434-2159
                                              ssilverstein@aarp.org

                                              Attorneys for Plaintiffs