USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/24/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                                                  :
FAIR HOUSING JUSTICE CENTER, INC.,   :
JANE DOE and JOHN DOE,                    :
                                                  :
                                                  :
                            Plaintiffs,          :          18-CV-3196 (VSB)
                                                  :
                                                  :          **OPINION & ORDER**
           - against -                          :
                                                  :
                                                  :
ANDREW M. CUOMO, in his official      :
capacity as Governor of the State of New  :
York, HOWARD A. ZUCKER, in his official :
capacity as Commissioner of the New York :
State Department of Health, THE NEW YORK :
STATE DEPARTMENT OF HEALTH, ELM :
YORK LLC, MADISON YORK ASSISTED :
LIVING COMMUNITY, LLC, MADISON :
YORK REGO PARK LLC, and VILLAGE :
HOUSING DEVELOPMENT FUND           :
CORPORATION,                                 :
                                                  :
                            Defendants.        :
                                                  :
---------------------------------------------------------X

Appearances:

Jota L. Borgmann
Kevin M. Cremin
Tanya Kesler
Mobilization for Justice
New York, New York
*Counsel for Plaintiff*

Susan A. Silverstein
Iris Y. Gonzalez
AARP Foundation
Washington, DC
*Counsel for Plaintiff*

David T. Luntz
Hinman Straub, P.C.
Albany, NY
*Counsel for Defendant*
*Village Housing Development Fund Corporation*

VERNON S. BRODERICK, United States District Judge:

Before me is Plaintiff Jane Doe's Motion for a Preliminary Injunction seeking: (1) to

prohibit Defendant Village Housing Development Fund Corporation ("Village Housing") from

preventing Plaintiff from returning to her apartment unless and until a warrant of eviction is

issued by a New York City court and executed by a New York City marshal; and (2) to direct

Village Housing to reenroll her in its Assisted Living Program and provide services pursuant to

the relevant New York City Code sections. For the reasons stated below, Plaintiff's preliminary

injunction motion is GRANTED IN PART and DENIED IN PART.

## I. Background[1]

### A. *VillageCare*

Village Housing operates VillageCare at 46 & Ten ("VillageCare"), which is an adult

care facility ("ACF"). (*See* Freeland Aff. ¶ 1.)[2] ACFs were established by statute in New York

to provide housing and services to people who, due to age or disability, are unable to live

independently. ACFs come in one of two forms: Adult Homes or Enriched Housing Programs.

*See* N.Y. Comp. Codes R. & Regs. ("NYCCRR") tit. 18, Parts 487, 488. VillageCare is an

Enriched Housing Program. (Freeland Aff. ¶ 1.) Enriched Housing Programs provide long-term

residential care to adults over sixty-five in community-integrated settings resembling

---

[1] The background section is based upon testimony during the evidentiary hearing and the various declarations and exhibits submitted by the parties, including those submitted for the evidentiary hearing.

[2] "Freeland Aff." refers to the Affidavit in Opposition of Sandy Freeland, filed May 29, 2018. (Doc. 60.)

independent housing units. NYCCRR tit. 18, § 488.2(a).

Village Housing also operates an assisted living program ("ALP") within VillageCare.[3] (Freeland Aff. ¶ 1.) ALPs are Medicaid-reimbursed programs that provide a greater level of services than pure Enriched Housing Programs, and are intended to serve people who would otherwise require placement in a nursing home. ALPs are required to provide or arrange to provide "personal care services . . . home health aide services; personal emergency response services; nursing services; physical therapy; occupational therapy; speech therapy; medical supplies and equipment not requiring prior authorization; and adult day health care." NYCCRR tit. 18, § 494.5(b). A person is eligible for an ALP if he or she requires more care or services than can be directly provided by an ACF; is eligible for a nursing home, but can be appropriately cared for at an ALP; and has a stable medical condition and is able, with direction, to take action sufficient to assure self-preservation in an emergency. See N.Y. Soc. Serv. Law § 461-1(1)(d).

One of the assessment tools VillageCare uses to determine eligibility is called a Uniform Assessment System evaluation ("UAS"). (See Freeland Direct Aff. ¶ 15.)[4] The UAS is intended to be an independent evaluation of whether an individual meets general eligibility criteria for a particular program or level of care. (Moroz Direct Aff. ¶ 2.)[5] It typically includes an in-person assessment lasting between one-and-a-half to three hours. (Id.) The results of the assessment are used to calculate a Nursing Facility Level of Care ("NFLOC") score. (Id.) According to Sandy

---

[3] VillageCare contains one hundred beds, eighty of which are dedicated to residents enrolled in the ALP. (Freeland Aff. ¶ 7.) All of the apartments at VillageCare are located on the third floor or higher. (Id. ¶ 8.)

[4] "Freeland Direct Aff." refers to the Affidavit of Sandy Freeland for Evidentiary Hearing on Plaintiff's Motion for a Preliminary Injunction, filed July 3, 2018, and submitted in redacted form. (Doc. 98-4.) An unredacted version of this document was filed under seal.

[5] "Moroz Direct Aff." refers to the Affidavit of Maya Moroz for Evidentiary Hearing on Plaintiff's Motion for a Preliminary Injunction, filed July 3, 2018, and submitted in redacted form. (Doc. 98-6.) An unredacted version of this document was filed under seal.

Freeland—the Vice President of Program Operations and the Administrator of Village Housing—the "primary purpose [of the UAS] is to determine whether the individual has an NFLOC score of at least 5 and is, thus, potentially eligible for an ALP [because] an NFLOC of 5 or more indicates nursing home eligibility." (Freeland Direct Aff. ¶ 15; *see also* Ex. D11.)[6] VillageCare considers an NFLOC score of above 15 "as an indicator that the extent of an applicant's physical, supervisory and psycho-social needs cannot be safely met in the VillageCare ALP." (Freeland Direct Aff. ¶ 21.) The average NFLOC score of current VillageCare residents is 9.17, and the highest NFLOC score of any current resident is 14. (Tr. 268:18-24.)[7]

All of VillageCare's current residents qualify for placement in a nursing home. As such, all residents have physical or mental conditions that require some degree of assistance with activities of daily living, such as bathing, dressing, and grooming. (Charles Direct Aff. ¶ 10.)[8] In addition, they have intermittent nursing and other skilled needs, which are provided through a contractor. (*Id.*) Some residents use wheelchairs and rollators, (*id.*), but the three residents who currently use wheelchairs use them for convenience, such as for attending appointments outside of the facility or outings with family, (Freeland Direct Aff. ¶¶ 31–32). However, VillageCare does not admit individuals who require continual contact assistance with ambulation, and none of VillageCare's current residents rely on wheelchairs for ambulation. (Freeland Direct Aff. ¶¶ 13–

---

[6] Exhibits marked "D" indicate Defendant's exhibits entered into evidence during the evidentiary hearing and filed on the docket in redacted form on August 3, 2018. (Doc. 118.) Unredacted version of these documents were filed under seal.

[7] "Tr." refers to the transcript for the evidentiary hearing on Plaintiff's preliminary injunction motion, held over the span of three days on July 10, 17, and 23.

[8] "Charles Direct Aff." refers to the Affidavit of Peter Charles for Evidentiary Hearing on Plaintiff's Motion for a Preliminary Injunction, filed July 3, 2018, and submitted in redacted form. (Doc. 98-5.) An unredacted version of this document was filed under seal.

14, 30, 32, 33.) In addition, no current residents require continual assistance with all activities of daily living, nor are they under a plan of care that involves contact guard assistance, a toileting schedule, or nighttime services while in bed. (Charles Direct Aff. ¶ 10; Tr. 262:1-10, 264:13-265:15.) According to Freeland, VillageCare is not equipped to provide continual assistance with ambulation or toileting. (Freeland Direct Aff. ¶ 29.)

Each day, VillageCare has approximately five personal care aides on site between 7:00 a.m. and 3:00 p.m., three personal care aides on site between 3:00 p.m. and 11:00 p.m., and two personal care aides on site between 11:00 p.m. and 7:00 a.m. (Id.) This staffing model allows residents to receive, on average, between two and four hours of personal care services per day, (id.), though some residents receive less than two hours and some receive more than four hours, (Tr. 191:19-192:5).[9] Nursing services are available on an intermittent basis through a contracted certified home health agency. (Freeland Direct Aff. ¶ 29.)

The eligibility requirements for admission to the VillageCare ALP include being able, with direction, to self-preserve in the case of an emergency. (Id. ¶ 13; see also Ex. D2.) According to VillageCare's Disaster and Emergency Plan (the "Plan"), all current residents are classified as "Ambulatory," which includes individuals who use rollators to ambulate. (Exs. D5, D6; Tr. 303:14-18.) No current residents are considered chronically chairfast. (Tr. 199:5-10.) Several residents require "supervision" during an evacuation, which means that VillageCare staff must be present with the resident during an evacuation—including on the stairs—to assist the

---

[9] Assuming eighty residents require an average of just two hours per day of personal care, VillageCare ALP residents would require a total of 160 hours of aide time per day. However, there are only a total of ten aides in a twenty-four hour period. Assuming the VillageCare ALP operates at full capacity, each aide would have to work sixteen hours. This is inconsistent with Freeland's testimony that each aide works an eight hour shift. (Freeland Direct Aff. ¶ 29.) I am unable to resolve this issue based upon the record before me and therefore do not make a specific finding, but it suggests one or more of the following: (1) that Freeland's estimates are incorrect; (2) that VillageCare is not operating at full capacity; (3) that multiple residents may receive personal care by an individual aide simultaneously; and/or (4) that each aide is working at more than maximum capacity.

5

resident and ensure that the resident does not fall. (Exs. D5, D6; Tr. 304:15-305:2, 312:17-22.)

