UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                         :

FAIR HOUSING JUSTICE CENTER, INC.,  :
JANE DOE and JOHN DOE,           :
                         :

                  Plaintiffs,  :         18-CV-3196 (VSB)
                         :

         -against-        :      **OPINION & ORDER**
                         :

ANDREW M. CUOMO, in his official    :
capacity as Governor of the State of New  :
York, HOWARD A. ZUCKER, in his official :
capacity as Commissioner of the New York :
State Department of Health, THE NEW   :
YORK STATE DEPARTMENT OF      :
HEALTH, ELM YORK LLC, MADISON   :
YORK ASSISTED LIVING COMMUNITY, :
LLC, MADISON YORK REGO PARK LLC, :
and VILLAGE HOUSING DEVELOPMENT :
FUND CORPORATION,           :
                         :

                Defendants.  :
                         :
---------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/30/2019

Appearances:

Jota Borgmann
Tanya Kessler
Kevin M. Cremin
Mobilization for Justice
New York, New York
*Counsel for Plaintiffs*

John Gasior
Erin R. McAlister
New York State Office of the Attorney General
New York, New York
*Counsel for Defendants Andrew M. Cuomo, Howard A. Zucker,
and New York State Department of Health*

Jeffrey J. Sherrin
O'Connell and Aronowitz
Albany, New York
*Counsel for Defendants Elm York LLC, Madison York Assisted Living Community, LLC,*
*and Madison York Rego Park LLC*

David T. Luntz
Hinman Straub P.C.
New York, New York
*Counsel for Defendant Village Housing Development Fund Corporation*

<u>VERNON S. BRODERICK</u>, United States District Judge:

Plaintiffs Fair Housing Justice Center, Inc., Jane Doe, and John Doe bring this action under the Fair Housing Act ("FHA"), Rehabilitation Act ("Rehab Act"), the Affordable Care Act ("ACA"), and the Americans with Disabilities Act ("ADA"). Before me are motions to dismiss the amended complaint from: (1) Defendants Howard A. Zucker, in his official capacity as Commissioner of the New York State Department of Health, and the New York State Department of Health; (2) Defendants Elm York LLC, Madison York Assisted Living Community, LLC, and Madison York Rego Park LLC; and (3) Village Housing Development Fund Corporation. For the reasons that follow, Defendants' motions are GRANTED IN PART and DENIED IN PART. Because I find that each of the Plaintiffs has standing to bring their claims and that any amendments to the state regulations governing admissions standards do not moot those claims, Defendants' motions to dismiss for lack of standing and on the basis of mootness are DENIED. Because Plaintiff Fair Housing Justice Center, Inc. did not address the motion to dismiss its claim pursuant to § 3604(d) of the FHA against Defendants Elm York LLC, Madison York Assisted Living Community, LLC, Madison York Rego Park LLC, and Village Housing Development Fund Corporation, those Defendants' motions to dismiss that claim are GRANTED. Defendants' motions to dismiss for failure to state a claim are otherwise DENIED.

# I.  <u>Background</u>[1]

Adult Care Facilities ("ACFs") were established by statute in New York to provide housing and services to people who, due to age or disability, are unable to live independently. (*See* Am. Compl. ¶ 1 n.1.)[2]  Assisted Living Programs ("ALPs") are Medicaid-reimbursed programs that provide a greater level of services than Enriched Housing Programs,[3] and are intended to serve people who would otherwise require placement in a nursing home.  ALPs are required to provide or arrange to provide "personal care services[;] . . . home health aide services; personal emergency response services; nursing services; physical therapy; occupational therapy; speech therapy; medical supplies and equipment not requiring prior authorization; and adult day health care."  N.Y. Comp. Codes R. & Regs. tit. 18 ("18 N.Y.C.R.R.") § 494.5(b).  A person is eligible for an ALP if he or she requires more care or services than can be directly provided by an ACF; is eligible for a nursing home, but can be appropriately cared for at an ALP; and has a stable medical condition and is able, with direction, to take action sufficient to assure self-preservation in an emergency.  *See* N.Y. Soc. Serv. L. § 461-1(1)(d).

For several years, Plaintiff Jane Doe has been a resident of an ACF with an ALP ("VillageCare"), operated by Defendant Village Housing Development Fund Corporation ("Village Housing").  (Am. Compl. ¶ 18.)  In April 2017, Jane Doe was transferred from VillageCare to a hospital to address complications stemming from a urinary tract infection, and

---

[1] The following facts are taken from the amended complaint and are assumed to be true for purposes of this motion. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508 n.1 (2002).  However, my references to the factual allegations should not be construed as a finding as to their veracity, and I make no such findings.

[2] "Am. Compl." refers to the Amended Complaint, filed August 14, 2018.  (Doc. 122.)

[3] Enriched Housing Programs provide long-term residential care to adults who are primarily sixty-five years of age or older, in community-integrated settings resembling independent housing units, which also provide for or arrange for the provision of room, board, housekeeping, personal care, and supervision.  *See generally* N.Y. Soc. Serv. L. § 461; N.Y. Comp. Codes R. & Regs. tit. 18 §§ 487, 488.

she was subsequently transferred to a nursing home.  (*Id.* ¶ 98.)  On June 8, 2017, a VillageCare nurse conducted a visual assessment of Jane Doe and observed that she was sitting in a wheelchair.  (*Id.* ¶¶ 101–02.)  As a result of that visual assessment, Defendant Village Housing sent Jane Doe a Notice of Termination, terminating her lease at VillageCare based on her need for "supervision and/or assistance with ambulation, transferring, dressing, grooming, toileting and bathing."  (*Id.* ¶ 100.)  At around the same time, VillageCare staff told Plaintiff John Doe, Jane Doe's brother, that Jane Doe was not mobile enough to continue living at VillageCare.  (*Id.* ¶ 104.)  The following month, Village Housing denied John Doe's appeal of the Notice of Termination and commenced an eviction proceeding against Jane Doe.  (*Id.* ¶¶ 107–108, 112.)

Based on his knowledge of VillageCare's general ban on wheelchairs and his belief that Jane Doe was eligible to continue to reside at VillageCare because she could walk with a rollator, John Doe filed a complaint with Plaintiff Fair Housing Justice Center ("FHJC"), a nonprofit organization dedicated to ensuring that all people have equal access to housing opportunities in the greater New York City region.  (*Id.* ¶¶ 12, 111.)  John Doe's complaint was one of many that FHJC has received in the past several years alleging discrimination against people who use wheelchairs and other mobility devices.  (*Id.* ¶¶ 54–55.)

