UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FAIR HOUSING JUSTICE CENTER, INC.,
JANE DOE and JOHN DOE,

                                 Plaintiffs,

                v.

HOWARD A. ZUCKER, in his official capacity as
Commissioner of the New York State Department of
Health, THE NEW YORK STATE DEPARTMENT
OF HEALTH, ELM YORK LLC, MADISON YORK
ASSISTED LIVING COMMUNITY, LLC,
MADISON YORK REGO PARK LLC, and VILLAGE
HOUSING DEVELOPMENT FUND
CORPORATION,

                               Defendants.

---

18 Civ. 3196 (VSB) (RWL)

**SETTLEMENT AGREEMENT BY
AND BETWEEN PLAINTIFFS AND
DEFENDANT VILLAGE HOUSING
DEVELOPMENT FUND
CORPORATION**

       This Settlement Agreement (the "Agreement") is entered into by and between Plaintiffs

Fair Housing Justice Center, Inc., the Estate of Jane Doe, and John Doe (hereinafter, "Plaintiffs")

and Defendant Village Housing Development Fund Corporation (hereinafter "Defendant"), by

and through their respective counsel (together, the "Parties" and each a "Party").

       **WHEREAS,** on August 14, 2018, Plaintiffs filed an Amended Complaint, alleging that

the Defendant discriminated against Jane Doe and against prospective and current residents who

use wheelchairs at its adult care facility, VillageCare at 46 and Ten (hereinafter "Facility"), in

violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, the Rehabilitation Act, 29 U.S.C. §

701 *et seq.*, and the Patient Protection and Affordable Care Act, 42 U.S.C. § 18001, *et seq.*;

**WHEREAS**, the Defendant denies the allegations of wrongdoing and liability against it in the Amended Complaint, and by entering into this Agreement does not intend to admit, and does not admit, the same;

**WHEREAS,** Defendant maintains it has complied and will continue to comply with the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and the Patient Protection and Affordable Care Act, 42 U.S.C. § 18001, *et seq.*;

**WHEREAS**, none of the provisions in this Agreement are intended to violate the regulatory requirements of New York law, and Plaintiffs and Defendant do not believe that any of the provisions herein violate New York law; and

**WHEREAS,** the Parties wish to voluntarily resolve the claims raised by Plaintiffs in the Amended Complaint, according to the terms set forth in this Agreement, as a compromise to avoid protracted expenses and litigation;

**NOW, THEREFORE,** it is hereby stipulated and agreed, by and among the Parties, that all claims shall be compromised, settled, released, and dismissed upon and subject to the terms of this Agreement, as follows:

## I.     DEFINITIONS

As used in this Agreement, the following terms shall have the following meanings:

1. "FHJC" means the Fair Housing Justice Center, Inc.

2. "Plaintiffs" means FHJC, the Estate of Jane Doe, and John Doe.

3. "Defendant" means Village Housing Development Fund Corporation, the operator of the Facility.

2

4.      "Action" means *Fair Housing Justice Center, Inc. v. Howard A. Zucker, et al.*, 18 Civ. 3196 (VSB) (RWL), pending in the United States District Court for the Southern District of New York.

5.      "Amended Complaint" means the Amended Complaint that Plaintiffs filed in this Action on August 14, 2018.

6.      "Assessment Forms" include the medical evaluation, mental health evaluation, and any other forms required prior to admission by DOH regulations or by Defendant.

7.      "Assistive Mobility Device" means a power wheelchair, manual wheelchair, rollator, rolling walker or walker.

8.      "DOH" means the New York State Department of Health.

9.      "Effective Date" means the last date upon which this Agreement is executed by the Parties, approved by the Surrogate's Court for the Estate of Jane Doe, and approved by the United States District Court for the Southern District of New York.

10.      "Facility" means VillageCare at 46 and Ten, located at 510 W 46th St, New York, New York 10036.

11.      "Independent Applicant" refers to a prospective resident whose initial contact with the Facility was made either by the applicant directly, or by a relative, friend, or other person acting on the applicant's behalf.

12.      "Institutional Applicant" refers to a prospective resident whose initial contact with the Facility is an institutional referral source, such as a hospital, nursing home, congregate care setting, or other health care, government or social services entity, contacting the Facility on behalf of the prospective resident.

13.     "Marketing Materials" refers to brochures, pamphlets, Websites, advertisements, videos, promotional materials included with application packets, and any other paper or digital documents used to advertise the Facility, to encourage people to apply for residency at the Facility, or to encourage people to refer potential applicants to the Facility.

14.     "Policy Manual" refers to any documents used by Defendant to provide training or guidance to its employees, agents or representatives, pertaining to the following: (i) the Non-Discrimination Policy and the Reasonable Accommodation and Modification Policy described in Section V of this Agreement; (ii) marketing activities; or (iii) the Admission Process and the Retention Review Process described in Section VI of this Agreement.

15.     "Principal" means any natural person who is a principal, owner, managing partner, partner, or member of Defendant.

16.     "Trainees" means the Principals of Defendant; the CEO of Defendant; the Vice President for Branding & Marketing Communications of Defendant; the administrator of the Facility; and every employee at the Facility and Facility contractor whose job duties include: (a) providing information to prospective residents about bed availability or the terms and conditions for admission or services offered at the Facility, (b) giving tours, (c) processing applications, (d) marketing or otherwise publicizing the services of the Facility, (e) setting financial or program quality targets as they relate to admission and retention decisions for the Facility, (f) implementing the Facility's policies regarding applications, admissions, room assignments, retention and termination of

admission agreements, and requests for reasonable accommodations and/or modifications; and/or (g) making admission or retention decisions.

17.   "Website" refers to any webpage maintained by or on behalf of Defendant for advertising purposes or informational use by potential applicants to, or residents of, the Facility or persons acting on their behalf.

## II.   TERM AND SCOPE OF AGREEMENT

1.   All obligations under this Agreement, unless otherwise specified, shall commence within thirty (30) days after the Effective Date and shall continue for three years thereafter (the "Settlement Period").

2.   If, during the Settlement Period, New York State modifies its adult care facility or assisted living program admission or retention "rules, regulations or official directives" binding on Defendant pursuant to 18 NYCRR s. 504.3(i), or if any court or administrative tribunal issues any decision, order or other binding directive on Defendant, and either Party reasonably and in good faith determines that said modification, decision, order, or binding directive materially affects the terms of the Agreement such that its terms should be amended, said Party agrees to notify the other Party within ten (10) days. Thereafter, the Parties shall meet and confer about the modification, decision, order or binding directive. If, after meeting and conferring for thirty (30) days, the Parties are unable to reach agreement about any amendments to this Agreement, they may seek immediate relief under paragraph 3 of Section III of this Agreement without awaiting a cure period to lapse.  During the period beginning on the date either Party provides notice as described above and continuing until either (i) the Parties reach agreement on amending this Agreement, or (ii) the District Court determines a Party's request for relief,

Defendant shall not be required to comply with that portion or portions of this Agreement that have been determined to be materially affected by said modification, decision, order, or binding directive.

3.      The Parties warrant and represent that they (i) except for the Estate of Jane Doe, have the power and authority to bind themselves as necessary and to execute and deliver this Agreement; (ii) have the power, authority and ability to perform their obligations hereunder; (iii) are the owners of all claims asserted or that could have been asserted that are being released, and have not assigned or transferred, or purported to assign or transfer, voluntarily or involuntarily, or by operation of law, all or any portion of such claims or any claim, right or interest that is agreed to be released in this Agreement; and (iv) have entered into this Agreement freely, voluntarily and knowingly with an adequate opportunity to consult with the attorneys of their choice prior to entering into this Agreement.  The Parties further represent that the making and performance of this Agreement will not violate any provisions of law, or any other agreement with any person or legal entity by which that Party is bound. The Estate of Jane Doe warrants and represents that its authority to bind itself as necessary and to execute and deliver this agreement is subject to the approval of the Surrogate's Court of the State of New York, County of New York, pursuant to the Decree granting Letters of Administration dated August 21, 2020.

4.      This Agreement shall be binding on Plaintiffs and Defendant and all of their Principals, employees, agents, representatives, officers, heirs, assigns, subsidiaries, or successors in interest, unless otherwise specified.

### III.     JURISDICTION AND ENFORCEMENT

1.      The United States District Court for the Southern District of New York (the "District Court") shall retain jurisdiction to enforce the terms of this Agreement. The District Court may enforce the terms of this Agreement upon the filing of an appropriate motion by either Party.  The Parties to this Agreement shall endeavor in good faith to informally resolve any differences regarding compliance with and interpretation of this Agreement.  The Parties agree to seek Court intervention only for substantial matters that impair or threaten to impair the benefits a Party sought to enjoy under this Agreement.