Freeland testified that the way VillageCare determines whether a resident can self-preserve during an emergency is whether she can safely go down two flights of stairs "without someone having to be with her at all times, directing her, [and] telling her, 'Hold on to the railings, step down, go down.'" (Tr. 300:13-301:11.) Charles testified that the Plan provides that residents are evacuated using emergency slides on the stairs or elevators, which has been approved by the fire department. (Tr. 77:18-78:5.) Freeland testified that the fire department has not pre-approved use of the elevators to evacuate, but rather that the fire department would determine whether elevator use was appropriate on a case-by-case basis during the emergency. (Tr. 299:11-300:12.)

### B. *Jane Doe's Admission to and Stay at VillageCare*

After submitting an application and participating in a thirty minute interview and assessment, (John Doe Direct Aff. ¶ 41),[10] Plaintiff was admitted to VillageCare's ALP in 2012 and occupied a third-floor apartment at VillageCare through April 2017, (*id.* ¶¶ 6–7). At the time of her admission, Jane Doe had "difficulty walking [and] urinary incontinence" and needed assistance with some activities of daily living, "including stairs [and] bathing." (Ex. D7, at 11–12.) However, she was able to perform many tasks mostly independently, including ambulating, transferring, toileting, dressing, and grooming. (*Id.* at 38–42.) Jane Doe did not utilize a wheelchair at the time that she was admitted, or at any time that she resided at VillageCare. (*Id.*; John Doe Direct Aff. ¶¶ 21, 23.)

While she lived at VillageCare, Plaintiff decorated her apartment with her personal

---

[10] "John Doe Direct Aff." refers to the Affidavit of Direct Testimony by John Doe in Support of Motion for Preliminary Injunction, filed July 3, 2018, and submitted in redacted form. (Doc. 98-3.) An unredacted version of this document was filed under seal.

belongings, hosted visitors in her apartment, read books and newspapers, and engaged in social and cultural activities with the other residents at VillageCare. (John Doe Direct Aff. ¶¶ 10–15.) She was well-liked by VillageCare staff and administration, (Freeland Direct Aff. ¶ 3), and she had an active social life that revolved around her family and friends, (John Doe Direct Aff. ¶ 10).

VillageCare performed periodic medical and mental evaluations of Plaintiff while she lived at VillageCare. A July 27, 2012 Patient Review Instrument ("PRI") indicated that Jane Doe required "intermittent supervision" with eating, mobility, and transferring—including requiring verbal cueing and physical assistance with difficult maneuvers such as stairs. (Ex. D7, at 86.) Similarly, an October 15, 2013 medical evaluation indicated that Jane Doe "need[ed] assistance grooming, bathing, showering, with laundry, shopping, transportation, toileting, and food prep." (*Id.* at 51.) Jane Doe experienced falls on multiple occasions while residing at VillageCare, at least in part due to a gait abnormality, which required Jane Doe to receive physical and occupational therapy. (*See id.* at 50, 51, 158, 161, 178.)

Beginning in approximately 2014, VillageCare also performed periodic UAS assessments of Jane Doe. (*See* Freeland Direct Aff. ¶ 22; Ex. D7, at 91–105.) Jane Doe received an NFLOC score of below 14 on each of her evaluations through March 2017. (Freeland Direct Aff. ¶ 22.) Jane Doe's July 12, 2014 UAS indicated that Jane Doe's cognitive skills for daily decision-making were "[i]ndependent," that her "[d]ecisions [were] consistent, reasonable and safe," and that her short-term memory and procedural memory were "OK." (Ex. D7, at 91.) With respect to her physical capabilities, the UAS indicated that Plaintiff needed "[m]aximal assistance"[11]

---

[11] "Maximal assistance" indicates that an individual needs "[h]elp throughout [the] task, but performs less than 50% of the task on [her] own." (Ex. D7, at 91.)

with managing a full flight of stairs; "[l]imited assistance"[12] with bathing; "supervision"[13] with dressing her upper and lower body; and "[n]o physical assistance" with locomotion, transferring to the toilet, or using the toilet. (*Id.* at 91–92.) It also noted that she was incontinent of bladder with "no control present." (*Id.* at 92.) Jane Doe received an NFLOC score of 10 on her July 12, 2014 UAS. (*Id.*) Jane Doe's August 8, 2016 UAS was substantially the same, except it did not evaluate her ability to manage stairs, and Jane Doe now required "[e]xtensive assistance"[14] with bathing and "[l]imited assistance" with dressing her upper and lower body. (*Id.* at 101.) Jane Doe received an NFLOC score of 11 on her August 8, 2016 UAS. (*Id.*) Jane Doe's January 21, 2017 UAS was also substantially the same, except she now also needed "[e]xtensive assistance" with dressing her upper and lower body. (*Id.* at 103.) She received an NFLOC score of 11 on this assessment. Finally, Jane Doe's March 27, 2017 UAS was substantially the same, except she was now "[i]nfrequently incontinent" of bowel.[15] (*Id.* at 106.) She received an NFLOC score of 13 on this assessment.

Beginning in the second half of 2016, Jane Doe's health began to decline. She suffered several falls from approximately June 2016 through March 2017. (Freeland Direct Aff. ¶¶ 23–25; *see also* Ex. D7, at 64, 208, 209.) She also exhibited signs of cognitive decline, her incontinence issues worsened, and she lost a significant amount of weight. (Freeland Direct Aff. ¶¶ 26–27; Ex. D7, at 203–12.) Jane Doe's declining health occurred following the loss of her

---

[12] "Limited assistance" indicates that an individual needs "[g]uided maneuvering of limbs, [and] physical guidance without taking weight." (Ex. D7, at 91.)

[13] "Supervision" indicates that an individual needs "[o]versight/cueing." (Ex. D7, at 91.)

[14] "Extensive assistance" indicates that an individual needs "[w]eight-bearing support (including lifting limbs) by 1 helper where [the] person still performs 50% or more of subtasks." (Ex. D7, at 101.)

[15] "Infrequently incontinent" is defined as "[n]ot incontinent over [the] last 3 days, but does have incontinent episodes." (Ex. D7, at 106.) This likely refers to two episodes of bowel incontinence in February and March 2017 while Jane Doe was using stool softeners. (*Id.* at 212–13.)

mother in _____ which had a significant emotional impact on Jane Doe. (Ex. D7, at 203, 211.) Jane Doe was diagnosed with depression for the first time in July 2016. (*See id.* at 77.) In January 2017, Jane Doe began taking Ensure, a nutritional supplement, to address her weight loss, after which she reported feeling stronger. (*Id.* at 211–12.) She did not suffer another fall until March 4, 2017, when she slipped in the shower with an aide. (*Id.* at 209–14.) She fell again on March 28, 2017, days before she was hospitalized for treatment of a urinary tract infection. (*Id.* at 215.)

### C. *Jane Doe's April 2017 Hospitalization*

On April 1, 2017, Jane Doe was hospitalized due to complications from a urinary tract infection. (John Doe Direct Aff. ¶¶ 21–22; Freeland Direct Aff. ¶¶ 27–28.) After spending several days in a hospital bed, Jane Doe had difficulty walking and was discharged to ████ ███████████████████████████████████ a nursing home for temporary rehabilitation. (John Doe Direct Aff. ¶ 23; Freeland Direct Aff. ¶ 28.) As part of her rehabilitation, Plaintiff began using a wheelchair for mobility. (John Doe Direct Aff. ¶ 23.) Plaintiff now uses both a rollator and a wheelchair to get around. (*Id.*) Plaintiff completed her rehabilitation and wants to return to her apartment and the ALP at VillageCare. (Jane Doe Decl. ¶ 7.)[16]

### D. *The June 2017 Assessment and Notice of Termination*

In June 2017, while she was still in rehabilitation, Jane Doe underwent a medical evaluation by ███████ and a visual assessment by VillageCare. (Freeland Direct Aff. ¶ 39.) The nurse performing the visual assessment noted that Jane Doe was initially observed sitting in

---

[16] "Jane Doe Decl." refers to the Declaration of Jane Doe in Support of Plaintiff's Motion for a Preliminary Injunction, filed May 18, 2018, and submitted in redacted form. (Doc. 48.) An unredacted version of this document was filed under seal.

a wheelchair. (Ex. D7, at 218.) He also noted that Jane Doe could "independently transfer from chair to walker (with supervision)," had an "unsteady gait and almost fell as she was just standing," and "was able to slowly ambulate (with supervision and on/off contact guard)." (*Id.*) The nurse did not note that Plaintiff had any skilled nursing needs. (*Id.*)

Based on the evaluation and visual assessment, Village Housing determined that Plaintiff required "supervision and/or assistance with ambulation, transferring, dressing, grooming, toileting and bathing," which VillageCare's ALP was not equipped to provide. (Ex. P2; *see also* Freeland Direct Aff. ¶ 38.)[17] Around the same time, a VillageCare staff member informed John Doe, Jane Doe's brother who had power-of-attorney for his sister, that Plaintiff was not mobile enough to continue living at VillageCare. (John Doe Direct Aff. ¶¶ 3, 24.) Village Housing thereafter issued a Notice of Termination to Plaintiff. (Ex. P2; Freeland Aff. ¶¶ 27–29.) Freeland testified that the fact that Jane Doe could not ambulate without continuous use of a wheelchair was a factor in VillageCare's decision to terminate her admission. (Tr. 311:12-20.)

John Doe submitted a written appeal of the Notice of Termination on Jane Doe's behalf in July 2017. (Ex. P3; John Doe Direct Aff. ¶ 27.) VillageCare denied Jane Doe's appeal on August 11, 2017, and informed her that she would have to reapply for admission if she wanted to return to the ALP. (Exs. P4, P5.) On August 18, 2017, Village Housing commenced an eviction proceeding in New York City Housing Court to terminate Plaintiff's admission to VillageCare. (*See* Ex. P6.) Village Housing's petition was dismissed without prejudice due to a service defect on May 22, 2018. (Ex. P8.)