Defendants Madison York Assisted Living LLC, Madison York Rego Park LLC, Elm York LLC (collectively, the "York Defendants"), and Defendant Village Housing (collectively, Village Housing and the York Defendants are referred to as the "ACF Defendants") each operate an ACF with an ALP.  (*Id.* ¶¶ 20–24.)  Based on the complaints that it received, FHJC sent testers to each ACF Defendant; the testers posed as family members of older adults seeking assisted living housing and services.  (*Id.* ¶¶ 56, 60.)  FHJC sent two testers to each ACF Defendant using similar scripts, except that one of the testers informed the ACF Defendants that

their older family member required the use of a wheelchair, and the other tester informed them that their older family member did not require the use of a wheelchair. (*See id.* ¶¶ 63, 66, 72, 77, 80, 85, 89, 95.) Each tester who represented that their older family member required a wheelchair was informed that, as a matter of policy, the ACF Defendants did not admit anyone who used a wheelchair. (*Id.* ¶ 64 (Defendant Madison York Rego Park informing tester that "wheelchairs are not allowed in the facility"); *id.* ¶¶ 73, 75 (Defendant Madison York Assisted Living Community, LLC informing tester that "we don't have any wheelchairs here" and that applicants "ha[ve] to walk for us" as part of the admission process); *id.* ¶ 83 (Defendant Elm York LLC telling tester that "you cannot have any wheelchairs"); *id.* ¶ 95 (Defendant Village Housing informing tester that "[e]ven though [the potential applicant] can get around and can get off the chair and transfer and all that . . . [w]e could not accept anyone in a wheelchair . . . under no circumstances").)

At the time of the testing, and before the original complaint was filed in this action, regulations promulgated by Defendant New York State Department of Health ("DOH") stated that an ACF operator "shall not accept nor retain any person who," *inter alia*, "is chronically chairfast and unable to transfer, or chronically requires the physical assistance of another person to transfer." (*Id.* ¶ 162 (citing 18 N.Y.C.R.R. § 487.4(b), as it appeared prior to May 25, 2018).) Similarly, at the time of the testing, and before the original complaint was filed in this action, DOH regulations stated that an ALP operator "must not accept or retain any person who . . . is chronically chairfast and requires lifting equipment to transfer or the assistance of two persons to transfer," and that an Enriched Housing operator "must not accept nor retain any person who . . . is chronically chairfast and unable to transfer or chronically requires the physical assistance of

another person to transfer."  (*Id.* ¶¶ 163–64 (citing 18 N.Y.C.R.R. §§ 488.4(b) and 494.4(d), as they appeared prior to May 25, 2018).)

Some of the ACF Defendants indicated to FHJC testers that the policies against wheelchairs were based in part on state statutes and/or regulations.  (*Id.* ¶¶ 73, 82–84, 96.) Accordingly, FHJC assigned testers, posing as family members of older adults seeking assisted living housing and services, to contact Defendant DOH and Defendant Commissioner Howard A. Zucker ("Commissioner Zucker") (collectively, Defendants DOH and Commissioner Zucker are referred to as the "State Defendants").  (*Id.* ¶ 172.)  A DOH official explained to one tester that ALPs "don't have to take in people with wheelchairs if they don't necessarily have the accommodations to do it."  (*Id.* ¶ 190.)  When one tester explained that the ALPs seemed to have a "'blanket rule' prohibiting all prospective residents who used wheelchairs," a DOH official responded, "And they can do that.  They can do that."  (*Id.* ¶ 200.)

On May 25, 2018, one month after the original complaint was filed in this action, DOH made amendments to the regulations described above (the "Original Regulations") through an emergency rulemaking process.  (*Id.* ¶ 205.)  The Original Regulations were amended and replaced with revised versions of §§ 487.4, 488.4, and 494.4 of Title 18 of the New York Codes, Rules and Regulations ("Emergency Regulations"), which struck the provisions barring admission and retention of people who were "chairfast."  (*Id.* ¶¶ 206–07.)  DOH stated that it was invoking the emergency rulemaking process because the non-emergency process "would be detrimental to the health and general welfare of individuals who primarily use a wheelchair for mobility and who are eligible for admission to [ACFs]," and because "[w]ithout this emergency regulation some operators will continue to refuse admission to otherwise eligible applicants, to the detriment of the health and general welfare of such applicants."  (*Id.* ¶ 206.)

The Emergency Regulations also prohibited ACFs from excluding "an individual on the sole basis that such individual is a person who primarily uses a wheelchair for mobility," and they required that ACFs "make reasonable accommodations to the extent necessary to admit such individuals, consistent with the [ADA]." (*Id.* ¶ 208.)  The Emergency Regulations left intact the provisions of the Original Regulations that barred admission and retention of people who "chronically require the physical assistance of another person in order to walk" and other categories of people.[4]  (*Id.* ¶ 209.)   The Emergency Regulations were extended several times. (*See* Docs. 172–74.)  On May 2, 2019, DOH adopted the Emergency Regulations as final ("Amended Regulations").  (Doc. 178.)

II.     **Procedural History**

On April 12, 2018, Plaintiffs commenced this action by filing the complaint.  (Doc. 1.) On May 18, 2018, Plaintiff Jane Doe moved for a preliminary injunction against Defendant Village Housing, Defendant Governor Andrew M. Cuomo ("Governor Cuomo"), Defendant Commissioner Zucker, and Defendant DOH, seeking an order directing those Defendants to permit Plaintiff Jane Doe to return to her apartment at VillageCare, and directing them to provide her with assisted living services. (Doc. 47.)  The parties briefed the motion, (Docs. 47–53, 58–62, 67–68, 73–74), and I held oral argument on June 12, 2018, and an evidentiary hearing on July 10, July 17, and July 23, 2018.  On September 10, 2018, I entered an order granting in part and denying in part the motion for a preliminary injunction, ordering that Plaintiff Jane Doe be

---

[4] Both the Original and Emergency Regulations also barred admission and retention of people who are chronically bedfast; who chronically require the physical assistance of another person to transfer; who chronically require the physical assistance of another person in order to walk; who chronically require the physical assistance of another person to climb or descend stairs, unless assignment on a floor with ground-level egress can be made; and people who are dependent on medical equipment.  (Am. Compl. ¶¶ 162–64, 209.)

allowed back into her apartment, but denying her request to be reenrolled in the VillageCare

Assisted Living Program.  (Doc. 140.)  I entered an Opinion & Order explaining my reasoning

on September 24, 2018.  (Doc. 151.)

On May 29, 2018, Defendant Governor Cuomo filed a motion to dismiss and a

memorandum of law in support, (Docs. 63–64), which Plaintiffs opposed on June 12, 2018,

(Doc. 75).  On June 14, 2018, DOH and Commissioner Zucker, the York Defendants, and

Defendant Village Housing filed motions to dismiss.  (Docs. 76, 79, 84.)  Defendant Governor

Cuomo filed a reply memorandum on June 19, 2018.  (Doc. 88.)  Shortly thereafter, Plaintiffs

requested leave to file an amended complaint.  (Docs. 89, 92.)  On June 21, 2018, I granted

Plaintiffs' request to amend the complaint, and I denied all of the motions to dismiss without

prejudice.  (Doc. 93.)