2.      Prior to filing any motion to enforce or modify the terms of this Agreement, a Party must:

        a.      Provide written notice of any instance of alleged noncompliance with the Agreement to the other Party;

        b.      Within twenty (20) days of written notice being provided, meet and confer in good faith concerning such alleged noncompliance;

        c.      Allow an opportunity of no less than thirty (30) days following the meet and confer in which the allegedly noncompliant Party may cure any noncompliance; and

        d.      During the thirty (30) day cure period, continue to meet and confer in good faith concerning any unresolved dispute about compliance or cure.

3.      If the allegedly noncompliant Party fails to cure within thirty (30) days as provided in Paragraph 2(c) of this Section above, either Party may request a conference

with the District Court.  If, within sixty (60) days of a Party's request for a conference to the District Court, the alleged noncompliance is not resolved or a conference is not held, either Party may file an appropriate motion for relief with the District Court.

## IV.    MONETARY RELIEF

Defendant shall pay Plaintiffs the total sum of $400,000 (the "Settlement Amount") in full and final settlement of all of Plaintiffs' monetary claims in this Action, including damages of $87,007 to compensate FHJC; damages of $77,163 to compensate the Estate of Jane Doe; damages of $35,830 to compensate John Doe; and $200,000 in attorney's fees and costs.  The Settlement Amount shall be delivered by a certified check via overnight mail to counsel for Plaintiffs at Pillsbury Winthrop Shaw Pittman LLP, 31 West 52nd Street, New York, NY 10019-6131, Attn: David G. Keyko, Esq., within ten (10) business days of the Effective Date.  The date upon which the Settlement Amount is received by counsel for Plaintiffs and the certified check clears shall be the "Release Date."

1.      Concurrently with the execution of this Agreement, Plaintiffs shall deliver to counsel for Defendant a signed Stipulation and Order of Dismissal in the form set forth in **Exhibit A**, to be held in escrow.  The Parties agree to stipulate that dismissal shall be with prejudice and with each Party to bear its own costs.  The Parties also agree to stipulate that the order shall vest the Court with continuing jurisdiction for the sole purpose of enforcing the terms of the Agreement.  Counsel for Plaintiffs shall file the executed Stipulation and Order of Dismissal with the Court within ten (10) business days of the Release Date.

V.    NON-DISCRIMINATION POLICY AND REASONABLE
      ACCOMMODATION POLICY AS TO THE FACILITY

      A.    Non-Discrimination.

      1.    The purpose of this Agreement is:  (a) to ensure that persons seeking or

inquiring, directly or through another person or entity, about admission to the Facility and

current residents who want to continue residing at the Facility are not denied admission

or continued residency because of use of a wheelchair or other Assistive Mobility

Device; and  (b) to ensure that those using a wheelchair or Assistive Mobility Device are

provided reasonable accommodations or modifications where needed to afford them

equal opportunity to use and enjoy the Facility's housing and services consistent with

applicable federal, state and local laws, rules and regulations.

      2.    This Agreement is not intended to override any federal, state or local laws,

rules or regulations that may exist now or in the future that govern the admission process

or limit eligibility for admission or retention.

      3.    Defendant shall adopt the "Non-Discrimination Policy" attached hereto as

**Exhibit B** regarding nondiscrimination against individuals with mobility impairments

and/or those individuals who rely on wheelchairs and other Assistive Mobility Devices.

      4.    Within thirty (30) days after the Effective Date, the Non-Discrimination

Policy shall be included in the Policy Manual and shall be distributed to current

employees involved in admissions and retention decisions and all Trainees as defined in

this Agreement.  The Non-Discrimination Policy shall be distributed to new Trainees at

the time they are hired.

      5.    Within thirty (30) days after the Effective Date, the Non-Discrimination

Policy shall be provided to applicants (i) at or before the interview during any

9

assessment/review stage of such applicant's application for admission and (ii) with any Admission Agreement.  If any applicant is interviewed prior to thirty (30) days after the Effective Date and not provided the Non-Discrimination Policy and such applicant's pending application is denied more than thirty (30) days after the Effective Date, such applicant shall be provided the Non-Discrimination Policy upon being informed of the denial.

6.      Within thirty (30) days after the Effective Date, the Non-Discrimination Policy shall be distributed to current residents.

**B.      Reasonable Accommodation and Modification.**

1.      Defendant shall adopt the "Reasonable Accommodation and Modification Policy" attached hereto as **Exhibit C.**

2.      Within thirty (30) days of the Effective Date, the Reasonable Accommodation and Modification Policy shall be included in the Policy Manual and shall be distributed to current employees involved in admissions and retention decisions and all Trainees as defined in this Agreement.  The Reasonable Accommodation and Modification Policy shall be distributed to new employees involved in admission and retention decisions at the time they are hired.

3.      Within thirty (30) days after the Effective Date, the Reasonable Accommodation and Modification Policy shall be provided to applicants (i) at or before the interview during any assessment/review stage of such applicant's application for admission and (ii) with any Admission Agreement.  If any applicant is interviewed prior to thirty (30) days after the Effective Date and not provided the Reasonable Accommodation and Modification Policy and such applicant's pending application is

10

denied more than thirty (30) days after the Effective Date, such applicant shall be provided the Reasonable Accommodation and Modification Policy upon being informed of the denial.

4.      Within thirty (30) days after the Effective Date, the Reasonable Accommodation and Modification Policy shall be distributed to current residents.

C.    **Marketing Materials.**

1.      Within thirty (30) days after the Effective Date, all Marketing Materials used by Defendant shall reference the Facility's Reasonable Accommodation and Modification Policy and the Facility's Non-Discrimination Policy.

2.      Within thirty (30) days after the Effective Date, Marketing Materials using human models or figures will include at least one such model or figure who is a person using a wheelchair.  Models or figures, if used, will portray persons in equal social settings.

3.      Defendant agrees to adhere to the HUD guidance on human models, a copy of which is attached hereto as **Exhibit D.**

4.      Defendant shall use the fair housing logo and/or "equal housing opportunity" on all Marketing Materials.

5.      Defendant shall place HUD/City Fair Housing posters at the Facility in a conspicuous location accessible to prospective and current residents and other members of the public.

6.      Defendant shall give to applicants and residents the brochure attached as **Exhibit E**, or such other government-published brochure agreed to by FHJC that provides information to people with disabilities about their fair housing rights.

11

**D.    Training.**

1.    Trainees shall receive training at least once per year on provisions of the Fair Housing Act, Rehabilitation Act, Americans with Disabilities Act, New York State Human Rights Law, and New York City Human Rights Law, that prohibit discrimination based on disability at facilities such as Defendant's Facility.  New employees who are Trainees shall also receive such training within thirty (30) days after they are hired.

2.    Trainees shall receive training once per year for two (2) consecutive years on Defendant's Non-Discrimination and Reasonable Accommodation and Modification Policies adopted contemporaneously with this Agreement.  New employees who are Trainees also shall receive such training within thirty (30) days after they are hired.

3.    In the first and third years of the Settlement Period, an independent trainer selected from the list of trainers attached hereto as **Exhibit F,** or a trainer otherwise mutually agreeable to the Parties, will provide two training sessions on housing discrimination for Defendant's Trainees.  Defendant will use reasonable best efforts to ensure all such Trainees attend at least one of such training sessions in the years the sessions are given.

**E.    Prohibition Against "No Wheelchair" Policy or Practice.**

1.    Employees of Defendant shall not communicate any form of a "no wheelchair" policy or practice to persons inquiring about residency, to any applicant or resident, or any representative of an applicant or resident.

2.    Within thirty (30) days after the Effective Date, using a form letter attached hereto as **Exhibit G**, Defendant shall inform the referral sources (defined below) to the Facility that Defendant will not deny admission on the basis of mobility

12

impairment without affording the prospective resident the opportunity to participate in the reasonable accommodation process, as described by the Reasonable Accommodation Policy adopted contemporaneously with this Agreement.  A copy of each letter shall be provided to Plaintiffs' counsel at the time they are disseminated. Defendant shall distribute its Non-Discrimination Policy to referral sources every six (6) months in the first year following the Effective Date and every twelve (12) months thereafter during the Settlement Period to ensure ongoing non-discrimination.  For purposes of this paragraph, "referral source" shall include any entity or individual or other method of referral that has referred at least three (3) potential applicants to the Facility within the immediately preceding year.  With respect to referrals through Defendant's Website, Defendant shall satisfy its obligations with respect to this Paragraph by posting its Non-Discrimination Policy and its Reasonable Accommodation and Modification Policy on its Website.