---

[17] Exhibits marked "P" indicate Plaintiff's exhibits entered into evidence during the evidentiary hearing and filed on the docket in redacted form on August 3, 2018. (Doc. 118.) Unredacted version of these documents were filed under seal.

### E.    *Jane Doe's Application for Readmission and Reevaluation*

Jane Doe submitted an application for readmission to VillageCare in October 2017 with

the help of John Doe and the staff at ███████[18] (John Doe Direct Aff. ¶ 31.) Jane Doe's

application included medical and mental health evaluations performed by physicians at

███████ as well as physical and occupational therapy notes. (Ex. P7.) Jane Doe's physical

therapy notes indicated that she could ambulate 125 feet with contact guard assistance, an

improvement from 15 feet less than two months earlier. (*Id.* at 46.)[19] Her medical evaluation,

performed on October 19, 2017, indicated that Plaintiff needed "constant" supervision and/or

assistance with bathing, grooming, and dressing; "intermittent" supervision and/or assistance

with transferring, ambulation, and toileting; and no assistance with eating.[20] (Ex. P7, at 41.) The

physician performing the medical evaluation certified that Plaintiff was "medically appropriate

to be cared for in an Adult Home, Enriched Housing Program or an ALP." (*Id.*) In addition, a

psychologist at ███████ certified that Plaintiff was "mentally suited for care" at VillageCare.

(*Id.* at 30.)

Peter Charles, a nurse manager at VillageCare, reviewed the evaluations and therapy

notes submitted by Jane Doe. (Charles Direct Aff. ¶ 4.) Charles also reviewed a November 29,

2017 medical evaluation of Plaintiff. (*Id.* ¶ 8.) The November 29 medical evaluation was

substantially identical to the October 19 medical evaluation, noting the same levels of

---

[18] Plaintiff also submitted an application to another nursing home, which rejected her because they did not have beds available, and because she was too high functioning. (John Doe Direct Aff. ¶ 34.)

[19] Plaintiff's Village Care application begins on page 28 of 54, with page numbers in the upper right hand corner. (*See generally* Ex. P7.) Citations to her application reference those page numbers.

[20] The medical evaluation indicated that Plaintiff did not need a 24/7 toileting program to maintain continence. Contrary to Charles's testimony, (Charles Direct Aff. ¶ 5), the medical evaluation indicated that Plaintiff needed "intermittent" assistance with toileting, rather than "continual," (Ex. D7, at 231).

supervision and/or assistance Plaintiff required for various activities and again including a physician's certification that Plaintiff was "medically appropriate to be cared for in an Adult Home, Enriched Housing Program or an ALP." (Tr. 69:9-16; Ex. D7, at 247–48.) A mental health evaluation of Plaintiff performed by a psychologist on December 5, 2017 similarly indicated that she was "mentally suited for care" at VillageCare.[21] (Ex. D7, at 250.)

As part of his assessment, Charles also performed a nursing assessment of Plaintiff at ████████ on October 24, 2017. (Charles Direct Aff. ¶ 4.) When Charles first walked into the facility, he observed Plaintiff sitting in a wheelchair. (Tr. 67:16-19.) During the assessment, Charles requested a rolling walker to assess Plaintiff's ability to ambulate without contact guard assistance. (Charles Direct Aff. ¶ 4.) Charles observed that Plaintiff needed verbal reminders on how to stand up properly, could only ambulate about two feet before becoming unsteady, and required continuous assistance throughout the assessment. (Id.)

On December 22, 2017, Plaintiff appeared at VillageCare for a screening and assessment to determine whether VillageCare could meet her needs. (Freeland Aff. ¶ 35.) Plaintiff was first interviewed for over an hour by three staff members of VillageCare, including Charles and Freeland. (John Doe Direct Aff. ¶ 37.) The staff members observed Plaintiff enter the building and ambulate about eighty feet using her rollator. (Id.; Charles Direct Aff. ¶ 6; Ex. D7, at 227.) Charles testified that Plaintiff needed constant cuing when transferring from standing to sitting and required Charles's assistance to sit, (Charles Direct Aff. ¶ 6), but the VillageCare case notes entered by the social worker indicated that Plaintiff "was able to transfer from a chair to her rollator during the screening," (Ex. D7, at 227). Charles also testified that Plaintiff would

---

[21] It should be noted that none of these evaluations indicated an awareness of the level of care provided by the VillageCare ALP, and the parties do not explain or point to evidence in the record concerning whether these evaluations are specific to the VillageCare ALP or to ALPs in general. Therefore, I am unable to resolve this issue based upon the record before me and do not make a specific finding.

occasionally veer towards the wall on her right side while using the rollator. (Charles Direct Aff. ¶ 6.) John Doe testified that the rollator was defective, and that the VillageCare staff members commented on the fact that it was defective. (John Doe Direct Aff. ¶¶ 37, 44.) On cross examination, Charles testified that that the rollator was not defective, but he admitted that he had not checked it for defects. (Tr. 73:22-74:4.)

After being interviewed by VillageCare's staff, Plaintiff participated in a UAS assessment conducted by Maya Moroz, a registered nurse for ANR Staffing Solutions, an independent organization unaffiliated with VillageCare.[22] (Moroz Direct Aff. ¶ 1.) Moroz testified that it was difficult to communicate with Plaintiff due to her impaired cognitive capabilities. (*Id.* ¶ 4.) Moroz had to constantly repeat and explain questions and cue Jane Doe. (*Id.*) Moroz observed that Jane Doe "appeared extremely frail and weak, and had very little strength in her arms and legs." (*Id.*) Moroz observed that Jane Doe was determined to walk using her rollator, but because one of Jane Doe's legs dragged behind her, she almost tripped and fell several times. (*Id.*) Moroz also testified that John Doe was present at the assessment and implored Moroz to repeat aspects of the assessment so Jane Doe could complete the tasks. (*Id.* ¶ 5.) John Doe testified that Moroz's "questions [to Jane Doe] seemed like rapid cross examination." (John Doe Direct Aff. ¶ 38.) Moroz testified that she gave Jane Doe additional opportunities to respond to questions. (Tr. 60:15-23; Moroz Direct Aff. ¶ 4). The UAS took between two-and-a-half to three hours, (Moroz Direct Aff. ¶ 5), and together with the interview, Jane Doe was at VillageCare for about four hours, (John Doe Direct Aff. ¶ 39). According to John Doe, the assessment was "grueling" and "designed to result in failure." (*Id.* ¶¶ 39, 40.) However, there is no evidence in the record that Moroz altered how she conducted her interview

---

[22] Moroz was not present for the interview of Plaintiff by the VillageCare staff members. (Tr. 225-6-11.)

or evaluation of Jane Doe from what she typically does in connection with UAS evaluations. (*See* Tr. 55:10-17.)

Plaintiff received an NFLOC score of 25 on the December 22, 2017 UAS assessment. (Ex. P10, at 20.) With respect to her cognitive capabilities, the UAS indicated that Plaintiff's cognitive skills for daily decision-making were "[m]oderately impaired," that her "[d]ecisions [were] consistently poor or unsafe," that she needed "cues/supervision . . . at all times," that her short-term memory was "OK," and that she had a "[m]emory [p]roblem" with her procedural memory. (*Id.* at 2.) She was usually able to make others understand her and usually understood others. (*Id.*) With respect to her physical capabilities, the UAS assessment indicated that Plaintiff needed "[m]aximal assistance" with managing stairs, "[e]xtensive assistance" with bathing, "[l]imited assistance" with dressing her upper body, "[e]xtensive assistance" with dressing her lower body, "[e]xtensive assistance" with walking, "[e]xtensive assistance" with locomotion, "[e]xtensive assistance" with transferring onto and off of the toilet, and "[e]xtensive assistance" with using the toilet. (*Id.* at 5.) The UAS noted that Plaintiff's primary mode of locomotion indoors was walking using assistive devices, and using a wheelchair. (*Id.* at 6.) The UAS also noted that Plaintiff "[a]mbulates using rollator with a slow and very unsteady gait," that she was "[n]ot able to stand on her own [without] holding to a rollator," and that she "[r]equires extensive human assistance to ambulate indoor[s]." (*Id.*) Finally, Plaintiff was described as having "[n]o control present" over her bladder continence and as being "[i]nfrequently incontinent" as to her bowel. (*Id.*) Nevertheless, the UAS assessment indicated that it was not the case that "[a]dequate informal supports for assistance and/or emergency back-up are not available [or that Jane Doe] cannot be left alone." (Ex. D7, at 131.)

At the end of the in-person assessment, Moroz discussed placement options with Jane and

John Doe and recommended that Plaintiff be placed in an ALP. (Moroz Direct Aff. ¶ 6; Ex. P8, at 20.) Moroz claims that her understanding was that she was only supposed to identify placement options in which the individual expressed interest. (Moroz Direct Aff. ¶ 6.) Because Jane and John Doe only expressed interest in an ALP, that was the only option Moroz recommended. (*Id.*; Tr. 55:18-56:4.) On cross examination, Moroz testified that her recommendation was wrong, and that Plaintiff was not appropriate for placement in an ALP at that time. (Tr. 54:14-23.) In Moroz's opinion, two to four hours of personal care would not be sufficient to care for Jane Doe. (Tr. 62:1-3.) Moroz believed Plaintiff might become appropriate for ALP placement in the future after additional physical therapy. (Tr. 54:24-55:9.) Ultimately, Moroz was not responsible for making eligibility determinations for any of the placement options listed on the UAS. (Moroz Direct Aff. ¶ 6.)