Plaintiffs filed an amended complaint on August 14, 2018, removing Governor Cuomo as

a Defendant.  (Doc. 122.)  On September 7, 2018, the York Defendants filed a motion to dismiss

the amended complaint, (Doc. 129), as well as a memorandum of law and a declaration in

support, (Docs. 130–31).  Defendant Village Housing also filed a motion to dismiss the amended

complaint, (Doc. 133), with a memorandum of law and declaration in support, (Docs. 134–35).

Finally, the Department of Health and Commissioner Zucker (the "State Defendants") filed a

motion to dismiss the amended complaint, (Doc. 136), with a memorandum of law and two

declarations in support, (Docs. 137–39).  On October 1, 2018, Defendant Village Housing

submitted a letter withdrawing the portions of its motion that address the claims of Plaintiffs Jane

Doe and John Doe.  (Doc. 156.)

On October 9, 2018, Plaintiffs filed a single omnibus memorandum in opposition to

Defendants' motions.  (Doc. 162.)  On October 19, 2018, the York Defendants filed a reply

memorandum and declaration in further support of their motion to dismiss.  (Docs. 165–66.)  On October 23, 2018, Village Housing filed a reply memorandum in further support of its motion to dismiss.  (Doc. 168.)  On the same day, the State Defendants filed a reply memorandum and an affirmation in support of their motion to dismiss.  (Docs. 169–70.)  Between November 26, 2018 and May 3, 2018, the State Defendants submitted several letters providing updates on the extension of the Emergency Regulations and final adoption of the Amended Regulations.  (Docs. 171–74, 177–78.)

## III.  <u>Legal Standards</u>

### A.  *Rule 12(b)(1)*

A claim may be "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In deciding a Rule 12(b)(1) motion to dismiss, "the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).  However, "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it."  *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008).  Furthermore, "[i]n resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) a district court may consider evidence outside the pleadings."  *Id.*  When a defendant "moves for dismissal under Rule 12(b)(1), as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined."  *U.S. ex rel. Kreindler & Kreindler v. United*

*Techs. Corp.*, 985 F.2d 1148, 1155–56 (2d Cir. 1993) (internal citation and quotation marks omitted).

### B.     *Rule 12(b)(6)*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss brought under Rule 12(b)(6), a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

## IV.    Discussion

Defendants assert the following arguments in support of their motions to dismiss, including:  (1) Plaintiffs lack standing; (2) Plaintiffs' claims are moot; (3) Plaintiffs' claims are not ripe;[5] and (4) Plaintiffs fail to plausibly allege several claims.  I consider each argument in turn.

### A.    *Article III Standing*

#### 1.  **Applicable Law**

Article III of the Constitution circumscribes a court's authority to hear cases, limiting the jurisdiction of federal courts to "cases" or "controversies."  U.S. Const. art. III, § 2.  Article III standing is "the threshold question in every federal case, determining the power of the court to entertain the suit."  *Ross v. Bank of Am., N.A. (USA),* 524 F.3d 217, 222 (2d Cir. 2008) (quoting *Denney v. Deutsche Bank AG,* 443 F.3d 253, 263 (2d Cir. 2006)).  To satisfy the requirements of Article III standing, a plaintiff must establish three elements:  "(1) the plaintiff must have suffered an injury in fact, i.e., an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there

---

[5] Defendants argue that Plaintiffs' claims are not ripe because, at the time Defendants' motions were submitted, the amended regulations were not yet final.  (*See* York Defs. Mem. 19–20; Village Housing Reply 3–4; State Defs. Reply 10–11.)  Defendants' arguments rely on cases such as *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo,* which states that "challenges to statutes are routinely found . . . unripe when proposed regulatory amendments are pending."  981 F.2d 50, 61 (2d Cir. 1992).  The State Defendants and Village Housing improperly raised this issue for the first time in their reply memoranda, and I could reject their argument on this basis alone.  *See Knipe v. Skinner,* 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief.").  In any event, the State Defendants have informed me that, as of May 13, 2019, the emergency regulations were adopted by the Department of Health and became final.  (*See* Doc. 178.)  Accordingly, even if Defendants' ripeness arguments were properly before me, such arguments are moot because the amendments are no longer pending.  "York Defs. Mem." refers to the Memorandum of Law in Support of Defendants Elm York LLC, Madison York Assisted Living Community LLC, and Madison Rego Park LLCs' Motion to Dismiss Plaintiffs' Amended Complaint, dated September 7, 2018.  (Doc. 130.)  "Village Housing Reply" refers to the Reply Memorandum of Law in Support of Village Housing Development Fund Corporation's Motion to Dismiss Plaintiffs' Amended Complaint, filed October 23, 2018.  (Doc. 168.)  "State Defs. Reply" refers to the State Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Amended Complaint, filed October 23, 2018.  (Doc. 169.)

must be a causal connection between the injury and the conduct complained of; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) (internal quotation marks omitted).

"The [FHA] permits any 'aggrieved person' to bring a suit challenging . . . discriminatory housing practices" and defines "aggrieved person" to include "any individual" who either "'claims to have been injured by a discriminatory housing practice'" or believes that such an injury "'is about to occur.'" *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 44 (2d Cir. 2015) (quoting 42 U.S.C. §§ 3602(d), (i), and 3613(a)(1)(A)). The Supreme Court has "repeatedly written that the FHA's definition of person 'aggrieved' reflects a congressional intent to confer standing broadly." *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303 (2017). Indeed, "[s]tanding under the Fair Housing Act is as broad as Article III permits." *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016).

## 2. Application

As an initial matter, I address a misplaced argument advanced by Defendants. Under substantially similar theories, each Defendant asserts that because the Original Regulations were amended subsequent to Plaintiffs' alleged injuries, those injuries either are not traceable to Defendants' conduct or are not redressable. (*See* State Defs. Mem. 11–13, 17–18; Village Housing Mem. 14–15; York Defs. Mem. 14–15.)[6] These arguments conflate the doctrine of standing with the doctrine of mootness. Standing is evaluated "as of the outset of the litigation." *Cook v. Colgate Univ.*, 992 F.2d 17, 19 (2d Cir. 1993). This makes sense since defendants

---

[6] "State Defs. Mem." refers to the State Defendants' Memorandum of Law in Support of Its Motion to Dismiss the Amended Complaint, dated September 7, 2018. (Doc. 137.) "Village Housing Mem." refers to the Memorandum of Law in Support of Village Housing Development Fund Corporation's Motion to Dismiss Plaintiffs' Amended Complaint, dated September 7, 2018. (Doc. 135.)

should not be permitted through their actions to strip a plaintiff of standing. Therefore, Defendants' arguments based on events that occurred after the litigation began should be evaluated under the doctrine of mootness. "The confusion is understandable"; even "Court[s] of Appeals [have] confused mootness with standing." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Although not a comprehensive characterization, mootness can be described as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Id.* (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)). In Part IV.B below, I consider whether the amendments to the Original Regulations moot Plaintiffs' claims. For now, I consider only whether Plaintiffs have alleged that, as of the outset of the litigation, they suffered an injury-in-fact that was fairly traceable to each Defendant's conduct, and that was likely to be redressed by a favorable judicial decision. *See Lamar Adver. of Penn, LLC v. Town of Orchard Park, N.Y.*, 356 F.3d 365, 373 (2d Cir. 2004).

a. FHJC

As an organization, FHJC can "have standing to sue in one of two ways. It may sue on behalf of its members" or it "can have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.* ("*NYCTA*"), 684 F.3d 286, 294 (2d Cir. 2012) (internal quotation marks omitted). FHJC does not assert the rights of its members. (*See* Pls. Opp. 9 n.1.)[7] Accordingly, I consider FHJC's standing under the second theory, and FHJC

---

[7] "Pls. Opp." refers to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Amended Complaint, dated October 9, 2018. (Doc. 162.)