   3. Defendant shall not reject any applicant or terminate any current resident on the basis that such individual is a person who uses a wheelchair for mobility, without affording such applicant or resident the opportunity to participate in the reasonable accommodation process, as described by the Reasonable Accommodation and Modification Policy adopted contemporaneously with this Agreement.

## VI. ADMISSION PROCESS FOR APPLICANTS/RETENTION PROCESS FOR CURRENT RESIDENTS

The admission process for Defendant shall be altered to include the following three stages in sequential order: (1) Referral; (2) Assessment/Review; and (3) Determination.  The Referral Stage may vary for Individual and Institutional Applicants, as set forth below, but the Assessment/Review and Determination stages shall generally be the same for all applicants.

13

### A.    Referral Stage.

This stage shall include any initial inquiries, up to the submission of documentation required by DOH regulation prior to admission.

 1.    **Independent Applicants.**

  a.    During informal, pre-assessment interactions, and throughout the application process, Defendant shall provide Independent Applicants with information about the services offered and admissions/eligibility requirements.  Defendant shall explain the Non-Discrimination Policy and Reasonable Accommodation and Modification Policy upon request, or if a mobility impairment or use of a wheelchair or other Assistive Mobility Device has been disclosed unsolicited.

  b.    Defendant shall disseminate any written materials, to the extent they exist, regarding services provided and general admissions/eligibility requirements to all Independent Applicants.

  c.    Defendant shall not, at the time of initial telephone inquiries, tours, meetings, or other informal interactions occurring before the Assessment Stage, screen out or reject Independent Applicants with mobility impairments or who use a wheelchair or other Assistive Mobility Device, or deter Independent Applicants with mobility impairments or who use a wheelchair or other Assistive Mobility Device from proceeding to the Assessment/Review stage.

d.    Defendant shall not inquire about mobility impairments, use of a wheelchair or other Assistive Mobility Device, or service needs specific to individuals with mobility impairments or use of a wheelchair or other Assistive Mobility Device, such as assistance with walking, climbing or descending stairs, or assistance with transferring, of the Independent Applicant at the Referral Stage.

e.    If the Facility has no empty beds, an Independent Applicant can request to be placed on the waitlist, as described below in Section VI.D of this Agreement.  Defendant shall document any periods of time where the Facility has no empty beds and provide that documentation to FHJC upon request.

2.    **Institutional Applicants.**

Defendant shall not inquire about mobility impairments or use of a wheelchair or other Assistive Mobility Device at the Referral Stage or decline admission to an Institutional Applicant based on mobility impairments or use of a wheelchair or other Assistive Mobility Device that were disclosed without solicitation.

3.    **Application Tracking.**

Defendant shall ensure that its records tracking the outcome of each Institutional and Independent Applicant includes:

(1) Name of referral source and contact information;

(2) Date of initial inquiry;

(3) Name of potential applicant;

15

(4) Whether mobility impairment was disclosed prior to assessment, and if so how and by whom;

(5) Whether the candidate proceeded to assessment, and if not, why not;

(6) If assessed, whether applicant had a mobility impairment;

(7) For applicants with mobility impairments:

      (a)Type of mobility impairment; and

      (b) Outcome of application; and

(8) Specific basis for any denial.

4.       The records will be kept in a form substantially similar to **Exhibit H**, attached hereto, provided, however, Defendant shall have the right to expand such form to collect additional information that it deems necessary or advisable for its business, marketing and operational activities.

     **B.**     **Assessment/Review Stage.**

1.       The Assessment portion of the Assessment/Review Stage shall involve acquiring such information as Defendant needs to make an admission decision, which includes the completion of the Assessment Forms, an interview and all other steps required by DOH regulations.  Following or in the process of the Assessment portion of this stage, the Facility shall review the information provided to it and determine whether the Facility can meet the needs of the Independent or Institutional Applicant, at which point mobility may be considered.

2.    Defendant shall not refuse any applicant access to the Assessment/Review Stage on the basis that the individual has a mobility impairment or uses a wheelchair or other Assistive Mobility Device.

3.    Defendant shall not discourage or deter Independent or Institutional Applicants from proceeding to the Assessment/Review Stage based on a mobility impairment or use of a wheelchair or other Assistive Mobility Device.

4.    Defendant shall retain a record of each inquiry or referral received. Defendant shall also retain any information collected or considered before making an admission decision for prospective residents that reach the Assessment/Review Stage, including but not limited to the Assessment Forms and a record of the outcome of each applicant who progresses to the Assessment/Review Stage.

5.    If the Facility determines that it could meet the mobility needs of the applicant by granting a reasonable accommodation or modification, whether or not such accommodation or modification was requested, it shall offer such reasonable accommodation or modification.

6.    When the Facility is able to offer reasonable accommodations to an applicant or resident who uses a wheelchair or other Assistive Mobility Device, consistent with federal law and 18 NYCRR §§ 488.4(b) and 494.4(b), but who would otherwise be barred from admission or retention under mobility-related provisions of 18 NYCRR §§ 488.4(c) and 494.4(d) and (e),[1] the Facility shall contact the DOH in writing

---

[1]  Barring admission or retention of people who are chronically bedfast; who chronically require the physical assistance of another person to transfer; who chronically require the physical assistance of another person in order to walk; who chronically require the physical assistance of another person to climb or descend stairs, unless assignment on a floor with ground-level egress can be made; and people who are dependent on medical equipment.

17

to describe the accommodation and seek DOH approval to admit or retain the applicant or resident.

7.      When necessary to obtain such DOH approval to admit the applicant or retain the resident, the Facility shall seek a regulatory waiver pursuant to 18 NYCRR §§ 488.3(f), 494.3(g)(1), or any other provision of the Social Services Law and DOH regulations.  Unless DOH grants the Facility a regulatory waiver pursuant to the preceding sentence, Facility shall have no obligation to admit or retain such person, except as provided in the subsequent paragraph, unless or until FHJC obtains an order from the District Court that requires such admission or retention.

8.      If the DOH denies the application for a regulatory waiver by the Facility seeking to admit or retain the person, Defendant shall be permitted to deny admission to such person, if such person is a new applicant, or terminate the admission agreement of such person, if such person is a current resident, and the foregoing actions shall not be considered a failure to admit or retain the person in violation of this Agreement. However, the Facility shall immediately notify Plaintiffs' counsel and provide copies of any related communications with the DOH regarding the person in question. Additionally, Defendant shall make reasonable efforts to obtain a response from DOH to any Facility application for a regulatory waiver within ninety (90) days of application for a regulatory waiver and shall inform Plaintiff's counsel within sixty (60) days and again within ninety (90) days of an application for a regulatory waiver being submitted if DOH has not responded.  With respect to an application for a regulatory waiver to admit a person, such applicant shall be placed on a waitlist until such time as DOH responds to such application, but in no event shall Defendant be required to admit such person until

such time as DOH grants the waiver application.  If DOH does not respond within ninety (90) days to an application for a regulatory waiver to retain a resident, Defendant shall not serve a Notice of Termination to said resident until after the ninety (90) day period for response to a waiver request has expired, and shall provide said Notice of Termination to Plaintiffs' counsel within three (3) days of service.

9.     If at any time, DOH rescinds a regulatory waiver previously granted to Defendant and/or the Facility pursuant to 18 NYCRR §§ 488.3(f), 494.3(g)(1), or any other provision of the Social Services Law and DOH regulations, then Defendant and the Facility shall be permitted to terminate the admission agreement of such person and comply with any other directives or requirements of DOH in connection with the rescission of such waiver.  However, the Facility shall immediately notify Plaintiffs' counsel and provide copies of any related communications with the DOH regarding the person in question.

### C.     Determination stage.

1.     The Facility shall complete the Denial Form/Determination Notice attached hereto as **Exhibit I** for every Independent Applicant or Institutional Applicant who proceeded to the assessment stage and was denied admission in full or in part based on mobility issues.

2.     The Facility shall send the completed Denial Form/Determination Notice to denied Individual Applicants and, upon request, to denied Institutional Applicants.

3.     The Denial Form/Determination Notice shall explain the reason for denial, referring to details of the Assessment Forms and:

19

a.    The Facility's current safety plan/evacuation plans if the denial is

due to safety concerns; or

b.    The Facility's staffing and resident population; or

c.    Specific statutory or regulatory provision(s) that preclude

admission, if the DOH failed to grant the Facility's waiver request,

as described above.