Based on the UAS, VillageCare's in-person interview and assessment, and the medical and mental evaluations, Village Housing declined to readmit Jane Doe. (*See* Freeland Aff. ¶ 42.) The decision to decline Jane Doe readmission was made by Freeland, Charles, and a social worker who participated in the interview of Jane Doe on December 22, 2017. (Tr. 284:4-25.) Charles and Freeland testified that, based on the assessments of Jane Doe and her medical evaluations and therapy notes,[23] Jane Doe required more care and services than VillageCare could provide. (Charles Direct Aff. ¶ 9; Tr. 284:16-25.) Freeland testified that providing for Jane Doe's medical needs would require VillageCare to provide a one-on-one companion for all or most of the day. (Freeland Direct Aff. ¶ 57.) According to Freeland, because VillageCare did not provide such services, VillageCare would have had to hire additional staff and modify the

---

[23] Freeland testified that when reviewing an application for admission, she does not review the UAS form, but rather reviews only the applicant's NFLOC score. (Tr. 218:20-219:25.)

nature and extent of the services it offers in order to accommodate Jane Doe. (*Id.* ¶ 58.)

F. *The March 2018 UAS*

Jane Doe participated in another UAS on March 9, 2018, performed by Eunice Hsu. (*See* Charles Aff. ¶ 12; Ex. D8.) Plaintiff received an NFLOC score of 29 on that UAS. (Charles Aff. ¶ 12; Ex. D8.) The evaluation results were substantially the same as her December 22, 2017 UAS, except that Jane Doe now had a "[m]emory [p]roblem" with her short-term memory and required "[m]aximal assistance" with bathing, "[e]xtensive assistance" with dressing her upper body, "[m]aximal assistance" with dressing her lower body, "[m]aximal assistance" with locomotion, "[m]aximal assistance" with transferring onto and off of the toilet, and "[m]aximal assistance" with using the toilet. (Ex. D8, at 2, 5.) In addition, the UAS noted that Plaintiff's primary mode of locomotion indoors was using a wheelchair. (*Id.* at 11, 12.)

The nurse performing the UAS recommended placement in a Managed Long Term Care program ("MLTC"). (*Id.* at 21.) A MLTC provides long-term care services to Medicaid-eligible individuals at home in order to assist them in remaining in the community. (Deetz Decl. ¶ 19.)[24] A MLTC may provide services up to and including 24-hour home health aide services. (Def.'s Opp. 8.)[25] According to Freeland, residents in VillageCare's Enriched Housing Program—which constitutes nine of the one hundred beds at VillageCare—can receive home and personal care services through a MLTC, as long as they are not participants in the ALP. (Tr. 242:11-24.) VillageCare offered Jane Doe the opportunity to be reassessed for the ALP, (Tr. 243:20-244:6), but there is nothing in the record indicating that Plaintiff was offered the opportunity to return to her apartment and participate in a MLTC, or to be reassessed for a MLTC. The DOH is

---

[24] "Deetz Decl." refers to the Declaration of Valerie Deetz, filed May 29, 2018. (Doc. 62.)

[25] "Def.'s Opp." refers to the Memorandum of Law of Defendant Village Housing Development Fund Corporation in Opposition to Plaintiff Jane Doe's Motion for a Preliminary Injunction, filed May 29, 2018. (Doc. 58.)

currently scheduled to transition all ALPs into MLTC plans by the end of 2018. (Tr. 244:14-23.)

### G. *Dr. Nichols's Evaluations*

Jane Doe's medical expert, Dr. Jeffrey Nichols, conducted two evaluations of her needs and abilities and reviewed portions of her medical records. (Nichols Direct Aff. ¶ 10.)[26] He asserts that Jane Doe is an "excellent candidate" to return to assisted living. (*Id.* ¶ 21.)

During his first evaluation on April 9, 2018, Dr. Nichols spent about forty-five minutes in direct contact with Jane Doe and an additional thirty minutes reviewing her nursing chart. (*Id.* ¶¶ 13–14.) He also reviewed the materials she submitted with her application for readmission. (*Id.* ¶ 15.) Dr. Nichols observed that Jane Doe "was alert and responded appropriately to questions," could "raise[] her arms overhead independently," "stood up from her wheelchair using her own strength," and "put on her shoes." (*Id.* ¶¶ 16, 18.) Based on his observations, Dr. Nichols concluded she could put on her top clothes independently, (*id.* ¶ 18), although he did not observe her do so, (Tr. 138:23-139:4). He also concluded that Jane Doe did not require any skilled nursing services. (Nichols Direct Aff. ¶ 19.)

Dr. Nichols performed his second evaluation on June 18, 2018. (*Id.* ¶ 23.) He performed the evaluation just after 5:00 p.m., which he testified tends to be the hour when older patients operate at their lowest functional level. (*Id.* ¶ 24.) This second assessment lasted forty-five minutes. (*Id.* ¶ 25.) Dr. Nichols observed Jane Doe—without physical assistance, direction, or cueing—transfer from her wheelchair to her rollator, walk with her rollator, maneuver around a

---

[26] Dr. Nichols has nearly 40 years of experience in the fields of long-term care and geriatric care. (Nichols Direct Aff. ¶ 3.) He currently serves as Chief Medical Officer at Gouverneur Skilled Nursing Facility, a 295-bed facility in New York City. (*Id.* ¶ 4.) He has served as medical director at several nursing homes, home care agencies, a hospice, and assisted living facilities. (*Id.* ¶ 6.) He has served as the physician member of the NYS Board of Examiners of Nursing Home Administrators under two different governors. (*Id.* ¶ 8.) He has written extensively about long-term care. (*Id.* ¶ 7.) "Nichols Direct Aff." refers to the Affidavit of Direct Testimony by Jeffrey Norman Nichols, M.D. in Support of Jane Doe's Motion for Preliminary Injunction, filed July 3, 2018, and submitted in redacted form. (Doc. 98.) An unredacted version of this document was filed under seal.

corner, turn around, walk back to her wheelchair, and transfer from her rollator to her wheelchair. (*Id.* ¶ 26.) She walked approximately twenty-five feet on her rollator. (*Id.*) While she walked, she stopped to take rests and would stand in place. (*Id.*) She was able to ask someone to spot her, but never needed the assistance. (*Id.*)

Counsel for Jane Doe recorded a three-minute video of Jane Doe ambulating during Dr. Nichols's June 2018 assessment.[27] The video depicts Jane Doe walking a short distance using her rollator and transferring from her rollator to a wheelchair.[28] Although Jane Doe walks independently in the video—without contact assistance—her counsel and Dr. Nichols stood near her while she was walking, apparently to provide support should Jane Doe require assistance. At one point, Jane Doe requested that someone spot her to ensure she did not fall. Her arms appeared to shake while clutching the rollator. Dr. Nichols provided instructions to Jane Doe with respect to where to walk and where to sit. At times, Jane Doe stopped to rest. The video appears to support Dr. Nichols's conclusion that Jane Doe currently needs the presence of another individual whenever she is ambulating. (Tr. 91:10-21.)

Dr. Nichols's second evaluation did not change his opinion that Jane Doe does not require skilled nursing services. (*Id.* ¶ 32.) In Dr. Nichols's opinion, Jane Doe's maximum personal care needs include: (a) "some supervision[29] and assistance with bathing and dressing in the morning and evening"; (b) "supervision to contact guard assistance[30] at times to walk with her rollator"; (c) "wheelchair transport for distances beyond 30-40 feet or outside her residence";

---

[27] The video was filed under seal to protect the identity of Jane Doe.

[28] Although Plaintiff claims that Dr. Nichols is not relying on this video, the video depicts Jane Doe's use of the rollator for several feet, which Dr. Nichols observed in person and relied on to form his opinions. (*See* Nichols Direct Aff. ¶ 26.)

[29] Dr. Nichols defines "supervision" as "having someone available to help if needed." (Nichols Direct Aff. ¶ 35.)

[30] Dr. Nichols defines "contact guard assistance" as "the helper keeps contact with the person to be ready to help if needed, but does not otherwise assist in performing a functional task." (Nichols Direct Aff. ¶ 35.)

and (d) "supervision to contact guard with toileting or using a bedside commode." (*Id.* ¶ 34.)
Furthermore, Dr. Nichols believes that Jane Doe requires approximately two hours of personal
care per day, which includes: (a) "15 minutes of assistance with toileting and dressing in the
morning"; (b) "30 minutes (10 minutes each trip three times per day) contact guard assistance for
three trips to and from the dining room"; (c) "15 minutes for assistance undressing and toileting
bedtime;" and (d) "20 minutes for two additional toileting episodes per day." (*Id.* ¶ 36.) In Dr.
Nichols's opinion, Jane Doe, in her current state, needs the presence of another individual
whenever she is ambulating and toileting, though she may not need it at all times of the day.
(Tr. 91:19-92:2, 137:23-138:1.)