"itself must meet the same standing test that applies to individuals." *NYCTA*, 684 F.3d at 294 (internal quotation marks omitted).

i. *Injury in Fact*

The Supreme Court and the Second Circuit have repeatedly found that organizations that have conducted investigations into alleged violations of the FHA have suffered an injury-in-fact and have standing under the statute. *E.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74 (1982); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 904–05 (2d Cir. 1993). Here, FHJC alleges that it "expended staff time and other resources to investigate and respond to Defendants' discriminatory practices, which diverted resources away from other FHJC activities." (Am. Compl. ¶ 16.) These other activities include, *inter alia*, "provid[ing] intake counseling to individuals and organizations who are potentially facing housing discrimination," and "assist[ing] with the preparation and filing of administrative housing discrimination complaints." (*Id.* ¶ 13.) The amended complaint describes FHJC's investigation in detail, including its testing of each of the Defendants. (*Id.* ¶¶ 54–97, 172–203.) Evaluating similar allegations, district courts have found that FHJC had standing to sue based on its testing activities to investigate alleged violations of the FHA. *See Fair Hous. Justice Ctr., Inc. v. Allure Rehab. Servs. LLC*, No. 15 CV 6336 (RJD) (LB), 2017 WL 4297237, at *1–3 (E.D.N.Y. Sept. 26, 2017); *L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 397–98 (S.D.N.Y. 2013) (finding that an allegation substantially similar to the allegation in paragraph 16 of the amended complaint was "sufficient to plead injury-in-fact and thus organizational standing"); *Fair Hous. Justice Ctr., Inc. v. Edgewater Park Owners Coop., Inc.*, No. 10 CV 912(RPP), 2012 WL 762323, at *4–6 (S.D.N.Y. Mar. 9, 2012). I see no reason to come to a different conclusion here, and find Defendants' attempts to distinguish these cases unavailing.

For example, the State Defendants assert that because testing is listed as one of its activities, (*see* Am. Compl. ¶ 13), the investigation did not interfere with its ability to carry out its usual activities, (*see* State Defs. Mem. 14–16). The State Defendants rely on *Citizens for Responsibility & Ethics in Washington v. Trump* ("*CREW*"), 276 F. Supp. 3d 174 (S.D.N.Y. 2017), where the court found that because the plaintiff organization's "entire reason for being is to investigate and combat corruption and reduce the influence of money in politics through, among other things, education, advocacy, and litigation" it was "thus not wasting resources by educating the public and issuing statements concerning the effects of Defendant's alleged constitutional violations or even by filing suit." *Id.* at 191.[8] The FHA was not at issue in *CREW*; rather, plaintiffs in *CREW* brought their action under the Emoluments Clauses of the United States Constitution, *see* U.S. Const. art. I, § 9, cl. 8 & art. II, § 1, cl. 7, and the court engaged in an "especially rigorous" standing inquiry because "reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *CREW*, 276 F. Supp. 3d at 184 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)).[9]

Such a "rigorous" standing inquiry is not required under the FHA. To the contrary, as explained above, the FHA requires me to engage in an inquiry that "is as broad as Article III permits." *Mhany Mgmt.*, 819 F.3d at 600. In the context of the FHA, the Second Circuit has announced that, even at the summary judgment phase, "only a 'perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact.'" *Nnebe v. Daus*, 644 F.3d

___

[8] I note that the judgment announced in this opinion was recently vacated and remanded by the Second Circuit Court of Appeals. *See Citizens for Responsibility & Ethics in Wash. v. Trump*, No. 18-474, 2019 WL 4383205 (2d Cir. Sept. 13, 2019).

[9] The State Defendants also rely on *CREW* to argue that FHJC's alleged injuries are not fairly traceable to the State Defendants because they were "a result of [FHJC's] own budgetary and operational choices." (*See* State Defs. Mem. 16.) For the same reasons, the reasoning in *CREW* does not apply to FHA cases such as this.

147, 157 (2d Cir. 2011) (quoting *Ragin*, 6 F.3d at 905).  This standard holds even where plaintiffs provide only "scant" evidence.  *Id.* at 156–57.

Defendants' other attempts to distinguish this case from those in which courts found that FHJC had standing to sue are also unavailing.  For example, Defendants rely on two cases decided in the United States District Court for the District of Columbia and the United States Court of Appeals for the District of Columbia, in support of their argument that "injuries resulting from the expense of testing do not constitute an injury-in-fact that is fairly traceable to the defendant's conduct when that injury is self-inflicted."  (*See* York Defs. Mem. 12 (citing *Fair Emp't Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994), and *Equal Rights Ctr. v. Post Props., Inc.*, 657 F. Supp. 2d 197, 201 (D.D.C. 2009), *aff'd but criticized*, 633 F.3d 1136 (D.C. Cir. 2011)); *see also* State Defs. Mem. 16 (same); Village Housing Mem. 12–13 (same).)  As an initial matter, those cases are not binding on me.  In addition, courts in the District of Columbia are not bound by the standards announced in the Second Circuit's decision in *Ragin* and its progeny, and therefore they are inapposite to the case at hand.  *See Ragin*, 6 F.3d at 905 (affirming district court's finding of standing where plaintiff organization had "established that its activities relating to identifying and counteracting the [d]efendants' [conduct in violation of the FHA] detracted the attention of [plaintiff] staff members from their regular tasks" (internal quotation marks omitted)).[10]

Accordingly, I find that FHJC has alleged sufficient facts in the amended complaint to demonstrate that it suffered an injury in fact.