4.    Nothing contained herein is intended to, nor shall it be interpreted as,

altering the legal responsibilities and obligations under city, state, and federal law of

Defendant with respect to:

a.    what is a reasonable accommodation or modification; or

b.    who bears the costs of such accommodation or modification.

5.    All Denial Forms/Determination Notices shall be retained by the Facility

for five (5) years.

**D.    Waiting List.**

To the extent that a denial is based on limited staffing, room availability, a

pending waiver request (as set forth above), or the resident population that could

change in the future, and where the applicant does not require immediate

placement, Defendant shall establish a waiting list for such applicants and notify

them if/when the Facility is able to accommodate the applicant at a future date.

Such applicants shall be told that they have been placed on a waiting list and that

they will be maintained on the waiting list for at least two (2) years after their

application is denied.

**E.      Retention Review for Current Residents.**

1.      Decisions to terminate residency because a resident's needs exceed the regulatory retention standards based in full or in part on mobility issues shall be assessed and documented in the same manner as admission assessments, as set forth above in Section VI. B. of this Agreement.

2.      For each resident who uses a wheelchair or other Assistive Mobility Device and is discharged from the Facility (whether voluntarily or involuntarily) because their physical needs exceed the regulatory retention standards, Defendant shall complete the termination form attached hereto as **Exhibit J**.

3.      For any discharge, if an outside provider or medical facility determines that the resident is appropriate for placement in an enriched housing program or assisted living program, this must be acknowledged in the documentation and specifically addressed by Defendant.

4.      If Defendant decides to terminate an admission agreement, including any determination that a resident has been permanently discharged from the Facility, it must provide the resident with a notice of termination as required by statute and follow the statutory and regulatory framework for terminating the admission agreement.  Defendant shall transmit copies of all such notices of termination to FHJC's counsel within three (3) business days of the notice for residents whose residency is terminated in whole or in part due to mobility issues.

**VII.    MONITORING**

1.      Upon reasonable written notice, Defendant will permit FHJC to inspect and copy the records described in Sections VI.A.3, VI.B.4, VI.C.1. VI.D, and VI.E.2 of

21

this Agreement no more than one (1) time per year during the Settlement Period.  FHJC

will keep confidential all information it inspects and copies pursuant to the terms of this

Agreement and will use the information for the sole purpose of monitoring compliance

with this Agreement. If FHJC is served with a court order, subpoena or other similar legal

process that purports to require the production of any such confidential information to

any tribunal or party other than Defendant, FHJC agrees to notify Defendant prior to

producing any such confidential information and, if reasonably possible, at least ten (10)

business days before the time within which FHJC is required to produce such confidential

information.

2.    At FHJC's request, Defendant shall provide Assessment Forms collected

or created regarding any persons admitted or denied during the Settlement Period, within

fifteen (15) business days of FHJC's request.

3.    FHJC may conduct compliance testing of the Facility during Settlement

Period.

## VIII.   RELEASES

1.    In exchange for Defendant's agreement to the terms set forth in this

Agreement and payment of the monetary relief described above, effective upon the

Release Date, Plaintiffs fully and forever release, acquit, and forever discharge with

prejudice, subject to the terms of this Agreement, Defendant and all its Principals,

employees, agents, representatives, officers, heirs, assigns, subsidiaries, successors in

interest, attorneys, and insurers of Defendant from any and all liability, claims, or rights

of action, of any kind or nature whatsoever arising from the beginning of time through

the Effective Date (hereinafter, "Plaintiffs' Released Claims").  For the avoidance of

22

doubt, Plaintiffs' Released Claims include all claims (1) whether disclosed or undisclosed, anticipated or unanticipated, suspected or unsuspected, accrued or unaccrued, matured or not matured, perfected or not perfected, liquidated or not liquidated, fixed or contingent, ripened or unripened, (2) whether at law or in equity, whether based on or arising under state, local, foreign, federal, statutory, regulatory, common or other law or rule and upon any legal theory, and (3) whether asserted directly, indirectly, derivatively, or otherwise; provided however, that Plaintiffs' Released Claims shall not include any claims to enforce any provision of this Agreement.

2.      Effective upon the Release Date, Defendant fully and forever releases, acquits, and forever discharges with prejudice, subject to the terms of this Agreement, Plaintiffs and their directors, employees, agents, representatives, officers, heirs, assigns, subsidiaries, successors in interest, attorneys and insurers from any and all liability, claims, or rights of action, of any kind or nature whatsoever arising from the beginning of time through the Effective Date (hereinafter, "Defendant's Released Claims"). For the avoidance of doubt, Defendant's Released Claims include all claims (1) whether disclosed or undisclosed, anticipated or unanticipated, suspected or unsuspected, accrued or unaccrued, matured or not matured, perfected or not perfected, liquidated or not liquidated, fixed or contingent, ripened or unripened, (2) whether at law or in equity, whether based on or arising under state, local, foreign, federal, statutory, regulatory, common or other law or rule and upon any legal theory, and (3) whether asserted directly, indirectly, derivatively, or otherwise; provided however, that Defendant's Released Claims shall not include any claims to enforce any provision of this Agreement.

23

3.      Nothing herein shall be interpreted as releasing any rights and obligations created by this Agreement, or to prohibit any Party from enforcing any rights or performing any obligations that they may have under this Agreement.

## IX.    NOTICE

Whenever this Agreement requires or contemplates that the Parties shall or may give notice to each other, notice shall be provided by both (i) electronic mail and (ii) next business day express delivery service, to the addresses set forth below, which notice shall be deemed effective upon delivery:

To Plaintiffs:

    Mobilization for Justice, Inc.
    100 William St., 6th Floor
    New York, NY  10038
    Attn:   Kevin Cremin, Esq.
            Jota Borgman, Esq.
            Tanya Kessler, Esq.
            Daniel A. Ross, Esq.
    Email: kcremin@mfjlegal.org
            jborgmann@mfjlegal.org
            tkessler@mfjlegal.org
            dross@mfjlegal.org

    AARP Foundation
    601 E Street, NW
    Washington, DC 20049
    Attn:   Susan A. Silverstein, Esq.
            Elizabeth A. Aniskevich, Esq.
    Email: ssilverstein@aarp.org
            eaniskevich@aarp.org

Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street
New York, NY 10019
Attn:   David G. Keyko, Esq.
         Jay D. Dealy, Esq.
         Michael J. Pisko, Esq.
Email: david.keyko@pillsburylaw.com
         jay.dealy@pillsburylaw.com
         michael.pisko@pillsburylaw.com

To Defendant:

Hinman Straub, P.C.
121 State Street
Albany, New York 12207
Attn:   David T. Luntz, Esq.
         Jennie L. Shufelt, Esq.
Email: dluntz@hinmanstraub.com
         jshufelt@hinmanstraub.com

## X.    CONSTRUCTION AND SEVERABILITY

1.     This Agreement shall be deemed to have been jointly drafted, and no provision herein shall be interpreted or construed for or against any Party because such Party drafted or requested such provision or this Agreement as a whole.

2.     If any provision in this Agreement is declared invalid or unenforceable by a court having competent jurisdiction, it is mutually agreed that this Agreement shall endure except for the part declared invalid or unenforceable by order of such court, unless the elimination of the invalid provision shall materially affect the intent of the Agreement.  The Parties agree that payment of the Settlement Amount as provided herein is a material term of this Agreement.  The Parties to this Agreement shall consult and use their best efforts to agree upon a valid and enforceable provision that shall be a

25

reasonable substitute for such invalid or unenforceable provision in light of the intent of this Agreement.

3.     Except as with respect to the Stipulation and Protective Order referenced in Paragraph 4 of this Section, this Agreement contains all the terms and conditions agreed upon by the Parties hereto, and no prior communications, whether oral or in writing, or oral or written agreement entered into prior to the execution of this Agreement regarding the subject matter of the instant proceeding shall be deemed to exist, to bind the Parties hereto, or to vary the terms and conditions contained herein.