Finally, Dr. Nichols testified that several of the findings noted in Jane Doe's December
22, 2017 UAS did not align with his observations of Jane Due during his assessments in April
and June 2018. First, he did not find that Jane Doe needed "[c]ues/supervision . . . at all times."
(*Id.* ¶¶ 42–44.) During his visits, neither he nor anyone at the nursing home provided Jane Doe
cues or supervision for any tasks. (*Id.* ¶¶ 44–45.) He also observed that Jane Doe does not have
"supervision at all times" at the nursing home, and that she spends time in her room and in the
hallway without any staff supervising her. (*Id.* ¶¶ 46–47.) Dr. Nichols found that Jane Doe has
no difficulty expressing herself or understanding others, but rather that she needs slightly more
time than others to finish her thoughts or understand others. (*Id.* ¶¶ 49–51, 54.) He also found
that Jane Doe has difficulty remembering certain details of her past, but does not have problems
that would present issues for providing ALP services. (*Id.* ¶ 52.) With respect to her
incontinence, Dr. Nichols observed that Jane Doe has functional incontinence—a condition
where the person is usually aware of the need to urinate but is unable to get to the bathroom—
which is common in women over seventy. (*Id.* ¶¶ 57, 61.) Finally, Dr. Nichols believes Jane

Doe is capable of self-preserving in an emergency, as she has no difficulty following directions, and she presents no additional emergency or evacuation risk beyond that of other VillageCare residents. (*Id.* ¶¶ 73, 80.) Although Dr. Nichols concludes that Jane Doe may be safely readmitted to the VillageCare ALP, he is unfamiliar with the VillageCare facility, Plaintiff's apartment, specific staffing and services provided at VillageCare, as well as the specifics of Jane Doe's living arrangements at VillageCare. (Tr. 86:9-87:19, 102:1-24.)

### H.    *VillageCare's Wheelchair Policies*

Jane Doe claims that VillageCare's termination of her admission and rejection of her readmission application stem from a blanket policy whereby VillageCare declines admission to any individual using a wheelchair. Plaintiff Fair Housing Justice Center ("FHJC") performed tests of VillageCare in October and November 2017 by surreptitiously recording interactions between VillageCare staff and investigators posing as individuals inquiring about placement. (*See* Dungee Decl. ¶¶ 9–20.)[31] VillageCare staffers, including an admissions coordinator, stated to FHJC testers that VillageCare "do[es] not admit residents on wheelchairs," that even if an applicant could "get around and get off the [wheel]chair and transfer and all that, [VillageCare] could not accept anyone in a wheelchair," and that VillageCare's wheelchair prohibition stems from legal requirements imposed by DOH regulations. (*Id.* ¶¶ 17–19; Ex. P15; *see also* Tr. 47:20-49:1.) In particular, an admissions coordinator listed that the ability to ambulate without a wheelchair was an express criteria to begin the application process. (Ex. P15.)

Freeland confirmed that prior to certain emergency amendments issued by DOH in May 2018, VillageCare told applicants that they would not be accepted into VillageCare's ALP if they

---

[31] "Dungee Decl." refers to the Declaration of Alaine Dungee in Support of Plaintiff Jane Doe's Motion for Preliminary Relief, filed May 18, 2018. (Doc. 52.)

used a wheelchair. (Tr. 307:13-20.) She also testified that current VillageCare residents are only allowed to use wheelchairs in common areas if their care plan necessitated it, or if VillageCare permits it on a case-by-case basis. (Tr. 291:25-292:21.) A resident is not permitted to use a wheelchair outside of his or her residence without the permission of VillageCare. (Tr. 292:22-25.) On May 25, 2018, DOH issued emergency amendments to the regulations governing eligibility to ALPs. (Deetz Decl. ¶ 7.) The amendments eliminate the phrase "chronically chairfast" from the regulations and add the following provision:

> An operator shall not exclude an individual on the sole basis that such individual is a person who primarily uses a wheelchair for mobility, and shall make reasonable accommodations to the extent necessary to admit such individuals, consistent with the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 et seq. and with the provisions of this section.

(*Id.* ¶ 8, Ex. A.) The new regulations became effective immediately. (*Id.* ¶ 7.) VillageCare has subsequently altered its policies and procedures regarding wheelchairs. (Tr. 307:21-308:2.) However, Freeland testified that VillageCare still is not permitted to admit individuals who are chronically in need of the physical assistance of another person to climb or descend stairs, which includes those who are chronically chairfast. (Tr. 198:13-199:4.)

## I.    *Jane Doe's Current Circumstances at the Nursing Home*

Jane Doe is currently residing in the long-term care floor at the nursing home where she completed rehabilitation. (Nichols Direct Aff. ¶ 82.) Plaintiff describes the nursing home as similar to a hospital. (Jane Doe Decl. ¶ 16.) The only separation between her bed and her roommate's is a curtain. (*Id.*) There is no space for personal items. (John Doe Direct Aff. ¶ 52.) She is confined to her wheelchair or her bed almost all of the time. (*Id.* ¶ 60.) She is forbidden from physical movement without the assistance of a private aid, and she is prohibited from using her rollator. (*Id.* ¶¶ 48–49.) Plaintiff has very little social interaction because few of the other

residents at the nursing home function at a level sufficient to hold conversation. (*Id.* ¶¶ 53, 55.)

Plaintiff claims that her physical and mental health is deteriorating daily at the nursing home due to the confinement and lack of social activity. She has begun to lose physical dexterity and strength, as well as her enthusiasm for life. (*Id.* ¶¶ 48–49, 61.) Dr. Nichols claims that Jane Doe may experience "excess deterioration" if she remains in a nursing home, which means she will experience "the functional loss beyond what would be expected from [her] medical condition due to failure to use and practice the abilities that the patient still retains." (Nichols Direct Aff. ¶ 74.) In particular, "she is at high risk of losing the ability to dress herself, walk with a walker, get in and out of chairs or bed, or the other instrumental activities of daily living which she still retains. (*Id.* ¶ 75) She is also "at risk of accelerated cognitive decline," (*id.* ¶ 76), and "at significant risk of emotional decompensation and relapse," (*id.* ¶ 81). Ultimately, Dr. Nichols believes that "Ms. Doe's life could be shorter in the nursing home." (Nichols Decl. ¶ 21.)[32]

On the other hand, Dr. Nichols believes that with a regular exercise program and more opportunities to walk,[33] Jane Doe could potentially fully dress herself, walk longer distances than she did during his June 2018 evaluation, and use her rollator without contact guard assistance. (Nichols Direct Aff. ¶¶ 27–28.)

---

[32] "Nichols Decl." refers to the Declaration of Jeffrey Norman Nichols, M.D. in Support of Jane Doe's Motion for Preliminary Injunction, filed May 18, 2018. (Doc. 50.)

[33] ▮▮▮▮▮ offers physical and occupational therapy to residents, but Jane Doe is not currently receiving those services. (Tr. 97:15-21.)

## II. Procedural History

Plaintiffs filed this action on April 12, 2018. (Doc. 1.) Jane Doe filed her motion for a preliminary injunction on May 18, 2018, (Doc. 47), along with supporting declarations, (Docs. 48–52), and a memorandum of law, (Doc. 53). Defendant Village Housing filed its opposition and supporting affidavits on May 29, 2018. (Docs. 58–60.) The State Defendants filed their opposition and supporting declaration on the same day. (Docs. 61–62.) Plaintiff filed her reply memorandum and affirmation on May 30, 2018. (Docs. 67–68.) The State Defendants filed a supplemental declaration on June 8, 2018, (Doc. 73), and Jane Doe filed a response to that declaration on June 11, 2018, (Doc. 74).

I held oral argument on Plaintiff's preliminary injunction motion on June 12, 2018. After hearing the parties' arguments, I denied Plaintiff's motion with respect to the relief requested as to the State Defendants for the reasons stated on the record, and I reserved my decision on Plaintiff's motion with respect to the relief requested as to Village Housing, pending the parties' presentation of proof at an evidentiary hearing. I held an evidentiary hearing over the course of three days—July 10, July 17, and July 23—during which the parties presented evidence and argued their positions.

## III. Legal Standards

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008). A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of the injunction; (3) that the balance of hardships tips in the movant's favor; and (4) that the public interest is not disserved by the issuance of the injunction. *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010). A court can also grant a preliminary injunction "in situations

where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). The party seeking the injunction must demonstrate "by a clear showing" that the necessary elements are satisfied. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (internal quotation marks and emphasis omitted); *see also Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 498 (S.D.N.Y. 2013). A plaintiff seeking an injunction that is mandatory—that is, that will alter rather than maintain the status quo—"must show a 'clear' or 'substantial' likelihood of success." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)).

The threat of irreparable harm is the *sine qua non* for justifying a preliminary injunction. *Naden v. Numerex Corp.*, 593 F. Supp. 2d 675, 680 (S.D.N.Y. 2009) (citing *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981)); *see also Jayaraj v. Scappini*, 66 F.3d 36, 38–39 (2d Cir. 1995) ("Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm . . . ." (quoting *Citibank N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985))). "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999) (quoting *Rodriguez v. DeBuono*, 162 F.3d 56, 61 (2d Cir. 1998)).

"A preliminary injunction is a specific equitable remedy and thus, must be framed in such a way as to strike a delicate balance between competing interests. By necessity, the scope of the injunction must be drawn by reference to the facts of the individual case, reflecting a careful

balancing of the equities." *Sunward Elecs., Inc.*, 362 F.3d at 26 (quoting *Joseph Scott Co. v. Scott Swimming Pools, Inc.*, 764 F.2d 62, 67 (2d Cir. 1985)).

## IV.  Discussion

### A.  *Likelihood of Success on the Merits*

Plaintiff brings claims under the Fair Housing Act ("FHA"), Rehabilitation Act ("RA"), and Affordable Care Act ("ACA") for discrimination against Village Housing. I address Plaintiff's FHA claims below, but because discrimination claims under each statute are analyzed pursuant to effectively the same framework, my reasoning applies to Plaintiff's claims under each statute. *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002) (FHA and RA); *Se. Pa. Transp. Auth. v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688, 699 (E.D. Pa. 2015) (RA and ACA).[34]

### 1.  Applicable Law

The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . that buyer or renter," 42 U.S.C.A. § 3604(f)(1), and "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of . . . that person," *id* § 3604(f)(2). "[D]iscrimination includes . . . a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3).

---

[34] However, unlike the FHA, the RA requires that a plaintiff show that the defendant acted "solely because of the disability" to make a prima facie case. *Reg'l Econ. Cmty. Action Program*, 294 F.3d at 49 (internal quotation marks omitted).