---

[10] Defendants also fail to acknowledge that the court in *BMC* found that the plaintiff organization did have standing, *see BMC Mktg.*, 28 F.3d at 1277, and they make no attempt to distinguish the factual circumstances on which that finding was based from the circumstances before me.

ii. *Fairly Traceable*

Defendant Village Housing argues that FHJC's injuries are not fairly traceable to Village Housing's conduct because Village Housing was obligated to comply with the Original Regulations, which prohibited the admission of persons who were chronically chairfast. (*See* Village Housing Mem. 13–15.) Village Housing provides no authority for its argument that compliance with a state regulation exempts a housing provider from liability under the FHA. As an initial matter, this argument ignores the Supremacy Clause, U.S. Const. art. VI, cl. 2, which "invalidates state laws that interfere with, or are contrary to, federal law." *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008) (internal quotation marks omitted). Moreover, the amended complaint alleges that Village Housing's blanket policy against admitting people who used wheelchairs exceeded the requirements of the Original Regulations. Although the Original Regulations only prohibited admitting people who were "chronically chairfast *and* unable to transfer," (*see* Am. Compl. ¶¶ 162–64), Plaintiffs allege that Village Housing denied admission to all chronically chairfast people, regardless of their ability to transfer, (*see id.* ¶¶ 88, 94–95). The work of the testers confirmed that Village Housing's blanket policy against admitting people who used wheelchairs exceeded the requirements of the Original Regulations. (*See id.* ¶ 64 (Defendant Madison York Rego Park informing tester that "wheelchairs are not allowed in the facility"); *id.* ¶¶ 73, 75 (Defendant Madison York Assisted Living Community, LLC informing tester that "we don't have any wheelchairs here" and that applicants "ha[ve] to walk for us" as part of the admission process); *id.* ¶ 83 (Defendant Elm York LLC telling tester that "you cannot have any wheelchairs"); *id.* ¶ 95 (Defendant Village Housing informing tester that "[e]ven though [the potential applicant] can get around and can get

off the chair and transfer and all that . . . [w]e could not accept anyone in a wheelchair . . . under no circumstances").)

The ACF Defendants also argue that because their policies and practices were based on and in compliance with state regulations, sending testers to confirm compliance was unnecessary, and so the injuries related to testing are not fairly traceable to their conduct. (*See* Village Housing Mem. 12–13; York Defs. Mem. 13.) Defendants cite no authority for this unpersuasive argument, and I am aware of none. To the contrary, the plaintiffs in *Ragin* were sufficiently injured when investigating public advertisements. *See Ragin*, 6 F.3d at 902. In addition, as described above, the policies of the ACF Defendants exceeded the requirements of the Original Regulations.

Accordingly, I find that FHJC's injuries are fairly traceable to all Defendants' conduct.

### iii. *Redressable*

The only arguments offered by Defendants in support of their position that FHJC's injuries will not be redressed by a favorable decision stem from the fact that the Original Regulations were amended. (*See* Village Housing Mem. 14–15; York Defs. Mem. 14–15.) As discussed above, these arguments are more appropriately considered under the doctrine of mootness, and I address them below. *See infra* Part IV.B .

Accordingly, I find that, as of the outset of this litigation, Plaintiff FHJC had standing to bring all of its claims.[11]

---

[11] The State Defendants also argue that "[n]o plaintiff, including FHJC, is likely to be able to support a claim for money damages against DOH under the ADA and RA." (*See* State Defs. Mem. 13 n.3.) The State Defendants waived this argument by inappropriately raising it in a footnote. *See In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677(NRB), 2007 WL 2589482, at *3 (S.D.N.Y. Sept. 7, 2007) ("Arguments which appear in footnotes are generally deemed to have been waived.").

b. Jane Doe[12]

The State Defendants argue that Jane Doe's injuries were not caused by the Original

Regulations because they resulted from her personal choices.  (*See* State Defs. Mem. 17 (arguing

that "although Village Housing found that its AL Program could not meet Jane Doe's needs, Jane

and John Doe could have looked into ACFs or AL Programs other than Village Housing" and

that their "decision not to do so, and any injury stemming therefrom, is not fairly traceable to

[the] State Defendants").)  The State Defendants provide no legal authority—and I am aware of

none—that supports the argument that, under the FHA, a housing provider or program may deny

admission to a person on the basis of a protected trait so long as other providers or programs are

arguably available.  It is not surprising that the State Defendants were unable to find legal

authority for their argument since it is based on pure speculation.  In any event, the fact that other

providers or programs might arguably be available does not mean that Village Housing did not

violate the FHA by denying admission to Jane Doe.  A contrary conclusion would defeat the

purpose of the FHA.

Jane Doe alleges that she suffered an injury when Village Housing sought to terminate

her residency agreement, refused to allow her to return to her apartment, and refused to allow her

to participate in its ALP based on her inability to walk and her use of a wheelchair.  (*See* Am.

Compl. ¶¶ 99–104.)  These injuries are fairly traceable to the State Defendants, because they

were based on regulations promulgated by DOH, and because the State Defendants sanctioned

[12] I consider only the State Defendants' motion to dismiss Plaintiffs Jane Doe and John Doe's claims for lack of standing.  Defendant Village Housing withdrew the portions of its motion that address the claims of Jane Doe and John Doe.  (*See* Doc. 156.)  The York Defendants moved to dismiss Jane Doe and John Doe's claims for lack of standing, although their argument is not supported by any citations to the law or the record.  At any rate, Jane Doe and John Doe did not bring any claims against the York Defendants.  (*See* Am. Compl. ¶¶ 226–322.)  Accordingly, Plaintiffs request, in two footnotes, that I deny the York Defendants' motion under Rule 11 and impose sanctions. (*See* Pls. Opp. 18 n.3, 21 n.5.)  If Plaintiffs seek sanctions against the York Defendants, they shall make the request in an appropriate motion that complies with Local Rule 7.1.

categorical bans on people who use wheelchairs. (*See id.* ¶¶ 169–171, 200, 213.) At the outset of the litigation, her claims were likely to be redressed by a favorable decision, because the Original Regulations prohibiting the admission of "chronically chairfast" people were still operative. (*Id.* ¶ 162.)

The remainder of the State Defendants' arguments regarding Jane Doe's standing are based on the amendments to the Original Regulations, which I address below. *See infra* Part IV.B. In other words, whether her claims—after the amendment—remain likely to be redressed by a favorable decision will be considered under the doctrine of mootness. For now, I find that at the outset of this litigation, Plaintiff Jane Doe sufficiently alleged standing against the State Defendants. *See Cook*, 992 F.2d at 19.

### c. John Doe

The State Defendants argue that John Doe's allegations that he was distressed that his sister was in a nursing home and that he had been aiding her attempts to return to Village Housing, including travel to visit her, are insufficient to allege standing. (*See* State Defs. Mem. 18–19.) The State Defendants argue that "John Doe has failed to allege any concrete injury to himself as distinct from the injury to his sister Jane Doe." (*Id.*) The State Defendants rely on district court opinions—one of which was from a court outside of this circuit—in cases that were not brought under the FHA. (*Id.* (citing *Phillips v. St. Mary Med. Ctr.*, Civil Action No. 12-2363, 2013 WL 1124372, at *1 (E.D. Pa. Mar. 19, 2013); *Squires v. Nephrology Found. of Brooklyn, Inc.*, No. 99 CV 1143, 1999 WL 1495421, at *3 (E.D.N.Y. Dec. 27, 1999)).) As discussed above, the FHA requires me to apply a broad and permissive approach to standing. *See supra* Part IV.A. The FHA grants standing to any "aggrieved person" who is "associated with [the targeted] buyer or renter." *See* 42 U.S.C. §§ 3604(f)(1)(c), 3613(a)(1)(A). The

Supreme Court has said that "the definition of 'person aggrieved' in the original version of the FHA showed a congressional intention to define standing as broadly as is permitted by Article III of the Constitution," *Bank of Am. Corp.*, 137 S. Ct. at 1298 (2017) (internal quotation marks omitted), and the Second Circuit has noted that the FHA "protects against the psychic injury caused by discriminatory statements made in connection with the housing market," *United States v. Space Hunters, Inc.*, 429 F.3d 416, 424 (2d Cir. 2005) (internal quotation marks omitted).