4.     The Parties agree that this Agreement, so-ordered by the District Court, complies with the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as it constitutes a court order for purposes of 45 CFR 164.512(e), incorporating by reference the Stipulation and Protective Order so-ordered on January 7, 2020, protecting the confidentiality of documents and information Defendant is obligated to provide to FHJC during the Settlement Period for the limited purpose of monitoring Defendant's compliance with this Agreement pursuant to Section VII of this Agreement, with the District Court maintaining jurisdiction to enforce this Agreement.  The Stipulation and Protective Order of January 7, 2020, is hereby extended and shall remain in full force and effect throughout the Settlement Period, so long as the District Court is vested with continuing jurisdiction to enforce the Agreement.   In the event that disclosure of protected health information under this Agreement is challenged by any individual, entity, or governmental agency, Defendant shall promptly notify FHJC and shall oppose such challenge.  In the event that such disclosure is found to violate HIPAA or other privacy law, Defendant shall promptly notify FHJC and the Parties shall meet and confer

26

and/or seek a conference with the District Court within thirty (30) days after such finding. During the pendency of such meet and confer or conference with the District Court, and until such time as the violation of HIPAA or other privacy law is remedied via either an amendment to this Agreement or further order of the District Court, Defendant shall have no obligation to comply with the provisions of this Agreement to the extent such obligations have been determined to violate HIPAA or other privacy law.

5.      The Parties agree this Agreement shall be subject to and interpreted in accordance with the laws of the State of New York, exclusive of any choice of law rules that would require the application of laws other than those of the State of New York.

6.      The failure or delay by a Party to require performance of any provision hereof shall not affect that Party's right to require performance at any time thereafter, nor shall a waiver of any breach or default constitute a waiver of any subsequent default or a waiver of the provision itself or any other provision.

7.      This Agreement may be executed in any number of counterparts and each such counterpart shall be deemed to be an original.  For purposes of executing this Agreement, a document signed and transmitted by facsimile or email shall be treated as an original document and have the same binding legal effect as an original signature on an original document.

*[the remainder of this page is intentionally blank]*

IN WITNESS WHEREOF, the Parties hereto by their duly authorized representatives have executed this Settlement Agreement on the dates indicated below:

**Fair Housing Justice Center, Inc.**

By: _Elizabeth Grossman_

Print Name: Elizabeth Grossman

Title: Executive Director

Date: 11/23/21

**Village Housing Development Fund Corporation**

By: _____

Print Name : _____

Title: _____

Date: _____

**The Estate of Jane Doe**

By: _____

Print Name: Michael Kamen

Title:_Administrator of Estate of Peggy Kamen (a/k/a Jane Doe)

Date: _____

**John Doe**

By: _____

Print Name: Michael Kamen (a/k/a John Doe)

Date: _____

It is so ORDERED this _____ day of _____, 2021.

_____

28

IN WITNESS WHEREOF, the Parties hereto by their duly authorized representatives have

executed this Settlement Agreement on the dates indicated below:

**Fair Housing Justice Center, Inc.**  **Village Housing Development Fund Corporation**

By:_____  By:_____

Print Name: Elizabeth Grossman  Print Name :_____

Title: Executive Director  Title:_____

Date:_____  Date:_____


**The Estate of Jane Doe**

By:_____*Michael Kamen*_____

Print Name: Michael Kamen

Title:_Administrator of Estate of Peggy Kamen
(a/k/a Jane Doe)

Date:_____11 26 21_____


**John Doe**

By:_____*Michael Kamen (a/k/a John Doe)*_____

Print Name: Michael Kamen (a/k/a John Doe)

Date:_____11 26 21_____


It is so ORDERED this _____ day of _____, 2021.

_____

28

IN WITNESS WHEREOF, the Parties hereto by their duly authorized representatives have executed this Settlement Agreement on the dates indicated below:

**Fair Housing Justice Center, Inc.**

By:_____

Print Name: Elizabeth Grossman

Title: Executive Director

Date:_____

**Village Housing Development Fund Corporation**

By:_____Emma DeVito_____

Print Name : _Emma DeVito_____

Title:_____President / CEO_____

Date:_____12/14/2021_____

**The Estate of Jane Doe**

By:_____

Print Name: Michael Kamen

Title:_Administrator of Estate of Peggy Kamen (a/k/a Jane Doe)

Date:_____

**John Doe**

By:_____

Print Name: Michael Kamen (a/k/a John Doe)

Date:_____

It is so ORDERED this _____ day of _____, 2021.

_____

28

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FAIR HOUSING JUSTICE CENTER, INC., JANE
DOE and JOHN DOE,

                                        Plaintiffs,

                    v.

HOWARD A. ZUCKER, in his official capacity as
Commissioner of the New York State Department of
Health, THE NEW YORK STATE DEPARTMENT
OF HEALTH, ELM YORK LLC, MADISON YORK
ASSISTED LIVING COMMUNITY, LLC,
MADISON YORK REGO PARK LLC, and VILLAGE
HOUSING DEVELOPMENT FUND
CORPORATION.,

                                        Defendants.

18 Civ. 3196 (VSB) (RWL)

**PROPOSED ORDER AND
STIPULATION OF VOLUNTARY
DISMISSAL PURSUANT TO
F.R.C.P. 41(a)(1)(A)(ii)**

        WHEREAS, pursuant to the Settlement Agreement dated _____, and filed with the Court

on _____ (ECF No. ____) (the "Settlement Agreement"), Plaintiffs Fair Housing Justice Center, the

Estate of Jane Doe, and Jane Doe Inc. (hereinafter "Plaintiffs"), and Defendant Village Housing

Development Fund Corporation (hereinafter "Defendant") have agreed to dismiss this case, in its

entirety with prejudice;

        WHEREAS, pursuant to the Settlement Agreement, Plaintiffs and Defendant agreed that

the Court shall have continuing jurisdiction for the sole purpose of enforcing the terms of the

Agreement;

        HEREBY STIPULATED AND AGREED by and between the parties' respective

counsel(s) that the above-captioned action as against the Defendant is voluntarily dismissed with

prejudice pursuant to the Federal Rules of Civil Procedure 41(a)(1)(A)(ii), the terms of the

Settlement Agreement are incorporated into this Order, the Court shall retain jurisdiction for the

sole purposes of enforcing the Settlement Agreement, and the Plaintiffs and Defendant are to

bear their own costs, expenses, and attorneys' fees except as outlined by the Settlement

Agreement.

FOR PLAINTIFF:


PILLSBURY WINTHROP SHAW PITTMAN LLP


By:_____        Dated: _____, 2021
       David G. Keyko
       Jay Dealy
       Michael J. Pisko
       31 West 52nd Street
       New York, NY  10019
       Tel:  212-858-1000


AARP FOUNDATION


By:_____        Dated: _____, 2021
       Susan Ann Silverstein
       Elizabeth Aniskevich
       601 E Street, NW
       Washington, DC 20049
       202-434-2159


MOBILIZATION FOR JUSTICE, INC.


By:_____        Dated: _____, 2021
       Kevin M. Cremin
       Jota Borgmann
       Tanya Kessler
       100 Williams Street
       New York, NY  10038
       Tel:  212-417-3700

4827-1461-7081.v1

FOR DEFENDANT VILLAGE HOUSING DEVELOPMENT FUND CORPORATION:

HINMAN STRAUB, P.C.


By:_____          Dated: _____, 2021
      David T. Luntz
      121 State Street
      Albany, NY 12207
      Tel:  (518) 436-0751




SO ORDERED

Dated: _____          _____
                                Hon. Vernon S. Broderick
                              United States District Judge

4827-1461-7081.v1

Exhibit B

**Non-Discrimination Statement
for Village Housing
Development Fund Corporation**

Village Housing Development Fund Corporation does not discriminate against any person on basis of race, color, national origin, religion/creed, sex, disability (including the use of a wheelchair), marital or partnership status, age, sexual orientation, gender identity, source of income, immigration status, lawful occupation, status as a victim of domestic violence, or military status.

Exhibit C

**Reasonable Accommodation Policy and Request Form**

Village Care at 46 and Ten is committed to providing equal housing opportunity.  As part of this commitment, we will modify our rules, policies, practices, and services to meet the needs of individuals with disabilities upon request if the accommodation is reasonable and necessary to allow you to fully use and enjoy residing in our community.

It is our policy to reject reasonable accommodation requests only when they are not related to a disability-based need, impose an undue financial and administrative burden, or fundamentally alter the nature of the services we provide.  In such case, we will discuss reasonable alternatives that may meet the requesting individual's needs.  We will bear any incidental costs of providing a reasonable accommodation.

**Procedure for Making Request**

Requests for reasonable accommodation may be submitted in writing.  If you need a reasonable accommodation due to a disability, we encourage you to submit the attached form.  The request need not be in writing to be considered by us.  Nor must it be made using the attached form to be considered a valid request for a reasonable accommodation.

If you are making a written reasonable accommodation request to us, fully describe the required accommodation on the Reasonable Accommodation Request form.  Please include any additional information that you believe would be useful in assisting us to evaluate the request.

**Verification and Documentation**

If your disability or disability-related need is not obvious, we may request that you provide verification that you have a disability-related need for the requested accommodation.  If you are an applicant for admission and your disability-related need is documented in your medical evaluation or nursing assessment, we will let you know if we require further documentation.