A plaintiff has three available theories on which he or she may base a discrimination claim under the FHA: (1) disparate treatment (also referred to as intentional discrimination); (2) disparate impact; and (3) failure to make a reasonable accommodation. *Reg'l Econ. Cmty. Action Program*, 294 F.3d at 48. Plaintiff here proceeds under theories of disparate treatment and failure to make a reasonable accommodation.

Where a plaintiff presents direct evidence of discrimination, the familiar burden-shifting framework, announced in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), does not apply. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121–22 (1985). "Direct evidence of discriminatory treatment is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse action." *United States v. Hylton*, 944 F. Supp. 2d 176, 187 (D. Conn. 2013) (internal quotation marks omitted), *aff'd*, 590 F. App'x 13 (2d Cir. 2014). If a plaintiff sets forth direct evidence of discrimination, "the burden of proof shifts to the defendants to show that they would have made the same decision regardless of discriminatory animus." *Id.*

Where a plaintiff is unable to marshal direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies. *See Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 152 (2d Cir. 2014). To make out a prima facie case of discrimination on the basis of disability under the FHA, a plaintiff must show that (1) she is a member of a protected class, (2) she sought and was qualified to purchase or rent the housing, (3) she was rejected, and (4) the housing opportunity remained available to other renters or purchasers. *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003).

If a plaintiff makes out a prima facie case, the burden of production shifts to the

defendant to produce a legitimate, nondiscriminatory reason for its decision. *Olsen*, 759 F.3d at

152. If a plaintiff then "makes a substantial showing that the defendants' proffered explanation

was false, it is permissible for the trier of fact to infer the ultimate fact of discrimination." *Id.* at

152–53 (quoting *Reg'l Econ. Cmty. Action Program*, 294 F.3d at 49). "Where the evidence

supports a conclusion that both permissible and impermissible factors motivated the adverse

action, . . . the plaintiff meets his or her burden of proof by 'showing that the adverse action was

motivated, at least in part, by an impermissible reason.'" *Mazzocchi v. Windsor Owners Corp.*,

204 F. Supp. 3d 583, 615–16 (S.D.N.Y. 2016) (quoting *Mhany Mgmt., Inc. v. Cty. of Nassau*,

819 F.3d 581, 616 (2d Cir. 2016)). A defendant may then prevail "if it sustains its burden of

proving its affirmative defense that it would have taken the adverse action on the basis of the

permissible reason alone." *Mhany*, 819 F.3d at 616 (quoting *Cabrera v. Jakabovitz*, 24 F.3d 372,

383 (2d Cir. 1994)).

A plaintiff may establish a reasonable accommodation claim under the FHA by showing:

"(1) that the plaintiff . . . had a handicap within the meaning of § 3602(h); (2) that the defendant

knew or reasonably should have been expected to know of the handicap; (3) that the

accommodation was likely necessary to afford the handicapped person an equal opportunity to

use and enjoy the dwelling; (4) that the accommodation requested was reasonable; and (5) that

the defendant refused to make the requested accommodation." *Olsen*, 759 F.3d at 156.

### 2. Application

Plaintiff contends that VillageCare discriminated against her when it terminated her

admission agreement in June 2017 and when it rejected her application for readmission in

December 2017. In particular, Plaintiff argues that she has presented direct evidence of

VillageCare's discriminatory conduct against her through, among other things, evidence of

VillageCare's explicit policy against admitting individuals using wheelchairs, VillageCare's termination of Plaintiff's admission after conducting a visual assessment during which she was seen using a wheelchair, and oral communication to John Doe that Jane Doe's difficulties ambulating prevented her return to VillageCare. (*See* Pl.'s Mem. 14.)[35] Village Housing does not dispute that the FHA applies to the facts alleged here. Instead, Village Housing contends that Plaintiff fails to establish discriminatory animus because VillageCare's determination to terminate her admission was based on its efforts to comply with DOH regulatory requirements, not a result of discriminatory animus. (Def.'s Opp. 11–16.) For the reasons that follow, I find that Plaintiff is likely to succeed on her claim that VillageCare discriminated against her when it terminated her admission agreement in June 2017.

The record contains the following evidence that VillageCare terminated Jane Doe's admission agreement, at least in part, due to its policy against wheelchairs: (1) statements of VillageCare's Admissions Coordinator that applicants "must ambulate with walker/rolling walker or cane," that VillageCare "do[es] not admit residents on wheelchairs," that even if an applicant could "get around and get off the [wheel]chair and transfer and all that, [VillageCare] could not accept anyone in a wheelchair," and that VillageCare's wheelchair prohibition stems from legal requirements imposed by DOH regulations regarding emergency evacuations, (Dungee Decl. ¶¶ 17–19; Ex. P15); (2) Freeland's testimony that prior to the DOH's May 2018 emergency amendments, VillageCare informed applicants that they would not be accepted into the ALP if they used a wheelchair, (Tr. 307:13-20); (3) the June 8, 2017 visual assessment of Jane Doe by a VillageCare nurse—while Jane Doe was still in rehabilitation—which noted Jane

---

[35] "Pl.'s Mem." refers to the Memorandum of Law in Support of Jane Doe's Motion for Preliminary Injunction, dated May 18, 2018. (Doc. 53.)

Doe's use of a wheelchair and focused primarily on her ability to ambulate, (Ex. D7, at 218); (4) the June 16, 2017 Notice of Termination, which was based, in part, on the June 8 visual assessment, (Ex. P2); (5) John Doe's testimony that, around the time of the visual assessment, a VillageCare staff member informed him that Jane Doe was not mobile enough to continue living at VillageCare, (John Doe Direct Aff. ¶ 24); and (6) Freeland's admission that the fact that Jane Doe could not ambulate without continuous use of a wheelchair was a factor in VillageCare's decision to terminate her admission, (Tr. 311:12-20).

Taken together, the evidence indicates that Plaintiff is likely to establish that VillageCare had a policy of not admitting individuals who used wheelchairs, and after conducting a visual assessment indicating that Jane Doe used a wheelchair and had difficulties with her mobility, terminated Jane Doe's admission on the basis of her wheelchair use.[36] *See Short v. Manhattan Apartments, Inc.*, 916 F. Supp. 2d 375, 397 (S.D.N.Y. 2012) (finding direct evidence of discrimination where FHJC testers elicited evidence of discriminatory policy, which was corroborated by witness testimony indicating discriminatory policy was applied to plaintiff).

Defendant contends that Plaintiff fails to establish discriminatory animus because VillageCare's determination to terminate her admission was a result of its efforts to comply with DOH regulatory requirements, not a result of discriminatory animus. (Def.'s Opp. 11–16.) Specifically, Defendant argues that Plaintiff failed to meet the criteria for admission to the VillageCare ALP because: (1) Plaintiff failed to meet the general eligibility criteria established by DOH regulation for ALPs due to her inability, with direction, to take action sufficient to assure self-preservation in an emergency, and (2) even if she did meet those criteria,

---

[36] The fact that Jane Doe was attempting to return to VillageCare rather than initially submitting an application does not materially alter my analysis, since the evidence supports a finding that VillageCare applied the same no wheelchair policy when she sought to return.

VillageCare's legally mandated individualized assessment revealed that Plaintiff's needs exceeded the level of care and services VillageCare provides. (Def.'s Opp. 12–16.) I evaluate both of these arguments in turn.

None of the contemporaneous evidence indicates that emergency evacuation concerns played a role in terminating Plaintiff's admission and sending her the Notice of Termination. Neither the nurse's notes from Plaintiff's June 8, 2017 visual assessment, (Ex. D7, at 218), nor the Notice of Termination, (Ex. P2), indicates that Plaintiff's ability to self-preserve in an emergency was a factor in terminating her admission. Similarly, Defendant's August 11, 2017 denial of Jane Doe's appeal of the Notice of Termination does not reference her ability to evacuate. (Ex. P5.) Nor do any of these documents describe any cognitive impairments that would limit Jane Doe's ability to follow instructions. (*See* Exs. P2, P5; Ex. D7, at 218.) Village Housing raised these arguments for the first time well after it issued the Notice of Termination. Therefore, there is no direct evidence that Plaintiff's ability to self-preserve in an emergency played a role in terminating her admission.

More importantly, it is not clear from the evidence presented what VillageCare's eligibility requirements are for self-preservation in an emergency, or how those requirements are applied and enforced. According to Freeland's own definition of being able to self-preserve in an emergency, many existing residents of VillageCare did not meet the eligibility criteria that purportedly disqualified Jane Doe. All VillageCare residents live on the third floor of the building or above. (Freeland Aff. ¶ 8.) Freeland testified that the way VillageCare determines whether a resident can self-preserve during an emergency is whether she can safely go down two flights of stairs "without someone having to be with her at all times, directing her, [and] telling

her, 'Hold on to the railings, step down, go down.'"[37] (Tr. 300:13-301:11.) However, VillageCare's resident evacuation assistance rosters as of April 2017 and June 2018 indicate that numerous residents required assistance, cueing, and supervision in evacuating. (Exs. D5, D6.) This included residents on the sixth floor, who required "[a]ssist[ance] walking/side by side." (Exs. D5, D6.) The evacuation assistance rosters also note that several residents utilize devices such as walkers, canes, and rollators to assist in ambulating, (Exs. D5, D6), suggesting that they would not be able to descend multiple flights of stairs without continuous assistance.[38] The rosters characterize some residents as "memormy impared [sic]" or "hearing impared [sic]," (Exs. D5, D6), indicating that they may have some cognitive or hearing challenges requiring assistance in evacuating, (Tr. 312:23-313:6). This suggests that many existing VillageCare residents would require significant assistance descending multiple flights of stairs, and thus do not meet the eligibility criteria described by Freeland.