John Doe has alleged both financial and emotional injuries. (*See* Am. Compl. ¶¶ 19, 103–04, 106–08, 149–151, 156.) For the reasons discussed above, these injuries are fairly traceable to the State Defendants' conduct, and, at the outset of the litigation, they were likely to be redressed by a favorable decision. *See supra* Part IV.A.2.b. Accordingly, John Doe has sufficiently alleged standing against the State Defendants.

### B.      *Mootness*

#### 1.   **Applicable Law**

"[T]he mootness doctrine ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit." *Cook*, 992 F.2d at 19. Defendants argue that the amendments to the Original Regulations, which remove the "chairfast" prohibition, render Plaintiffs' claims moot. (*See* Village Housing Mem. 8–10; York Defs. Mem. 7–10; State Defs. Reply 9–10.) However, if simply amending a regulation could automatically moot a plaintiff's entire claim, "a defendant could moot a case by repealing the challenged [regulation] and replacing it with one that differs only in some insignificant respect." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 662 (1993). Accordingly, Plaintiffs claims are only moot if, after the adoption of the Amended Regulations, Defendants "can demonstrate that (1) there is no reasonable expectation that the alleged violation

will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Granite State Outdoor Adver., Inc. v. Town of Orange, Conn.*, 303 F.3d 450, 451 (2d Cir. 2002).

### 2. Application

The Original Regulations, which were the subject of the original complaint, required that an ALP "must not accept nor retain any person who . . . is chronically chairfast and requires lifting equipment to transfer or the assistance of two persons to transfer." (*See* Am. Compl. ¶¶ 162–63.) The Amended Regulations direct that an operator of an ACF, ALP, or Enriched Program "shall not exclude an individual on the sole basis that such individual is a person who primarily uses a wheelchair for mobility, and shall make reasonable accommodations to the extent necessary to admit such individuals, consistent with the [ADA]," and they do not include the language from the Original Regulations prohibiting the admission of "chronically chairfast" individuals. *See* 18 N.Y.C.R.R. §§ 487.4(b), 488.4(b), 494.4(b).

The Amended Regulations continue to prohibit the admission of any person who "chronically requires the physical assistance of another person in order to walk" or who "chronically requires the physical assistance of another person to climb or descend stairs, unless assignment on a floor with ground-level egress can be made." *Id.* §§ 487.4(c)(9)–(10); *see also* 488.4(c)(9)–(10). The Amended Complaint alleges that this language will continue to harm Plaintiffs in the same way as the "chronically chairfast" prohibition in the Original Complaint. (*See* Am. Compl. ¶¶ 209–13.)

I am aware that "[s]ome deference must be accorded to a state's representations that certain conduct has been discontinued," *Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo*, 981 F.2d 50, 59 (2d Cir. 1992), and that "challenges to statutes are routinely found moot

22

when a statute is amended," *id.* at 61.  However, even according the State Defendants a measure

of deference, I cannot find that, where a regulation prohibits the admission of persons who

require assistance walking or assistance climbing or descending stairs, there "is no reasonable

expectation that" the programs will continue to exclude all people who require the use of a

wheelchair.  *See Granite State*, 303 F.3d at 451.  Indeed, common sense dictates that all people

who are "chronically chairfast" most likely require the assistance of other people in order to walk

or assistance climbing or descending stairs.  Based on this interpretation, Plaintiffs adequately

allege that the Amended Regulations act as a categorical bar on people who are chronically

chairfast, and therefore the Amended Regulations "suffer[] from similar infirmities" as the

Original Regulations.  *Lamar Adver.*, 356 F.3d at 378; *see also Ne. Fla. Chapter of Associated*

*Gen. Contractors of Am.*, 508 U.S. at 662 (finding that, even where a new ordinance

disadvantaged plaintiffs "to a lesser degree than the old one," plaintiffs' claims were not moot

because the new ordinance "disadvantage[d] them in the same fundamental way").[13]

Accordingly, I find that the Amended Regulations do not moot Plaintiffs' claims.

### C.  *Failure to State a Claim*

#### 1.  State Defendants

The State Defendants argue that because the Amended Regulations specifically prohibit

operators from excluding persons solely on the basis that the person uses a wheelchair for

---

[13] Defendants also argue that the inclusion of language in the Amended Regulations requiring operators to "make reasonable accommodations to the extent necessary to admit such individuals, consistent with the [ADA]," 18 N.Y.C.R.R. §§ 487.4(b), 488.4(b), 494.4(b), renders it unlikely that any person will be excluded for using a wheelchair.  Operators were obligated to make reasonable accommodations when the Original Regulations were in effect, so the inclusion of this language in the Amended Regulations does not "completely and irrevocably eradicate[] the effects" of the Original Regulations.  *Granite State*, 303 F.3d at 451.  In addition, this language in the Amended Regulations does not alter the fact that those same regulations continue to prohibit the admission of any person who "chronically requires the physical assistance of another person in order to walk" or who "chronically requires the physical assistance of another person to climb or descend stairs, unless assignment on a floor with ground-level egress can be made."  18 N.Y.C.R.R. §§ 487.4(c)(9)–(10); *see also* 488.4(c)(9)–(10).

mobility, Plaintiffs have not alleged that the State Defendants discriminate on the basis of disability.  (*See* State Defs. Mem. 21–23.)  For the reasons I have already discussed, *see supra* Part IV.B.2, this argument fails because Plaintiffs have adequately alleged that the Amended Regulations continue to discriminate against all persons who use wheelchairs for mobility.

Contrary to the State Defendants' arguments, Plaintiffs have also adequately alleged that the Amended Regulations discriminate against persons with "other mobility impairments."  (*See* Am. Compl. ¶¶ 209–12.)  Whether Plaintiffs can prove these allegations must await discovery, summary judgment or trial, but these claims are not appropriately dismissed at this stage in the litigation.

### 2. ACF Defendants

The ACF Defendants argue that Plaintiffs do not sufficiently allege violations of the FHA, 42 U.S.C. §§ 3604(f)(1)–(3), 3604(c), 3604(d), or of the Rehab Act or the ACA.  (*See* Village Housing Mem.18–24; York Defs. Mem. 19–23.)  I consider each of these arguments in turn.