**Providing Disability-Related Accommodations**

We will discuss your request for a reasonable accommodation with you.  If the accommodation is approved, we will provide a letter explaining how and when the

accommodation can be provided.

If a specific accommodation cannot be made because it is an undue financial and administrative burden or because it would be a fundamental alteration of the services provided by us, then we will discuss alternative accommodations that may address your disability-related need.  If no alternative meets your disability-related the needs, or if you and Village Care at 46 and Ten cannot agree on a reasonable alternative, we will notify you of the denial in writing in a reasonable amount of time and will provide an opportunity for you to make a revised reasonable accommodation request. If your request is part of your application for admission, we will address it in writing as part of our application denial.

**Reasonable Accommodation Request**

Name: _____

Address: _____

_____

Phone: _____

I am requesting a reasonable accommodation on behalf of:_____

(Name of Person with Disability or "Self")

Please describe the reasonable accommodation you are requesting and the disability-
related reason for your request:

_____

_____

_____

_____

Date: _____     Signature: _____

This form, along with any additional information, should be submitted to:

If you have any questions, please contact _____ at _____
_____

**For Office Use Only**

[ ]      Approved     Reason:_____

[ ]      Denied            _____

_____

Exhibit D

# PART 109--FAIR HOUSING ADVERTISING

Sec.
109.5      Policy.
109.10     Purpose.
109.15     Definitions.
109.16     Scope.
109.20     Use of words, phrases, symbols, and visual aids.
109.25     Selective use of advertising media or content.
109.30     Fair housing policy and practices.


APPENDIX I TO PART 109—FAIR HOUSING ADVERTISING

AUTHORITY:   Title VIII, Civil Rights Act of 1968, 42 U.S.C. 3600-3620; section 7(d), Department of HUD Act, 42 U.S.C. 3535(d).

SOURCE:  54 FR 3308, Jan. 23, 1989, unless otherwise noted.

## § 109.5    Policy.

It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.  The provisions of the Fair Housing Act (42 U.S.C. 3600, *et seq.*) make it unlawful to discriminate in the sale, rental, and financing of housing, and in the provision of brokerage and appraisal services, because of race, color, religion, sex, handicap, familial status, or national origin.  Section 804(c) of the Fair Housing Act, 42 U.S.C. 3604(c), as amended, makes it unlawful to make, print, or publish, or cause to be made, printed, or published, any notice, statement, or advertisement, with respect to the sale or rental of a dwelling, that indicates any preference, limitation, or discrimination because of race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination. However, the prohibitions of the act regarding familial status do not apply with respect to *housing for older persons*, as defined in section 807(b) of the act.

## § 109.10    Purpose.

The purpose of this part is to assist all advertising media, advertising agencies and all other persons who use advertising to make, print, or publish, or cause to be made, printed, or published, advertisements with respect to the sale, rental, or financing of dwellings which are in compliance with the requirements of the Fair Housing Act. These regulations also describe the matters this Department will review in evaluating compliance with the Fair Housing Act in connection with investigations of complaints alleging discriminatory housing practices involving advertising.

## § 109.15    Definitions.

As used in this part:

(a) *Assistant Secretary* means the Assistant Secretary for Fair Housing and Equal Opportunity.

(b) *General Counsel* means the General Counsel of the Department of Housing and Urban Development.

(c) *Dwelling* means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

(d) *Family* includes a single individual.

(e) *Person* includes one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11 of the United States Code, receivers, and fiduciaries.

(f) *To rent* includes to lease, to sublease, to let and otherwise to grant for a consideration the right to occupy premises not owned by the occupant.

(g) *Discriminatory housing practice* means an act that is unlawful under section 804, 805, 806, or 818 of the Fair Housing Act.

(h) *Handicap* means, with respect to a person--

(1)  A physical or mental impairment which substantially limits one or more of such person's major life activities,

(2) A record of having such an impairment, or

(3) Being regarded as having such an impairment.

This term does not include current, illegal use of or addiction to a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)).  For purposes of this part, an individual shall not be considered to have a handicap solely because that individual is a transvestite.

(i) *Familial status* means one or more individuals (who have not attained the age of 18 years) being domiciled with--

(1) A parent or another person having legal custody of such individual or individuals;  or

(2) The designee of such parent or other person having such custody, with the written permission of such parent or other person.  The protections afforded against discrimination on the basis of familial status shall apply to any person who is pregnant or is in the process of securing legal custody of any individual who has not attained the age of 18 years.

## § 109.16    Scope.

(a) *General*. This part describes the matters the Department will review in evaluating compliance with the Fair Housing Act in connection with investigations of complaints alleging discriminatory housing practices involving advertising.  Use of these criteria will be considered by the General Counsel in making determinations as to whether there is reasonable cause, and by the Assistant Secretary in making determinations that there is no reasonable cause, to believe that a discriminatory housing practice has occurred or is about to occur.

(1) *Advertising media*. This part provides criteria for use by advertising media in determining whether to accept and publish advertising regarding sales or rental transactions.  Use of these criteria will be considered by the General Counsel in making determinations as to whether there is reasonable cause, and by the Assistant Secretary in making determinations that there is no reasonable cause, to believe that a discriminatory housing practice has occurred or is about to occur.

(2) *Persons placing advertisements.* A failure by persons placing advertisements to use the criteria contained in this part, when found in connection with the investigation of a complaint alleging the making or use of discriminatory advertisements, will be considered by the General Counsel in making a determination of reasonable cause, and by the Assistant Secretary in making determinations that there is no reasonable cause, to believe that a discriminatory housing practice has occurred or is about to occur.

(b) *Affirmative advertising efforts.* Nothing in this part shall be construed to restrict advertising efforts designed to attract persons to dwellings who would not ordinarily be expected to apply, when such efforts are pursuant to an affirmative marketing program or undertaken to remedy the effects of prior discrimination in connection with the advertising or marketing of dwellings.

[54 FR 308, Jan. 23 1989, as amended at 55 FR 53294, Dec. 28, 1990.]

## § 109.20    Use of words, phrases, symbols, and visual aids.

The following words, phrases, symbols, and forms typify those most often used in residential real estate advertising to convey either overt or tacit discriminatory preferences or limitations.  In considering a complaint under the Fair Housing Act, the Department will normally consider the use of these and comparable words, phrases, symbols, and forms to indicate a possible violation of the act and to establish a need for further proceedings on the complaint, if it is apparent from the context of the usage that discrimination within the meaning of the act is likely to result.

(a) *Words descriptive of dwelling, landlord, and tenants*. White private home, Colored home, Jewish home, Hispanic residence, adult building.

(b) *Words indicative of race, color, religion, sex, handicap, familial status, or national origin--*

(1) *Race*--Negro, Black, Caucasian, Oriental, American Indian.

(2) *Color*--White, Black, Colored.

(3) *Religion*--Protestant, Christian, Catholic, Jew.

(4) *National origin*--Mexican American, Puerto Rican, Philippine, Polish, Hungarian, Irish, Italian, Chicano, African, Hispanic, Chinese, Indian, Latino.

(5) *Sex*--the exclusive use of words in advertisements, including those involving the rental of separate units in a single or multi-family dwelling, stating or tending to imply that the housing being advertised is available to persons of only one sex and not the other, except where the sharing of living areas is involved.  Nothing in this part restricts advertisements of dwellings used exclusively for dormitory facilities by educational institutions.

(6) *Handicap*--crippled, blind, deaf, mentally ill, retarded, impaired, handicapped, physically fit. Nothing in this part restricts the inclusion of information about the availability of accessible housing in advertising of dwellings.

(7) *Familial status*--adults, children, singles, mature persons.  Nothing in this part restricts advertisements of dwellings which are intended and operated for occupancy by older persons and which constitute *housing for older persons* as defined in Part 100 of this title.

(8) *Catch words*--Words and phrases used in a discriminatory context should be avoided, e.g., *restricted, exclusive, private, integrated, traditional, board approval or membership approval.*

(c) *Symbols or logotypes.* Symbols or logotypes which imply or suggest race, color, religion, sex, handicap, familial status, or national origin.

(d) *Colloquialisms.* Words or phrases used regionally or locally which imply or suggest race, color, religion, sex, handicap, familial status, or national origin.

(e) *Directions to real estate for sale or rent (use of maps or written instructions).* Directions can imply a discriminatory preference, limitation, or exclusion.  For example, references to real estate location made in terms of racial or national origin significant landmarks, such as an existing black development (signal to blacks) or an existing development known for its exclusion of minorities (signal to whites).  Specific directions which make reference to a racial or national origin significant area may indicate a preference.  References to a synagogue, congregation or parish may also indicate a religious preference.