Jane Doe herself, at various points during her residency at VillageCare, required assistance going down stairs. At the time of her admission in 2012, Jane Doe had "difficulty walking" and needed assistance with some activities of daily living, "including stairs." (Ex. D7, at 11–12; see also id. at 80.) In July 2014, Jane Doe's UAS noted that she needed "[m]aximal assistance" with managing one full flight of stairs, meaning that she needed "[h]elp throughout [the] task, but perform[ed] less than 50% of the task on [her] own." (Id. at 91.) This would appear to violate VillageCare's criteria, as defined by Freeland, that residents should be able to

---

[37] Charles testified that "self-direct" in the context of evacuation meant that, after being notified that there is a fire, a resident would be "able to get to the necessary place without assistance." (Tr. 78:7-11.)

[38] Freeland testified that a comment on the roster for one of the residents stating "Cane/Supervision" meant that "the resident ambulates with a cane and we would want to make sure that someone is in the room with the resident, or if they were going to go down the stairs that someone, the staff will be placed at different intervals to make sure that they're there in case there is a fall." (Tr. 304:15-25.) Freeland further testified that the term "Supervision" on the rosters meant that a resident would need assistance going down stairwells. (Tr. 312:17-22.)

descend two flights of stairs without continuous assistance. Nevertheless, VillageCare did not terminate Jane Doe's admission for being unable to self-preserve in an emergency until after her hospitalization when she began using a wheelchair during her rehabilitation in 2017.

Perhaps because of the difficulties VillageCare residents would experience in evacuating by stairs, the evidence suggests that residents would not, in practice, actually use the stairs in the case of an emergency. Charles testified that if there were a disaster or fire requiring evacuation, residents would use emergency slides or the elevators to evacuate, which has been approved by the fire department. (Tr. 77:18-78:5.) This is consistent with VillageCare's Emergency Management and Evacuation Plan, which contemplates using evacuation sleds or elevators if approved by the fire department. (*See* Ex. D4, at 10, 29.) Given the alternatives to descending the stairs that are available in the case of an emergency at VillageCare, coupled with the numerous residents who do not appear to be able to descend the stairs without assistance, I find that Defendant is unlikely to succeed in proving that Jane Doe's inability to self-preserve in an emergency was the reason it terminated her admission agreement in June 2017.

Defendant argues that even if Jane Doe met the general eligibility criterion of being able to self-preserve in an emergency, VillageCare was justified in terminating her admission because it determined that it was unable to meet Jane Doe's service and care needs. Defendant points to the admission and retention standards for ALPs established by DOH, which state that "[b]efore an operator admits an individual to an assisted living program, a determination must be made that the assisted living program can support the physical, supervisory and psycho-social needs of the resident." NYCCRR tit. 18, § 494.4(e). The regulation goes on to state that the determination must be based on several evaluations, including a medical evaluation, an interview, a preassessment screening by the operator, and a mental health evaluation. *Id.*

§ 494.4(f). Defendant contends that VillageCare made an individualized determination that Jane Doe had a variety of deficits in her capabilities—including cognitive impairments, unmanaged incontinence, high risk of falls, and inability to ambulate and transfer independently—that required services and care that VillageCare could not provide. (Def.'s Opp. 14–16.)

Here again, the contemporaneous evidence does not indicate that these purported deficits played a role in VillageCare's decision to terminate Plaintiff's admission. As an initial matter, VillageCare—based upon its interpretation of the DOH regulations in force at the time—had a policy of rejecting applicants who used wheelchairs. In addition, VillageCare's termination decision was not informed by the full panoply of assessments outlined in § 494.4(f). While it does not appear that VillageCare was under an obligation to conduct such extensive assessments before terminating Plaintiff's admission, *see* NYCCRR tit. 18, § 494.4(e) (requiring an individualized determination "[b]efore an operator admits an individual"), it cannot be said that the termination decision was based upon the type of individualized assessment contemplated in the regulation.

Rather, the Notice of Termination was based upon a medical evaluation performed by ████████ which does not appear to be in the record before me—and a visual assessment performed by VillageCare's nurse. (Freeland Aff. ¶¶ 27–28; Ex. P2.) The notes of the visual assessment focus primarily on Jane Doe's ability to ambulate and transfer, specifically noting that Jane Doe utilized a wheelchair. (*See* Ex. D7, at 218.) It does not appear that the nurse conducting the assessment observed or tested Jane Doe's cognitive capabilities or her needs with respect to her incontinence. (*See id.*) Although the Notice of Termination stated that Jane Doe "require[d] supervision and/or assistance with ambulation, transferring, dressing, grooming, toileting and bathing," (Ex. P2), the notes of the visual assessment do not reference Jane Doe's

33

capabilities with respect to dressing, grooming, toileting, or bathing, apart from a general reference to Jane Doe's ability to complete "ADLs," or activities of daily life, (*see* Ex. D7, at 218). The visual assessment notes do indicate that Jane Doe's physical and occupational therapists at ███████ believed she needed an additional three weeks of therapy to safely return to VillageCare and that there was room for Jane Doe to improve, (*id.*), but rather than providing Jane Doe time to improve and complete her rehabilitation, VillageCare terminated her admission based on an internal deadline to provide eviction notices. Based on the record before me, I do not find a likelihood that defendant will "sustain[] its burden of proving its affirmative defense that it would have taken the adverse action on the basis of . . . permissible reasons alone." *Mhany*, 819 F.3d at 616 (quoting *Cabrera*, 24 F.3d at 383).

Defendant takes the position that Plaintiff may only prevail on the likelihood of success prong by demonstrating that VillageCare discriminated against her in terminating her admission and in rejecting her application for readmission.[39] (Tr. 356:10-21.) However, Defendant does not provide a legal basis for that position, nor have I found one. The FHA makes it unlawful to "make unavailable or deny" a dwelling on the basis of a disability and to "discriminate . . . in the terms, conditions, or privileges of sale or rental of a dwelling" on the basis of a disability. 42 U.S.C. § 3604(f)(1)–(2). The plain terms of the statute encompass the termination of Jane Doe's admission agreement, which effectively denies her access to her dwelling. Moreover, without the termination of her admission, Jane Doe would not have needed to apply for readmission; as a result, requiring her to demonstrate discrimination in the reapplication process would effectively

---

[39] In an order filed on July 13, 2018, I asked the parties to address during their closing arguments, among other things, whether "[i]n order to prevail on the likelihood of success prong, does Plaintiff have to show that both the termination of Plaintiff's admission in June 2017 and the denial of her readmission at the end of 2017 were motivated by discrimination?" (Doc. 107 at 1-2.) Neither party specifically addressed this issue by citing to case law either in their prehearing papers or during closing arguments.

allow Village Housing to benefit from its discrimination in terminating Plaintiff's admission agreement. Therefore, I do not address whether or not Plaintiff is likely to succeed on the merits of her discrimination claim with respect to VillageCare's rejection of her application for readmission, or with respect to whether VillageCare refused her a reasonable accommodation. However, as discussed below, the evidence related to Jane Doe's application for readmission are relevant to the determination of what remedy is appropriate.

### B. *Irreparable Harm*

Plaintiff contends that she will suffer irreparable harm because: (1) she will continue to be subjected to discrimination by not being allowed back into her apartment; (2) her physical and mental health will continue to deteriorate in the nursing home; and (3) she will continue to be unnecessarily institutionalized in the nursing home. (Pl.'s Mem. 10–12.) She argues that the injunctive relief requested—returning to her apartment and re-enrolling in VillageCare's ALP— will allow her to avoid suffering irreparable harm. (*Id.*) Defendant disagrees, arguing that the harms Plaintiff claims she will suffer are speculative, and even if they were not, she could avoid them by pursuing alternative housing options. (Def.'s Opp. 8–10.) Plaintiff has established that she will suffer irreparable harm by not being permitted to return to her apartment.

As the Second Circuit has noted, "[t]here is some support for the proposition that where a plaintiff demonstrates a likelihood of success on the merits of a fair housing claim, irreparable harm may be presumed." *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999); *accord Rogers v. Windmill Pointe Vill. Club Ass'n, Inc.*, 967 F.2d 525, 528 (11th Cir. 1992) (explaining that "irreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes" (citation omitted)). Because Jane Doe has shown a likelihood of success on her FHA claim, there is at least a presumption of irreparable

harm. *See Rogers*, 967 F.2d at 528 (explaining that "[w]hen housing discrimination is shown it is reasonable to presume that irreparable injury flows from the discrimination," but "such a presumption, may be rebutted by evidence that any injury that may occur is not irreparable" (citation omitted)).

Whether or not Plaintiff may be afforded a presumption of irreparable harm, I find that she has set forth sufficient evidence to establish irreparable harm. Jane Doe presented evidence that her living situation at VillageCare was unique, and Defendants have not presented evidence to the contrary. At VillageCare, much of Jane Doe's daily activities revolved around interacting and socializing with her friends who also resided at VillageCare. (*See* John Doe Direct Aff. ¶¶ 10–15.) She participated in numerous activities with her friends, including hosting them in her apartment, watching television in their apartments, eating meals inside and outside of VillageCare, discussing politics and current events, attending theater events, and visiting museums and botanical gardens. (*Id.*)

In contrast, at the nursing home, Jane Doe experiences minimal social interaction, as other nursing home residents do not function at a level sufficient to interact with her. (*Id.* ¶¶ 53, 55.) Dr. Nichols testified that the "lack of routine social interaction with others at [Jane Doe's] functional and intellectual level places her at risk of accelerated cognitive decline." (Nichols Direct Aff. ¶ 76.) Although he has not presented concrete medical evidence supporting this assertion, I credit Dr. Nichols's testimony on this issue.