#### a.  Sections 3604(f)(1)–(3) of the FHA, the Rehab Act, and the ACA[14]

The FHA makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . that buyer or renter," 42 U.S.C. § 3604(f)(1), and "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities

---

[14] Courts generally "consider reasonable accommodation claims arising under the . . . [Rehab Act] and [the] FHA in tandem."  *Forziano v. Indep. Grp. Home Living Program, Inc.*, 613 F. App'x 15, 18 (2d Cir. 2015).  The ACF Defendants argue, and Plaintiffs do not dispute, that the "ACA must also be read in tandem because Congress enacted section 18116(a) to create a private right of action for violations of the [Rehab Act] and three other federal civil rights statutes."  (*See* Village Housing Mem. 24 (citing *S. Pa. Transp. Auth. v. Gilead Scis., Inc.*, 102 F. Supp. 3d 688 (E.D. Pa. 2015)); York Defs. Mem. 23 (same); *see also generally* Pls. Mem.)

in connection with such dwelling, because of a handicap of . . . that person," *id* § 3604(f)(2).

"[D]iscrimination includes . . . a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3). A plaintiff has three available theories on which he or she may base a discrimination claim under the FHA: (1) disparate treatment (also referred to as intentional discrimination); (2) disparate impact; and (3) failure to make a reasonable accommodation. *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002). Plaintiff here proceeds under theories of disparate treatment and failure to make a reasonable accommodation.

i.  *Sections 3604(f)(1) and 3604(f)(2)*

To establish a prima facie case of discrimination under § 3604(f)(1), a plaintiff must allege: "(1) that a person residing in or intending to reside in the dwelling after its sale or rental to the plaintiff had a handicap as defined in the FHA, (2) that the plaintiff sought and was qualified to purchase or rent the housing, (3) that he was rejected, and (4) that the rejection occurred in circumstances giving rise to an inference of discrimination on the basis of the handicap of the person residing or intending to reside with the plaintiff." *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 152 (2d Cir. 2014). "[V]arious forms of discouragement" during the application process have been found to violate § 3604(f)(1). *LeFrak*, 987 F. Supp. 2d at 399 (quoting *Corey v. U.S. Dep't of Hous. & Urban Dev.*, 719 F.3d 322, 326 (4th Cir. 2013)). Similarly, "[t]o state a claim for intentional discrimination under § 3604(f)(2), a plaintiff must establish that: (1) he is a member of the protected class; (2) that defendants took adverse action against him; and (3) that the adverse action took place under circumstances giving rise to an

inference of discrimination." *Mazzocchi v. Windsor Owners Corp.*, No. 11 Civ. 7913(LBS), 2012 WL 3288240, at *7 (S.D.N.Y. Aug. 6, 2012).

In their arguments in favor of dismissal of Plaintiff FHJC's claims under §§ 3604(f)(1) and 3604(f)(2), Defendants appear to concede that the FHJC testers were applying on behalf of persons with mobility disabilities ("Tester Applicants") and that they were denied housing. (*See* Am. Compl. ¶¶ 63, 73, 82, 95.) Notwithstanding this concession, the ACF Defendants argue that Plaintiffs fail to allege that the Tester Applicants were "otherwise qualified"; i.e., that they met the various other eligibility criteria for admission to ACFs. (*See* Village Housing Mem. 19–20; York Defs. Mem. 20–21.) The testers did not have an opportunity to demonstrate that the Tester Applicants satisfied all of the other eligibility criteria, because, in each case, the ACF Defendants represented that the use of a wheelchair was disqualifying. (*See* Am. Compl. ¶¶ 64, 73, 83, 95.) In other words, once it was revealed that the Tester Applicants needed to use wheelchairs, they were essentially disqualified from consideration by the representatives of the ACF Defendants and the application process ceased prior to any inquiry concerning whether the Tester Applicants were otherwise qualified. In any event, Plaintiffs could not reasonably allege that the hypothetical Tester Applicants would have otherwise met the eligibility criteria, because those applicants did not exist. This pleading gap does not defeat the allegations, because it is well established that testers from fair housing organizations can establish violations of the FHA without a formal application to a housing provider. *See Havens*, 455 U.S. at 373.[15]

Moreover, FHJC alleges that it sent a second tester to each ACF Defendant with a factual script similar to the one used for the Tester Applicants, except that the description of the

---

[15] For the same reason, the York Defendants' argument that the FHJC is not a "qualified individual," (*see* York Defs. Mem. 20), must also fail.

prospective applicant did not include that the applicant required a wheelchair, and each of those testers was encouraged to continue the application process. (*See* Am. Compl. ¶¶ 66–71, 77–79, 85–87, 88–92.) At this stage in the litigation, I must "constru[e] the complaint liberally . . . and draw[] all reasonable inferences in the plaintiff's favor." *Heller v. Consol. Rail Corp.*, 331 F. App'x 766, 767 (2d Cir. 2009) (summary order). Based on the allegations discussed above and the compared experiences of the two sets of testers, I can infer that the ACF Defendants determined that each of the Tester Applicants was otherwise qualified.

The ACF Defendants' argument that FHJC has not alleged intentional discrimination because it has not demonstrated discriminatory animus under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), must also fail. (*See* Village Housing Mem. 22; York Defs. Mem. 21–23.) FHJC alleges that each of the representatives of the ACF Defendants directly told the testers that the Tester Applicants would not be admitted because they used a wheelchair; i.e., because they had a mobility impairment. (Am. Compl. ¶¶ 64, 73, 75, 82–83, 89.) At this stage in the litigation, no more than this alleged direct evidence of disability discrimination is required. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (where a plaintiff presents direct evidence of discrimination, the burden-shifting framework announced in *McDonnell Douglas* does not apply).

For the foregoing reasons, the ACF Defendants' motions to dismiss claims brought by Plaintiffs for violation of §§ 3604(f)(1)–(2) are denied.

ii. *Section 3604(f)(3), the Rehab Act, and the ACA*

A reasonable accommodation claim must allege: "(1) that the plaintiff . . . had a handicap within the meaning of § 3602(h); (2) that the defendant knew or reasonably should have been expected to know of the handicap; (3) that the accommodation was likely necessary to

afford the handicapped person an equal opportunity to use and enjoy the dwelling; (4) that the accommodation requested was reasonable; and (5) that the defendant refused to make the requested accommodation." *Olsen*, 759 F.3d at 156. In the Second Circuit, in order to prevail on a reasonable accommodation claim, plaintiffs must first give defendants "an opportunity to accommodate them through the . . . established [administrative] procedures." *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 578 (2d Cir. 2003).

Other courts of appeal have held that plaintiffs need not formally request an accommodation through administrative procedures where the request would be futile. *See, e.g.*, *United States v. Vill. of Palatine,* 37 F.3d 1230, 1234 (7th Cir. 1994). Although the Second Circuit has not expressly adopted such a futility rule in the context of the FHA, it has adopted a futility rule in other contexts. *See, e.g.*, *Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 488 (2d Cir. 2002) (recognizing "that the IDEA's exhaustion requirement does not apply in situations in which exhaustion would be futile" (internal quotation marks omitted)). In *Davoll v. Webb*, 194 F.3d 1116, 1133 (10th Cir. 1999), the Tenth Circuit noted that one of the defendant's policies "foreclosed the only reasonable accommodation that could have assisted plaintiffs," and stated that where the defendant's statements "effectively indicated that the [defendant] had no intention of engaging in the interactive process in good faith with [the plaintiff][,] [h]er 'failure' to inquire about [a reasonable accommodation] was a logical result of the [defendant's] position."