(f) *Area (location) description.* Names of facilities which cater to a particular racial, national origin or religious group, such as country club or private school designations, or names of facilities which are used exclusively by one sex may indicate a preference.

## § 109.25   Selective use of advertising media or content.

The selective use of advertising media or content when particular combinations thereof are used exclusively with respect to various housing developments or sites can lead to discriminatory

results and may indicate a violation of the Fair Housing Act. For example, the use of English language media alone or the exclusive use of media catering to the majority population in an area, when, in such area, there are also available non-English language or other minority media, may have discriminatory impact.  Similarly, the selective use of human models in advertisements may have discriminatory impact.  The following are examples of the selective use of advertisements which may be discriminatory:

(a) *Selective geographic advertisements*. Such selective use may involve the strategic placement of billboards; brochure advertisements distributed within a limited geographic area by hand or in the mail; advertising in particular geographic coverage editions of major metropolitan newspapers or in newspapers of limited circulation which are mainly advertising vehicles for reaching a particular segment of the community; or displays or announcements available only in selected sales offices.

(b) *Selective use of equal opportunity slogan or logo*. When placing advertisements, such selective use may involve placing the equal housing opportunity slogan or logo in advertising reaching some geographic areas, but not others, or with respect to some properties but not others.

(c) *Selective use of human models when conducting an advertising campaign.* Selective advertising may involve an advertising campaign using human models primarily in media that cater to one racial or national origin segment of the population without a complementary advertising campaign that is directed at other groups.  Another example may involve use of racially mixed models by a developer to advertise one development and not others.  Similar care must be exercised in advertising in publications or other media directed at one particular sex, or at persons without children.  Such selective advertising may involve the use of human models of members of only one sex, or of adults only, in displays, photographs or drawings to indicate preferences for one sex or the other, or for adults to the exclusion of children.

## § 109.30 Fair housing policy and practices.

In the investigation of complaints, the Assistant Secretary will consider the implementation of fair housing policies and practices provided in this section as evidence of compliance with the prohibitions against discrimination in advertising under the Fair Housing Act.

(a) *Use of Equal Housing Opportunity logotype, statement, or slogan.* All advertising of residential real estate for sale, rent, or financing should contain an equal housing opportunity logotype, statement, or slogan as a means of educating the homeseeking public that the property is available to all persons regardless of race, color, religion, sex, handicap, familial status, or national origin.  The choice of logotype, statement or slogan will depend on the type of media used (visual or auditory) and, in space advertising, on the size of the advertisement.  Table I (see Appendix I) indicates suggested use of the logotype, statement, or slogan and size of logotype.  Table II (see Appendix I) contains copies of the suggested Equal Housing Opportunity logotype, statement and slogan.

(b) *Use of human models.* Human models in photographs, drawings, or other graphic techniques may not be used to indicate exclusiveness because of race, color, religion, sex,

handicap, familial status, or national origin.  If models are used in display advertising campaigns, the models should be clearly definable as reasonably representing majority and minority groups in the metropolitan area, both sexes, and, when appropriate, families with children. Models, if used, should portray persons in an equal social setting and indicate to the general public that the housing is open to all without regard to race, color, religion, sex, handicap, familial status, or national origin, and is not for the exclusive use of one such group.

(c) *Coverage of local laws*. Where the Equal Housing Opportunity statement is used, the advertisement may also include a statement regarding the coverage of any local fair housing or human rights ordinance prohibiting discrimination in the sale, rental or financing of dwellings.

(d) *Notification of fair housing policy--*

(1) *Employees*. All publishers of advertisements, advertising agencies, and firms engaged in the sale, rental or financing of real estate should provide a printed copy of their nondiscrimination policy to each employee and officer.

(2) *Clients*. All publishers or advertisements and advertising agencies should post a copy of their nondiscrimination policy in a conspicuous location wherever persons place advertising and should have copies available for all firms and persons using their advertising services.

(3) *Publishers' notice*. All publishers should publish at the beginning of the real estate advertising section a notice such as that appearing in Table III (see Appendix I). The notice may include a statement regarding the coverage of any local fair housing or human rights ordinance prohibiting discrimination in the sale, rental or financing of dwellings.

APPENDIX I TO PART 109--FAIR HOUSING ADVERTISING

The following three tables may serve as a guide for the use of the Equal Housing Opportunity logotype, statement, slogan, and publisher's notice for advertising:

Table I

A simple formula can guide the real estate advertiser in using the Equal Housing Opportunity logotype, statement, or slogan.

In all space advertising (advertising in regularly printed media such as newspapers or magazines) the following standards should be used:

| Size of advertisement | *Size of logotype in inches* |
|---|---|
| ½ page or larger………………………………….. | 2x2 |
| 1/8 page up to ½ page………………………… | 1x1 |
| 4 column inches to 1/8 page…........................ | ½ x ½ |

| Less than 4 column inches | ( [1] ) |
|---|---|

[1] Do not use.

In any other advertisements, if other logotypes are used in the advertisement, then the Equal Housing Opportunity logo should be of a size at least equal to the largest of the other logotypes; if no other logotypes are used, then the type should be bold display face which is clearly visible. Alternatively, when no other logotypes are used, 3 to 5 percent of an advertisement may be devoted to a statement of the equal housing opportunity policy.

In space advertising which is less than 4 column inches (one column 4 inches long or two columns 2 inches long) of a page in size, the Equal Housing Opportunity slogan should be used. Such advertisements may be grouped with other advertisements under a caption which states that the housing is available to all without regard to race, color, religion, sex, handicap, familial status, or national origin.

Table II

Illustrations of Logotype, Statement, and Slogan.  Equal Housing Opportunity Logotype:



Equal Housing Opportunity Statement:  We are pledged to the letter and spirit of U.S. policy for the achievement of equal housing opportunity throughout the Nation.  We encourage and support an affirmative advertising and marketing program in which there are no barriers to obtaining housing because of race, color, religion, sex, handicap, familial status, or national origin.

Equal Housing Opportunity Slogan:  "Equal Housing Opportunity."

Table III

Illustration of Media Notice--Publisher's notice:  All real estate advertised herein is subject to the Federal Fair Housing Act, which makes it illegal to advertise "any preference, limitation, or discrimination because of race, color, religion, sex, handicap, familial status, or national origin, or intention to make any such preference, limitation, or discrimination."

We will not knowingly accept any advertising for real estate which is in violation of the law. All persons are hereby informed that all dwellings advertised are available on an equal opportunity basis.

Exhibit E

# HOW TO FILE A COMPLAINT

If you believe that you have been discriminated against because of your disability or denied a reasonable accommodation for your disability, you can file a complaint with the New York State Division of Human Rights.

A complaint must be filed with the Division within one year of the alleged discriminatory act.

To file a complaint:

- Visit the Division's website, at WWW.DHR.NY.GOV, and download a complaint form. Completed complaints must be signed before a notary public, and returned to the Division (by mail or in person).

- Stop by a Division office in person.

- Contact one of the Division's offices, by telephone or by mail, to obtain a complaint form and/or other assistance in filing a complaint.

For more information or to find the regional office nearest to your home or place of employment, visit our website at WWW.DHR.NY.GOV.

## SOME EXAMPLES:

You rent an apartment in an apartment building and need to use a wheelchair to enter and leave your apartment. You cannot get up the steps at the front of the building without assistance of others. Do you have any options?

**Your landlord may be required to provide you with a ramp or other reasonable means to permit you to access the building.**

_____

You suffer from depression and your doctor recommends that you adopt a companion animal and have the animal reside with you at your home. However, your landlord, coop, or condo does not allow pets. Do you have any options?

**If your doctor certifies that because of your disability, you require a companion animal in order to use and enjoy the premises, you should be permitted to reside in your home with your companion animal as a reasonable accomodation to your disability, despite the "no pet" rule.**

_____

You have a disability that makes it difficult for you to walk from your car to your apartment. Your apartment building has handicapped parking spaces. However, the handicapped parking spaces closest to your apartment are frequently occupied. Can your landlord provide you with a reserved parking space close to your apartment?