Defendant contends that Dr. Nichols's opinions are speculative, (Def.'s Opp. 8), but Defendant has not presented any evidence to contradict his opinions. Indeed, there is no dispute that after being substantially bedridden in the hospital, Jane Doe's physical abilities deteriorated, including her ability to ambulate, requiring her to undergo physical therapy. This lends some

support to Dr. Nichols's opinion that Jane Doe's largely sedentary lifestyle in the nursing home will be deleterious to her physical condition and capabilities. Rather than presenting evidence to contradict Dr. Nichols's opinions, Defendant contends that Jane Doe has alternative housing options available to her, such as enrollment in an MLTC outside of VillageCare or another ALP. (*Id.* at 8–9.) The fact that there might be alternative places Jane Doe could live does not diminish the unique nature of her living environment at VillageCare. Moreover, as Dr. Nichols explained, "[i]t is an axiom of Geriatrics that patients do better in their own home with familiar surroundings whenever possible." (Nichols Direct Aff. ¶ 83.) Jane Doe had lived at VillageCare for several years before being hospitalized. She had developed a routine at the facility and had created a home in her apartment, containing her valued possessions, including over 100 books that she enjoyed reading. (John Doe Direct Aff. ¶¶ 10, 13.) Returning to her specific apartment and the community at VillageCare would reintroduce Jane Doe into a familiar and supportive environment that would "encourage the preservation of 'over-learned' behaviors." (Nichols Direct Aff. ¶¶ 81, 83.) As such, I find that Jane Doe has established that she will suffer irreparable harm if she does not return to her apartment at VillageCare. *See Liddy v. Cisneros*, 823 F. Supp. 164, 174 (S.D.N.Y. 1993) (finding irreparable harm where plaintiff would suffer "a further deterioration of her physical and mental health" absent injunctive relief); *see also Long v. Benson*, No. 4:08CV26-RH/WCS, 2008 WL 4571903, at *2 (N.D. Fla. Oct. 14, 2008) (finding that "because of the very substantial difference in [plaintiff's] quality of life in the apartment as compared to the nursing home, each day he is required to live in the nursing home will be an irreparable harm"), *aff'd*, 383 F. App'x 930 (11th Cir. 2010).

In addition, returning to VillageCare would permit Plaintiff to be more independent than she is permitted to be at the nursing home, allowing her to regain certain abilities that have

deteriorated. Jane Doe currently resides on the long-term care floor at ██████ (Nichols Decl.
¶ 24.) She is confined to her wheelchair or bed almost all of the time, and is forbidden by
nursing home staff from using her rollator and from physical movement without an aide's
assistance. (John Doe Direct Aff. ¶¶ 48–49, 60.) As such, she has little opportunity to exercise
or maintain and develop her strength. (Nichols Direct Aff. ¶ 75.) Dr. Nichols testified that these
circumstances create a likelihood that Jane Doe will suffer "excess deterioration," meaning she is
likely to experience "the functional loss beyond what would be expected from [her] medical
condition due to failure to use and practice the abilities which [Jane Doe] still retains." (*Id.*
¶ 74.) In fact, in Dr. Nichols's opinion, Jane Doe has already begun to experience excess
deterioration due to the limitations they place on Jane Doe's ability to perform basic daily tasks.
(*Id.* ¶ 77.) Dr. Nichols believes that, in the nursing home, Jane Doe "is at high risk of losing the
ability to dress herself, walk with a walker, get in and out of chairs or bed, or perform the other
instrumental activities of daily living that she still retains." (*Id.* ¶ 75.) Further, "[p]rolonged
institutionalization [at the nursing home] places her at significant risk of emotional
decompensation and relapse." (*Id.* ¶ 81.) Ultimately, Dr. Nichols believes that Jane Doe's "life
could be shorter in the nursing home." (Nichols Aff. ¶ 21.) Again, Defendant claims Dr.
Nichols's opinions are speculative, but Defendant has not contradicted them. As such, based
upon the totality of the facts and Dr. Nichols's opinions, I find that Plaintiff has established
irreparable harm.

### C. *Balance of the Equities and the Public Interest*

The balance of the equities in this matter clearly tips in favor of Jane Doe with respect to
the requested relief of being allowed to re-enter her apartment. As discussed above, her housing
situation is unique and substantially contributes to her quality of life. In addition, the evidence

presented indicates that she will continue to experience excess deterioration in the context of her nursing home, and returning to the familiarity of her apartment will contribute to the recovery of her mental and physical capabilities. Defendant—other than by generally asserting it will need to increase its staff should Jane Doe return to VillageCare—has not demonstrated through testimony or documents that it will suffer significant hardship by simply permitting Jane Doe back into her apartment. Indeed, the evidence suggests that VillageCare would either not incur additional costs or could recoup any additional costs associated with Jane Doe's return. (*See* Tr. 107:21-108:9, 293:4-294:20; *see also id.* at 262:11-263:5.)

However, Jane Doe has not established that she is entitled to the second prong of her requested relief—being readmitted into the VillageCare ALP—in part due to her current condition as evidenced by her recent NFLOC scores and, relatedly, whether the VillageCare ALP can adequately care for Jane Doe without materially transforming its service model. As Dr. Nichols has acknowledged, and as Jane Doe's two most recent NFLOC scores confirm, her condition has deteriorated since she was hospitalized for treatment related to her urinary tract infection. (*See* Nichols Direct Aff. ¶ 77.) Jane Doe received an NFLOC score of 29 on her most recent UAS, performed on March 9, 2018, (Charles Aff. ¶ 12; Ex. D8), which is more than double the NFLOC score of any current VillageCare ALP resident, (Tr. 268:18-24), and is almost double the NFLOC score that VillageCare considers as the indicator for requiring services beyond those VillageCare's ALP can provide, (Freeland Aff. ¶ 19). Plaintiff's March 2018 UAS revealed that she required significantly more assistance with tasks—including dressing, transferring, and toileting—than she did while she resided at VillageCare. (*See* Ex. D8.) The parties strongly dispute whether VillageCare's ALP is equipped to provide Jane Doe the services and care she needs. Based on the record before me, I cannot at this stage conclude

that VillageCare's ALP would be able to provide the services Jane Doe needs. Therefore, the appropriate remedy here does not include directing Defendant to re-enroll Jane Doe in the VillageCare ALP. The question, then, becomes whether there is an equitable remedy available to ensure that Jane Doe receives the necessary services in her apartment at VillageCare.

During the course of litigating this motion, each party has acknowledged that enrolling Jane Doe in an MLTC while she lives in her VillageCare apartment would be an agreeable resolution to this dispute. During oral argument, counsel for Defendant explained that ten of the 100 beds at VillageCare are not allocated either to the ALP or the Enriched Housing Program, and that Jane Doe "could live in one of those, enroll in a managed long-term care program, and receive whatever services and personal care services that she is determined to need up to and including 24 hours a day that would be paid by Medicaid." (Oral Arg. Tr. 60:8-14.)[40] During closing arguments, counsel for Jane Doe indicated that enrolling Jane Doe in a MLTC while she lived in her apartment at VillageCare would be "a way to resolve" the dispute between the parties. (Tr. 351:1-25.) During her in-court testimony, Freeland testified that residents in VillageCare's Enriched Housing Program can receive services through a MLTC, as long as they are not enrolled in the ALP. (Tr. 242:8-24.) Valerie Deetz, the Director of the Division of Adult Care Facilities and Assisted Living Surveillance at the DOH, (Deetz Decl. ¶ 1), suggested that if she met the eligibility requirements, an MLTC would be a viable option for Jane Doe, should VillageCare allow her to return to her apartment but refuse to provide care, (*id.* ¶ 18). The nurse performing Jane Doe's March 2018 UAS recommended an MLTC as an appropriate placement for Plaintiff. (Ex. D8.) Thus, it appears that allowing Jane Doe to return to her VillageCare

---

[40] "Oral Arg. Tr." Refers to the transcript for oral argument on Plaintiff's preliminary injunction motion, which was held on June 12, 2018. (Doc. 109.)

apartment and enrolling her in a MLTC—assuming she meets the eligibility requirements—is a remedy that would achieve the appropriate balance of the equities and advance, or at least not hinder, the public interest.[41]

However, recognizing that there may be administrative or regulatory barriers complicating Village Housing's ability to permit Jane Doe to re-enter her apartment and receive MLTC services, I will allow the parties to inform me in a joint letter within one week of the entry of this Opinion & Order of any reasons why the relief granted is unworkable.

## V.    **Conclusion**

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is GRANTED IN PART and DENIED IN PART. Specifically, Plaintiff's motion is granted with respect to her request that I direct Defendant Village Housing to permit her to return to her apartment unless and until a warrant of eviction is issued by a New York City court and executed by a New York City marshal. That relief is subject to Plaintiff's application to and enrollment in a Managed Long-Term Care Program that provides adequate care and services to Plaintiff in her VillageCare apartment. The parties shall use their best efforts to have Plaintiff evaluated for a Managed Long-Term Care Program within three (3) weeks of the entry of this Opinion & Order. Plaintiff's motion is denied with respect to her request that I direct Defendant Village Housing to reenroll Plaintiff in its ALP and provide services pursuant to 18 NYCRR § 494.5.

Should the relief granted present difficulties for either party that make it unworkable, the parties shall submit a joint letter of no more than five (5) pages within one (1) week of the entry of this Opinion & Order outlining in detail the reasons why they believe the relief granted is

---

[41] I note that VillageCare's ALP residents will transition into and be covered by MLTC plans by the end of this year. (Tr. 244:14-23.)

unworkable.

SO ORDERED.

Dated: September 10, 2018
      New York, New York

Vernon S. Broderick
United States District Judge