Here, Plaintiffs allege that an employee of Defendant Madison York Rego Park LLC told a tester that "wheelchairs are not allowed in the facility," and "we cannot accommodate a wheelchair-bound patient." (Am. Compl. ¶ 64.) Plaintiffs allege that an employee of Defendant Madison York Assisted Living Community, LLC told a tester, "We don't, we don't have any

wheelchairs here," and that they were "not set up for wheelchairs." (*Id.* ¶ 73.) Plaintiffs allege that an employee of Defendant Elm York LLC told a tester, "So let me stop right there . . . . [Y]ou're not allowed . . . you cannot have any wheelchairs. Walkers, canes, yes . . . . But not wheelchairs." (*Id.* ¶¶ 82–83.) Finally, Plaintiffs allege that Defendant Village Housing told a tester that "[e]ven though [your mother-in-law] can get around and can get off the chair and transfer and all that . . . [w]e could not accept anyone in a wheelchair . . . under no circumstances." (*Id.* ¶ 95.) In light of these statements, Plaintiffs have adequately alleged that the ACF Defendants had categorical policies against wheelchairs and that any request for a reasonable accommodation would have been futile. Accordingly, their failure to specifically ask for an accommodation does not render their allegations insufficient, and the ACF Defendants' motions to dismiss the reasonable accommodation claim are denied.

### b. Section 3604(c)

Section 3604(c) makes it unlawful to "make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . handicap . . . or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c). In determining whether a statement runs afoul of § 3604(c), courts adopt an "ordinary listener" standard. *Soules v. U.S. Dept. of Hous. & Urban Dev.*, 967 F.2d 817, 824 (2d Cir. 1992). Under this standard courts inquire whether a statement would suggest to an ordinary listener that a particular protected class is preferred or not preferred for the housing in question. *Id.* An ordinary listener hears statements in context and "is neither the most suspicious nor the most insensitive of our citizenry." *Id.; see also Mancuso v. Douglas Elliman LLC,* 808 F. Supp. 2d 606, 625 (S.D.N.Y. 2011).

The ACF Defendants argue that Plaintiff has not sufficiently alleged that any of their statements indicated a preference based on disability. (*See* Village Housing Mem. 16–18; York Defs. Mem. 16–18.) They argue that their inquiries about wheelchair use cannot be discriminatory because they are permitted by regulations issued by the Department of Housing and Urban Development ("HUD"), such as 24 C.F.R. §§ 100.202(c)(3), (d). (*See id.*) Defendants misunderstand these regulations.

Section 100.202(c) makes it unlawful "to make an inquiry to determine whether an applicant for a dwelling . . . has a handicap or to make inquiry as to the nature or severity of a handicap of such a person." This provision, on its face, prohibits the ACF Defendants' alleged inquiries to testers about prospective applicants' use of wheelchairs. The regulation includes a limited exception, permitting an inquiry about a person's disability to "determine whether an applicant for a dwelling is qualified for a priority available to persons with handicaps or to persons with a particular type of handicap." *Id.* § 100.202(c)(3). A logical reading of this exception reveals that it permits the exclusion of applicants who are able-bodied in a manner in which the target population for a particular program is not. The ACF Defendants confoundingly suggest that it says the opposite, that they may exclude applicants who are disabled in a manner in which the target population for a particular program is not. This interpretation is incoherent in light of the general prohibition against inquiring into a person's disability, and runs contrary to the entire purpose of the FHA.

The ACF Defendants also rely on *Soules*, where the Second Circuit found that limited inquiry about the age of an applicants' children may be permissible based on "[l]ocal zoning regulations," and therefore, "standing alone, an inquiry into whether a prospective tenant has a child does not constitute an FHA violation." 967 F.2d at 824. However, in *Soules*, the validity

of the local zoning regulations was not challenged in the lawsuit, and the ACF Defendants provide no support for the argument that where a regulation is challenged as violating the FHA, an inquiry directed at compliance with that regulation is protected from liability. Accordingly, the ACF Defendants' motions to dismiss Plaintiffs' claims under § 3604(c) are denied.

The York Defendants also argue that because they were providing truthful, non-misleading information to the testers, they are protected by the First Amendment from liability under § 3604(c). (York Defs. Mem. 24–25.) However, "the Constitution accords a lesser protection to commercial speech than to other constitutionally guaranteed expression," *Ragin*, 923 F.2d at 1002 (citation omitted), and does not protect "commercial speech related to illegal activity." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563–64 (1980). If Plaintiffs prove at trial that the York Defendants' conduct violated the FHA, then their statements will relate to illegal activity, and the First Amendment will not protect them. As discussed above, Plaintiffs have plausibly alleged that the statements relate to violations of the FHA, and so I cannot find that the allegations fail as a matter of law.

### c. Section 3604(d)

The amended complaint also alleges a violation of § 3604(d). (*See* Am. Compl. ¶ 229.) Although the ACF Defendants argue in their moving papers that this claim should be dismissed, (*see* Village Housing Mem.18–19; York Defs. Mem. 19–23), Plaintiffs do not address those arguments in their opposition brief, (s*ee generally* Pls. Opp. 30–39). Accordingly, Plaintiffs concede that the amended complaint does not adequately allege a violation of § 3604(d), and the ACF Defendants' motions to dismiss claims under that section are granted. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived . . . ."); *see also Am. Tissue, Inc. v. DLJ Merch. Banking Partners, II, L.P.*,

No. 03 Civ. 6913(GEL), 2006 WL 1084392, at *6 (S.D.N.Y. Apr. 20, 2006) (dismissing certain claims because plaintiff "fail[ed] to address with any seriousness the legal sufficiency of those claims as amended").

**V.      Conclusion**

For the foregoing reasons, Defendants' motions to dismiss the amended complaint for lack of Article III standing and under the doctrine of mootness are DENIED.  The State Defendants' motion to dismiss for failure to state a claim is DENIED.  The ACF Defendants' motions to dismiss for failure to state a claim are GRANTED IN PART and DENIED IN PART.  Specifically, the ACF Defendants' motions are GRANTED to the extent they seek dismissal Plaintiff FHJC's claims brought against them under § 3604(d) of the FHA; the ACF Defendants' motions for failure to state a claim are otherwise DENIED.

The Clerk of Court is directed to terminate the open motions at Document 129, 133, and 136.  Defendants are directed to file answers to the amended complaint within thirty (30) days of the entry of this Opinion & Order.

SO ORDERED.

Dated: September 30, 2019
      New York, New York

Vernon S. Broderick
United States District Judge