**Housing providers are required to provide accessible parking based upon the size of the parking area. However, a housing provider is usually not required to reserve a parking space for any particular resident with a disability, unless all parking is reserved.**



## HOUSING
## Rights of Persons with Disabilities

**ONE FORDHAM PLAZA
BRONX, NEW YORK 10458
1-888-392-3644
TTY: 718-741-8300
WWW.DHR.NY.GOV**

## The Housing Rights of Persons with Disabilities

The New York State Human Rights Law prohibits housing discrimination on the basis of a disability. The Human Rights Law defines a disability as:

> "a physical, mental or medical impairment which prevents the exercise of a normal bodily function or is demonstrable by medically accepted diagnostic techniques, or
>
> a record of such impairment, or
>
> a condition regarded by others as such impairment."

It is unlawful to discriminate against individuals with a disability in the rental, sale, or leasing of housing.

It is unlawful for a landlord to take any discriminatory action because of a history of a disability or because they perceive that an individual has a disability.

It is also unlawful for a landlord to take any disctiminatory action against a person for filing a complaint of discrimination.

The New York State Human Rights Law applies to everyone who sells, rents, or leases housing, including owners, managing agents, and real estate brokers or other agents.

Real estate brokers, real estate salespersons, and their employees have additional obligations. It is illegal, based upon a disability, for them to:

- refuse to negotiate for the sale, rental or leasing of housing;

- represent that housing is not available for sale, rental, or lease when it is available.

### Limitations

The New York State Human Rights Law does not cover:

- rental units in two-family homes occupied by the owner;

- rental in rooming houses occupied by the owner;

- rental of all rooms to persons of the same sex; certain senior housing.

### Reasonable Accommodation

The New York State Human Rights Law requires that efforts be made to accommodate the needs of persons with disabilities in housing.

Specifically, the Law requires that:

> a person with a disability be permitted to make reasonable modifications to the occupied permises, if the modifications are necessary to have

full use and enjoyment of the premises; reasonable accommodations be made in rules, policies, practices, or services, when such accommodations are necessary to permit a person with a disability equal opportunity to use and enjoy the housing.

The Law also requires that all buildings constructed after March 13, 1991 provide that:

- Public and common areas are readily accessible to and usable by persons withdisabilities;

- all doors are sufficiently wide to allow passage by persons in wheelchairs; and

- all multi-family buildings contain accessible passageways, fixtures, outlets, bathrooms, and kitchens.

For further information on state laws prohibiting disability discrimination and on the procedures for filing a complaint, please contact any regional office of the New York State Division of Human Rights, or visit our website: WWW.DHR.NY.GOV.

Exhibit F

**APPROVED TRAINERS**

| | |
|---|---|
| Jessica Bellinder | Legal Aid Society |
| Jacob Inwald | Legal Services NYC |
| Elaine Gross | ERASE Racism |
| Nicole Grennan | ERASE Racism |
| Aissatou Barry | The Legal Aid Society |
| Bianca Cappellini | Bronx Legal Services |

Exhibit G

Dear _____:

We write to clarify the admission policies for Village Care 46 and Ten:

As you know, our facility offers Assisted Living Program and Enriched Housing Program services to residents who are medically stable but need long-term residential care, room, board, housekeeping, personal care, supervision, and home health services.

We write to clarify that our facility does not discriminate against people who use wheelchairs. We consider all prospective residents based upon our ability to meet their individual needs, including those who may use a wheelchair and those that may need reasonable accommodations. Furthermore, when necessary, we will seek permission from the New York State Department of Health to admit wheelchair users.

We value your referral of prospective residents and look forward to continuing to work with you.

Sincerely,


Sandy Freeland
Senior Vice President of Program Operations and Administrator

Exhibit H

**46 & Ten Application Tracking**

| | GENERAL REFERRAL INFORMATION | | | | DISCLOSURE OF MOBILITY IMPAIRMENT | | ASSESSMENTS | | | | DENIALS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Name of Potential Applicant | Date of Initial Inquiry | Referral Source | Referral Source Contact Name | Referral Source Contact Information | Was mobility impairment disclosed prior to assessment? (Yes/No) | If yes, describe how it was disclosed and identify the person who made such disclosure | Has potential applicant been assessed? (Yes/No) | If "No", why was the individual not assessed? | If Yes, did the assessment indicate the applicant has a mobility impairment? | If the assessment indicated mobility impairment, type of mobility impairment | Was applicant's application denied? (Yes/No) | If Yes, what is the reason for denial (insert corresponding number from denial form) |
| | | | | | | | | | | | | |

# Exhibit I

# Village Care 46 and Ten
# Notice of Admission Determination

Applicant's Name: _____

Address: _____

Family member/guardian: _____

Address: _____

Thank you for your interest in Village Care 46 and Ten. Unfortunately, after reviewing your application information, we have determined that we cannot admit you to the facility. Below is an explanation of our decision. If our decision is based on bed availability, you may choose to join a wait list for admission. If you would like to join our waitlist, please check the box below and return this form to VillageCare at 46 & Ten, 510 West 46th Street, New York, NY 10036.

☐   **Please add me to the VillageCare at 46 & Ten Waitlist.**

Our denial decision is based on the following information from your application or assessment:

_____

_____

_____

_____

If you have a mobility disability and that mobility disability was related to our decision, we considered the following reasonable accommodations:

_____

_____

_____

But    ____   You rejected the offered accommodation.
         ____   We determined that the accommodation was not reasonable because
         _____,
         and that no other accommodation was reasonable and would meet your needs.
         ____   The Department of Health denied our request for a waiver of regulations that would permit us to admit you.

Your application was denied because:

1.   ____   You require continual medical or nursing care.
2.   ____   You have a serious and persistent mental disability sufficient to warrant placement in an acute care or residential treatment facility operated or certified by an office of the Department of Mental Hygiene.
3.   ____   You require health, mental health or other services which cannot be provided by local service agencies.
4.   ____   You cause or are likely to cause a danger to yourself or others.

# Village Care 46 and Ten
## Notice of Admission Determination

5. ___ You have repeatedly behaved in a manner which directly impairs the well-being, care, or safety of the resident or other residents or which directly interferes with the orderly operation of the facility.

6. ___ You require continual skilled observation of symptoms and reactions, or accurate recording of such skilled observations for the purposes of reporting on a medical condition to your physician.

7. ___ You refuse or are unable to comply with a prescribed treatment program, including but not limited to a prescribed medications regimen and such refusal or inability causes, or is likely to cause, in the judgment of your physician, life-threatening danger to yourself or others.

8. ___ You are chronically bedfast and require lifting equipment to transfer or the assistance of 2 persons to transfer.

9. ___ You are chronically in need of the physical assistance of another person in order to walk and no reasonable accommodation could be provided or the Department of Health denied our waiver request, as detailed above

10. ___ You are chronically in need of the physical assistance of another person to climb or descend stairs, and no apartments at the facility have ground-level egress, and no reasonable accommodation could be provided or the Department of Health denied our waiver request, as detailed above

11. ___ You have chronic unmanaged urinary or bowel incontinence.

12. ___ You suffer from a communicable disease or health condition which constitutes a danger to other residents and staff.

13. ___ You are dependent on medical equipment and do not meet all conditions set in 18 NYCRR 488.4(c)(13)(i) through (vi) (enriched housing regulations).

14. ___ You are not self-directing; i.e. you require continuous supervision and are not capable of making choices about your activities of daily living.

15. ___ You engage in alcohol or drug use which results in aggressive or destructive behavior.

16. ___ You are not medically eligible for, and would not otherwise require placement in, a residential health care facility.

17. ___ You do not require more care and services to meet daily health or functional needs than can be provided directly by an adult care facility.

18. ___ You do not exhibit a stable medical condition as categorized by the long-term care patient classification system as defined in Title 10 NYCRR.

19. ___ You are unable, with direction, to take action sufficient to assure self-preservation in an emergency.

20. ___ You are cognitively, physically or medically impaired to a degree which endangers the safety of yourself or other residents.

21. ___ The ALP cannot support your physical, supervisory and psycho-social needs

22. ___ The ALP cannot safely and adequately care for you, even if the services identified as necessary by the assessment of your needs are provided.


23. ___ Other: Specify:_____


Completed by: _____     Date: _____

4815-9601-7407, v. 1

Exhibit J

# Village Care 46 and Ten
# Termination Log Form

Completed by: _____ Date: _____

Name of Resident: _____ Age/DOB: _____

Mobility device used: ☐ Cane ☐ Walker/Rollator ☐ Manual Wheelchair ☐ Power Wheelchair

Date of termination of admission agreement: _____

Termination is: ☐ Voluntary ☐ Involuntary

Notice of Termination provided to resident: ☐ Yes ☐ No

Reason for Termination: _____

_____

_____

Date of most recent UAS: _____

Discharged to: ☐ Nursing Home ☐ Hospital ☐ Living with Family ☐ Other: _____