UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
                                         :

FAIR HOUSING JUSTICE CENTER, INC,   :
JANE DOE and JOHN DOE,           :

                                         :

                      Plaintiffs,   :          18-CV-3196 (VSB)

                                         :

           - against -           :          **OPINION & ORDER**

                                         :

JAMES MCDONALD,[1] in his official   :
capacity as Commissioner of the New York  :
State Department of Health, THE NEW    :
YORK STATE DEPARTMENT OF        :
HEALTH, ELM YORK LLC, MADISON    :
YORK ASSISTED LIVING COMMUNITY, :
LLC, MADISON YORK REGO PARK LLC, :
and VILLAGE HOUSING DEVELOPMENT :
FUND CORPORATION,          :

                                         :

                     Defendants.  :

                                         :
---------------------------------------------------------X

Appearances:

Kevin M. Cremin
Jota Borgmann
Tanya Kessler
Daniel A. Ross
Mobilization for Justice
New York, NY

David G. Kekyo
Jay D. Dealy
Pillsbury Winthrop Shaw Pittman LLP
New York, NY

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Commissioner James V. McDonald is automatically substituted for former Commissioner Mary T. Bassett.

Sebastian Monzon Rueda
AARP Foundation
Washington, DC
*Counsel for Plaintiffs*

Erin R. McAlister
Attorney General's Office of the State of New York
New York, NY
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

In 1973, Congress passed the Rehabilitation Act ("RA"), prohibiting recipients of federal funding from discriminating against persons based on a disability. 29 U.S.C. § 794(a). Section 1557 of the 2010 Affordable Care Act ("ACA") similarly prohibits discrimination and the denial of benefits on the basis of disability "under[] any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). Until 2018, the State of New York prohibited the "chairfast," or wheelchair-bound individuals,[2] from qualifying for placement in Adult Care Facilities ("ACFs"). (Doc. 122 ("FAC" or "First Amended Complaint") ¶¶ 1, 162.)

Before me are the parties' cross motions for summary judgement. Because the exclusion of wheelchair-bound individuals constituted intentional discrimination under the RA and ACA as a matter of law, Plaintiffs' motion for summary judgment is GRANTED as to liability for injuries caused by the operative regulations in place from 2013-2018 ("Original Regulations"). Defendants' motion for summary judgment regarding this exclusion is DENIED. Because genuine issues of material fact that cannot be resolved on the papers remain as to damages,

---

[2] A chairfast individual is defined as a person who "requires the assistance of two persons, one at either elbow, when transferring to or from a chair/sitting position." (Doc. 366 ¶ 94; *see also* N.Y.S. Assembly, Mem. of Support of A.7755 (2013) (amending Soc. Serv. Law § 461-1).) For the purposes of this Opinion & Order, I will use the term "wheelchair-bound individuals" and the term "chairfast," as defined in the State of New York's regulations, interchangeably.

causation, and whether the regulations, as amended in 2018, ("Amended Regulations"), discriminated against wheelchair-bound individuals, both parties' motions with regard to those issues are DENIED.

### I.       Factual Background

ACFs are defined as entities that "provide[] temporary or long-term residential care and services to adults who, though not requiring continual medical or nursing care . . . are by reason of physical or other limitations associated with age, physical or mental disabilities or other factors, unable or substantially unable to live independently." (FAC ¶ 1, n.1, (quoting N.Y. Soc. Serv. Law § 2 ¶ 21).)  In New York, ACFs are either adult homes, governed by 18 N.Y. Comp. Codes R. & Regs. ("NYCCRR") § 487, or Enriched Housing Programs ("EHPs"), governed by 18 NYCCRR § 488.[3]  Many, but not all, ACFs operate an Assisted Living Program ("ALP"), which is an "ACF that is certified to provide services" for "residents who require a greater level of care as compared to an ACF" without this certification, i.e. people who qualify for nursing home placement and might otherwise be placed in a nursing home.  (Doc. 332 ("Defs' SOF") ¶¶ 6–7.)  Some adult homes and EHPs receive federal funding.  (Doc. 337 ¶ 7.)  ALPs have to provide residents "room, board, housekeeping, supervision, personal care, case management activities and home health services."  18 NYCCRR § 494.5(a).  ALPs can only admit residents who are "medically eligible for, and would otherwise require placement in" a nursing home, 18 NYCCRR § 494.4(d), who are "able, with direction to take action sufficient to assure self-preservation in an emergency," N.Y. Soc. Serv. Law § 461-l.1(d)(ii).

---

[3] "*An enriched housing program* means an adult care facility established and operated for the purpose of providing long-term residential care to five or more adults, primarily persons 65 years of age or older, in community-integrated settings resembling independent housing units." (18 NYCCRR § 488.2(a) (emphasis in original).)

From 1991 to 2013, the governing law in New York "exclude[d] individuals who were chronically 'chairfast'" from ALPs as well. (Doc. 366 ¶¶ 10–12.) In 2013, the New York state legislature amended the governing law, N.Y. Soc. Serv. Law § 461-l, to remove the automatic exclusion of "chairfast" individuals from admission to ALPs. *See* 2013 Sess. Law News of N.Y. Ch. 454 (A. 7755). The Assembly sponsor's memorandum for this amendment stated that the change was designed to enable ALPs "to admit and retain individuals who are chronically chairfast . . . but who do[] not need continual nursing or medical care." (Doc. 331-22.) Even after that N.Y. Soc. Serv. Law § 461-l was amended, the Original Regulations promulgated by the New York Department of Health ("DOH"), still barred "chairfast" individuals from the ALPs associated with adult homes and EHPs, i.e., all ACFs, until May 25, 2018. (Doc. 329 ("Pls' SOF") ¶¶ 29–31.)

In August 18, 2014, Mobilization for Justice sent a letter to the DOH stating that the Original Regulations were "facially discriminatory against people with disabilities" and that individual ACFs were using the regulations "to discriminate against people who use wheelchairs." (Doc. 331-23 at 1.) In October 2014, the DOH issued a Dear Administrator letter informing ALPs throughout the state that they were authorized to admit "chairfast" individuals in certain limited circumstances, provided that they first notify the DOH. (Doc. 331-24.) The letter informed ALPs that they could only admit chairfast residents if they were "equipped and staffed to meet the needs of the resident," "the resident's physician [] approve[d] of the placement," the applicant had a "stable medical condition," and the applicant was able "with direction, to take action sufficient to assure self-preservation in an emergency." (*Id.*) Those "in need of continual nursing or medical care," the "chronically bedfast," or those "cognitively, physically or medically impaired to such a degree that his or her safety would be endangered," were deemed

4

ineligible.  (*Id.*)  When facilities contacted the DOH regarding approval for the admission of a "chairfast" individual, DOH employees asked specific questions about the individual and recorded the answers on a form which contained questions for DOH employees to review regarding admission.  (Doc. 331-27 at 23:20-53:13.)  The regulations in place at the time by the state still prohibited wheelchair-bound individuals from being admitted into ACFs.  (Doc. 336-12 (18 NYCCRR § 494.4(d)(3) as it appeared prior to 2018:  "An operator must not accept nor retain any person who . . . is chronically chairfast and requires lifting equipment to transfer or the assistance of two persons to transfer").)

On June 17, 2015, Nahid Sorooshyari at Mobilization for Justice sent an email to Michelle Brown and Timothy Perry-Coon at the DOH offering "to give the group resources on the Fair Housing Act (FHA) and its application to ACFs so that as we revise the regulations, we can bring them into compliance with the FHA."  (Doc. 331-33 at 2.)  Attached to the email was a summary of the FHA and why ACFs discriminated against disabled residents in violation of the FHA.  (*Id.* at 3–4.)  The attachment stated that 18 NYCCRR § 487.4(b) "should be revised because it essentially forces operators to choose between complying with the regulation and complying with the FHA."  (*Id.* at 4.)  By 2016, the DOH had created a regulatory working group to review ACF regulations.  (Doc. 336-3 at 28:17-31.4.)

Jane Doe was a wheelchair-bound individual.  (FAC ¶ 18.)  She was a resident of the ALP operated by VillageCare 46 and Ten ("Village Care"), an ACF.  (*Id.*)  John Doe is Ms. Doe's brother, power of attorney, and healthcare proxy.  (*Id.* ¶ 19.)  In June 2017, Village Care terminated Ms. Doe's residency while she was in a nursing home.  (*Id.* ¶¶ 98–99.)  Ms. Doe's status as a wheelchair-bound individual was a factor in the termination of her residency.  (*Id.* ¶¶ 104, 126.)

Fair Housing Justice Center ("FHJC") is a non-profit that advocates on behalf of equal access to housing opportunities. (Doc 333 ¶¶ 3–4.) As part of this work, FHJC employs "testers" who pass as renters or homebuyers to determine whether illegal housing discrimination is taking place. (Docs. 333, 335, 339–45.) In 2017, FHJC began conducting testing of ACFs. (Pls' SOF ¶ 51.) FHJC testers contacted ACFs to inquire about admission criteria. (*Id.* at ¶¶ 51–80.) FHJC conducted tests of ACFs implementing the Original Regulations. Tester Anna Jones tested Madison York Assisted Living on March 9, 2017. (Doc. 339.) Tester Craig Waletzko tested Madison York Assisted Living on March 15, 2017 and March 22, 2017, and Elm York Assisted Living on March 22, 2017. (Doc. 340.) Tester Kate Haggerty tested Elm York Assisted Living on March 20, 2017, Madison York Assisted Living on March 20, 2017, and Village Care on November 1, 2017. (Doc. 342.) On October 31, 2017, tester Michael Puzzo tested Village Care. (Doc. 344.) None of these tests revealed that the ACFs permitted wheelchair-bound individuals in any capacity. (Docs. 339, 340, 342.) The ACFs told FHJC testers that they were not allowed to include wheelchair-bound individuals "by law," (Doc. 342-2 at 3), that the State "has it" in such a way that ACFs cannot admit wheelchair-bound individuals, (Doc. 342-4 at 6), or that they could not admit such persons because of "DOH regulations," (Doc. 342-9 at 2).

FHJC testers also called the DOH itself regarding the Original Regulations. On one of these calls on April 28, 2017, DOH official Renald Paul, a supervisor of inspectors, (Doc. 331-38 at 13:20-14:25), tried to justify the exclusion of wheelchair-bound individuals from ACFs because: "You don't want [your father] to run over people in front of him with the wheelchair," (Doc. 335-2 at 9), and stated that ALP "don't have to take in people with wheelchairs if they don't necessarily have the accommodations to do it," (*id.* at 14). In another call, FHJC testers

called DOH officials Linda O'Connell and Dorothy Persico, who, when testers posing as wheelchair-bound individuals told them that some ACFs seemed to have a blanket rule against admitting wheelchair-bound individuals, suggested that those testers look outside of New York City to find placement for wheelchair-bound family members. (Doc. 335-3 at 7–8, 13–14.)

On April 12, 2018, Plaintiffs filed the instant lawsuit challenging the Original Regulations. (*See* Doc. 1.) On May 25, 2018, the DOH issued the Amended Regulations, emergency regulations amending its ACF admission and retention standards. (Doc. 331-34 at 4–5.) In 2019, the Amended Regulations were adopted on a permanent basis and superseded the Original Regulations. (Doc. 331-40.) The Amended Regulations contain provisions that require that "An operator shall not exclude an individual on the sole basis that such individual is a person who primarily uses a wheelchair for mobility, and shall make reasonable accommodations to the extent necessary to admit such individuals, consistent with the Americans with Disabilities Act of 1990." (Doc. 331-39.) However, it also still provides that "[a]n operator shall not accept nor retain any person who . . . chronically requires the physical assistance of another person in order to walk; [or] chronically requires the physical assistance of another person to climb or descend stairs, unless assignment on a floor with ground-level egress can be made." (Doc. 331-39.) A public comment on these Amended Regulations from David McNally with an aarp.org email address alleged that the regulations, as revised, were still discriminatory and failed to comply with federal anti-discrimination law. (Doc. 335-41.) Several other public comments were lodged that also claimed that the revised regulations did not remedy the concern that the DOH was violating federal anti-discrimination laws. (*Id.*)

FHJC continued to test ACFs following the adoption of the Amended Regulations. Following the adoption of the Amended Regulations, FHJC tested at least ten more ACFs: (i)

7

The W Assisted Living at Riverdale ("W Assisted Living"), (Docs. 339-3; 345-3; 336-32); (ii) Lott Assisted Living, (Docs. 339-4; 345-2; 336-33); (iii) West 74th Street Residence, (Doc. 345-4); (iv) Frederick Fleming House, (Doc. 341-2); (v) Ridge Street Gardens, (Doc. 336-30; 343-2); (vi) Alma Rangel Gardens, (Docs. 339-5; 345-5); (vii) Jennings Hall, (Doc. 336-27); (viii) River View Gardens, (Doc. 331-28); (ix) Clinton Gardens, (Doc. 331-29); and (x) 129th Street Residence, (Doc. 331-31). The New York City Human Rights Commission tested an eleventh facility, Castle Senior Living. (Doc 331-43.)

Of these eleven ACFs, four (Frederick Fleming House, Lott Assisted Living, Castle Senior Living, and West 74th Street Residence) stated that they would not accept wheelchair-bound individuals at all, two (Alma Rangel Gardens, Ridge Street Gardens) stated that wheelchair-bound individuals were accepted, but that they needed to live on the first floor, and one (W Assisted Living) stated that they accept people who use wheelchairs but that these individuals "ha[d] to be able to self-propel." (Pls' SOF ¶¶ 96–108.) Clinton Gardens and River View Gardens also arguably only allowed wheelchair-bound individuals to live on the first floor because a general manager of New York Foundation for Senior Citizens building, which subsidizes River View and Clinton Gardens, stated that "any disabled apartments must be on the first floor and the floors are only so big." (Doc. 343-2 at 4–5.) Testing did not reveal that Jennings Hall or 129th Street Residence did not accept wheelchair-bound individuals or that either ACF discriminated against wheelchair-bound individuals through the application of the Amended Regulations. (Docs. 336-29; 336-31.)

8

On October 21, 2021, the State Defendants[4] proposed further amended regulations with Plaintiffs' recommended changes and some further language regarding resident safety.  (Doc. 336-35.)  After objection from FHJC, (Doc. 338 ("Defs' Mem.") at 16–17 ("Plaintiff FHJC submitted a comment objecting to the additional safety language, arguing that the safety requirements are already contained in other portions of the regulations and therefore incorrectly give the impression that additional safety requirements apply to individuals with mobility impairments")), the State Defendants struck the additional safety language and published the further revised regulations in the State Register on March 9, 2022, and the revised regulations were adopted on February 22, 2023.  (Doc. 397 ¶ 23.)

## II.    **Procedural History**

Plaintiffs FHJC, John Doe, and Jane Doe (collectively, "Plaintiffs") first filed suit against the State Defendants, as well as Elm York LLC, Madison York Assisted Living Community LLC, Madison York Rego Park LLC (together "York Defendants"), and Village Housing Development Fund Corporation ("Village Housing"), on April 12, 2018.  (Doc. 1.)  On August 14, 2018, the Plaintiffs filed a First Amended Complaint, which is now the operative complaint in this matter.  (FAC.)

Jane Doe filed a motion for a preliminary injunction on May 18, 2018, (Doc. 47), along with supporting declarations, (Docs. 48–52), and a memorandum of law, (Doc. 53).  Defendant Village Housing and the State Defendants filed their opposition and supporting affidavits on May 29, 2018.  (Docs. 58–62.)  Plaintiff filed a reply memorandum and affirmation on May 30, 2018.  (Docs. 67–68.)  The State Defendants filed a supplemental declaration on June 8, 2018,

---

[4] "State Defendants" refers to the DOH and Dr. James V. McDonald in his official capacity as the Commissioner of the DOH.

(Doc. 73), and Jane Doe filed a response to that declaration on June 11, 2018, (Doc. 74). After holding an evidentiary hearing, on September 24, 2018, I issued an Opinion & Order granting in part and denying in part Plaintiff Jane Doe's preliminary injunction to return to her apartment unless and until a warrant of eviction was issued. (Doc. 151.)

On September 7, 2018, the York Defendants filed a motion to dismiss the Amended Complaint, (Doc. 129), as well as a memorandum of law and a declaration in support, (Docs. 130–31). Defendant Village Housing also filed a motion to dismiss the Amended Complaint, (Doc. 133), with a memorandum of law and declaration in support, (Docs. 134–35). Finally, the State Defendants filed a motion to dismiss the Amended Complaint, (Doc. 136), with a memorandum of law and two declarations in support, (Docs. 137–39). On October 9, 2018, Plaintiffs filed a single omnibus memorandum in opposition to Defendants' motions. (Doc. 162.) On October 19, 2018, the York Defendants filed a reply memorandum and declaration in further support of their motion to dismiss. (Docs. 165–66.) On October 23, 2018, Village Housing filed a reply memorandum in further support of its motion to dismiss. (Doc. 168.) On the same day, the State Defendants filed a reply memorandum and an affirmation in support of their motion to dismiss. (Docs. 169–70.) On September 30, 2019, I issued an Opinion & Order granting in part and denying in part Defendants' motions to dismiss. (Doc. 179.)

On December 4, 2019, the York Defendants filed a notice of voluntary dismissal of their cross-claims. (Doc. 189.) On December 4, 2019, Village Housing filed a notice of voluntary dismissal of its cross-claims. (Doc. 188.) On December 17, 2021, the York Defendants entered into a settlement agreement with Plaintiffs, (Doc. 259), and I so-ordered that agreement on December 21, 2021, (Doc. 265). On December 23, 2021, Village Housing entered into a proposed settlement agreement with Plaintiffs. (Doc. 267.) I so-ordered that agreement on

December 28, 2021. (Doc. 268.) On January 19, 2022, an order and stipulation of voluntary dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii) was entered with respect to the York Defendants. (Doc. 274.) As of January 2022, the only active claims were those against State Defendants.

On December 16, 2022, Plaintiffs moved for partial summary judgment on "Counts VII and X in the Amended Complaint," (Doc. 328), i.e., the claims for compensatory and declaratory relief under the RA, including reasonable attorney's fees, (Count VII), and compensatory and declaratory relief under the ACA, including reasonable attorney's fees, (Count X). (FAC ¶¶ 285–94; 314–22). Plaintiffs' motion was accompanied by a supporting memorandum of law, (Doc. 346 ("Pls' Mem.")), Plaintiffs' Rule 56.1 Statement of Facts, (Pls' SOF), and declarations from Mobilization for Justice Attorney Tanya Kessler, (Doc. 331), Executive Director of FHJC Elizabeth Grossman, (Doc. 333), Plaintiff John Doe, (Doc. 334), FHJC Tester Alaine Dungee, (Doc. 335), FHJC Tester Anna Jones, (Doc. 339), FHJC Tester Craig Waltezko, (Doc. 340), FHJC Tester Inga Ballard, (Doc. 341), FHJC Tester Kate Haggerty, (Doc. 342), FHJC Tester Margaret Diaz-Padilla, (Doc. 343), FHJC Tester Michael Puzzo, (Doc. 344), and FHJC Tester Susan Burns, (Doc. 345).

On February 27, 2023, State Defendants filed a brief in opposition to Plaintiffs' motion for summary judgment, (Doc. 358 ("Defs' Opp'n.")), along with accompanying declarations from Assistant Attorney General Erin McAlister, (Doc. 359), and DOH Associate Attorney Renee Greer, (Doc. 360), as well as their Counterstatement of Rule 56.1 Facts, (Doc. 361 ("Defs' CSOF")). Plaintiffs filed their reply memorandum of law on March 24, 2023. (Doc. 379 ("Pls' Reply").)

11

On December 16, 2022, State Defendants also moved for partial summary judgment on Plaintiffs' damages claims. (Doc. 330.) The motion was accompanied by a memorandum of law, (Defs' Mem.), a Rule 56.1 Statement of Facts, (Defs' SOF), and declarations from Assistant Attorney General Erin McAlister, (Doc. 336), and Heidi Hayes, DOH Acting Director of the Division of Adult Care Facility and Assisted Living Surveillance, (Doc. 337).

On February 27, 2023, Plaintiffs filed a brief in opposition to Defendants' motion for summary judgment. (Doc. 362 ("Pls' Opp'n.").) That same day, Plaintiffs filed a supporting declaration from Daniel Ross, an attorney at Mobilization for Justice, (Doc. 364), and a Counterstatement of Rule 56.1 Facts, (Doc. 366 ("Pls' CSOF")). Plaintiffs' Counterstatement of Rule 56.1 Facts also included 181 additional paragraphs styled as a "counterstatement of undisputed material facts." (Defs' CSOF ¶¶ 72–253.) Defendants filed their reply memorandum of law on March 24, 2023. (Doc. 377 ("Defs' Reply").)

On March 9, 2023, State Defendants moved to strike Plaintiffs' "counterstatement of undisputed material facts"—the 181 paragraphs at Doc. 366—as improperly submitted. (Doc. 369.) This motion was accompanied by a supporting memorandum of law. (Doc. 370.) Plaintiffs filed an opposition to this motion on March 23, 2023. (Doc. 375.) Defendants filed their reply in support of this motion on March 30, 2023. (Doc. 379.)

On November 12, 2025, the State Defendants and the Plaintiffs agreed to voluntarily dismiss all injunctive claims for relief against the State Defendants with prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii). (Doc. 397.) Therefore, the only active disputes pending before me are the cross-motions for summary judgment on those claims at issue in "Plaintiffs' December 16, 2022 Motion for Summary Judgment," (*id.* at ¶ 87), i.e., Plaintiffs' claims for damages under the RA and ACA, (Pls' Mem. 2 ("Plaintiffs move for summary judgment on

Counts VII and X of their Amended Complaint, which seek damages under the [RA] and [ACA].")).

### III.    <u>Legal Standard</u>

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002) (citing Fed. R. Civ. P. 56(a)). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

 "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In the event that "a party fails . . . to properly address

another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citation and quotation marks omitted). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citing *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000)).

"Where, as here, there are cross-motions for summary judgment, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46, 51 (2d Cir. 2010) (internal quotation marks omitted).

## IV.    **Discussion**

### A.    *Motion to Strike*

The Local Rules of the United States District Courts for the Southern and Eastern Districts of New York require any party that moves for summary judgment to submit a "separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Loc. Civ. R. 56.1(a). The party opposing the motion must include "a correspondingly numbered paragraph admitting or denying,

and otherwise responding to, each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Loc. Civ. R. 56.1(b).  All such statements by the movant or opponent under Rule 56.1(a) and (b) must be followed by citation to admissible evidence.  *See* Loc. Civ. R. 56.1(d).

On December 16, 2022, Plaintiffs filed their Rule 56.1 Statement of Undisputed Facts. (Pls' SOF.)  On the same date, Defendants filed their Rule 56.1 Statement.  (Defs' SOF.)  On February 27, 2023, Defendants filed their Counterstatement of Rule 56.1 Facts.  (Defs' CSOF.) On the same date, Plaintiffs filed their Counterstatement of Rule 56.1 Facts.  (Pls' CSOF.) Plaintiffs' Rule 56.1 Counterstatement also contained 181 paragraphs following their "correspondingly numbered paragraph[s] admitting or denying, and otherwise responding to" Defendants' Rule 56.1 Statement of Facts, titled "counterstatement of undisputed material facts." (*Id.* ¶¶ 72–253 (capitalization altered).)  Defendants' Rule 56.1 Counterstatement contained no such paragraphs and only contained "correspondingly numbered paragraph[s] admitting or denying, and otherwise responding to" Plaintiffs' Rule 56.1 Statement of Facts.  (Doc. 366.) Therefore, Defendants argue that Plaintiffs' Counterstatement is improper and should be struck from the record.  (Docs. 369–70.)

Defendants make two principal arguments in support of the claim that Plaintiffs' Counterstatement should be struck:  (1) they claim that Plaintiffs' Counterstatement is not "short and concise" and so violates Rule 56.1, (Doc. 370 at 3–4); and (2) they argue that Plaintiffs' Counterstatement improperly bolsters Plaintiffs' own motion by adducing further "undisputed" facts in support of its own motion when it should be responding to Defendants' motion for

summary judgment and presenting facts for which there is, in fact, a dispute of material fact, to support its argument that Defendants are not entitled to summary judgment, (*id.* at 2–3).

The first argument fails. "The appropriate length of the 'short and concise' statement contemplated by Local Civil Rule 56.1 varies by case complexity and there is no hard and fast page limit." *Olin Corp. v. Lamorak Ins. Co*., 332 F. Supp. 3d 818, 839 (S.D.N.Y. 2018) (internal quotation marks omitted). Therefore, courts in the District have denied motions to strike statements as long as a 405-paragraph, 134-page statement, *In re Namenda Direct Purchaser Antitrust Litig*., No. 15-CV-7488, 2017 WL 6606629, at *1 (S.D.N.Y. Dec. 20, 2017), and a 403-paragraph, ninety-page statement, *Capitol Records, LLC v. Vimeo*, LLC, 972 F. Supp. 2d 500, 509 (S.D.N.Y. 2013), *vacated in part on other grounds*, 826 F.3d 78 (2d Cir. 2016). Indeed, Defendants' own counterstatement, at eighty-three pages, (Doc. 361), is actually longer than Plaintiffs' sixty-three-page statement, (Doc. 366).

With regard to Defendants' second argument, Defendants appear to argue that because Plaintiffs have styled their counterstatement as a statement of undisputed facts, rather than as a statement of facts about which there is a genuine dispute, that it is improper and must be struck from the record. However, it is apparent that Plaintiffs do not believe these facts to be disputed because they have moved for summary judgment themselves. Therefore, it would be inconsistent with their litigation posture to style their "short and concise statement of additional material facts," which they are permitted to adduce to their counterstatement by Local Rule 56.1(b), as a statement of "disputed facts," when they have filed a summary judgment motion of their own explicitly arguing that their entitlement to damages is "undisputed." (*See* Pls' Mem. 9, 18.) It is uncontested that, even when a party is filing a cross-motion for summary judgment, a party must file a Rule 56.1 counterstatement of some sort. *See, e.g.*, *Napoleon v. 5665 Sunrise*

16

*Hwy Corp.*, No. 18-CV-5703, 2020 WL 6385309, at *1 (E.D.N.Y. July 30, 2020) ("recommend[ing] that [] cross-motions [for summary judgment] be denied without prejudice to resubmit only after the parties comply with [] local rule" 56.1), *report and recommendation adopted*, 2020 WL 5757534 (E.D.N.Y. Sept. 28, 2020); *Ringel v. Cnty. of Nassau*, No. 18-CV-1930, 2021 WL 4316715, at *2 (E.D.N.Y. Sept. 22, 2021) (deeming facts to be admitted against Defendants where they failed to submit a counterstatement in accordance with Rule 56.1 altogether).  Therefore, I cannot find that merely naming the counterstatement a statement of undisputed facts, alone, is sanctionable, or warrants striking Plaintiffs' additional paragraphs from the record.

Therefore, I decline to strike Plaintiffs' Counterstatement.  However, Defendants request in the alternative that they "explicitly be excused from any obligation to reply to the duplicative statements to which they have already replied in State Defendants 56.1 Response and that the decision not to respond to a statement in Plaintiffs' Counterstatement not be deemed an admission as to materiality or the truth of the statement." (Doc. 370 at 4.)  Defendants explain that both Plaintiffs' Counterstatement and their Statement of Facts "recite, almost completely, the same set of facts that they allege present issues that do not need to be tried," and that they only differ by approximately thirty-five of the more than 200 facts alleged.  (*Id.* at 3.)  I have broad discretion to determine whether or not to "deem th[o]se facts" added to Plaintiffs' Counterstatement and not responded to "admitted by Defendants."  *Osekavage v. Sam's E., Inc.*, 619 F. Supp. 3d 379, 383 n.1 (S.D.N.Y. 2022) (declining to deem such facts admitted).

Here, although Defendants' failure to contest these additional facts arguably could lead to their admission, I exercise my "broad discretion," to decline to find those additional facts admitted by Defendants.  *Holtz v. Rockefeller & Co.*, 258 F. 3d 62, 73 (2d. Cir. 2001), *abrogated*

*on other grounds by Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009); *see also Darley v. United States*, No. 22-CV-00714, 2025 WL 1159518, at *1, n.2 (S.D.N.Y. Apr. 21, 2025) (declining to deem such facts admitted); *GEICO Marine Ins. Co. v. Mandel*, No. 19-CV-03107, 2020 WL 6318948, at *2 (E.D.N.Y. Sept. 18, 2020), *report and recommendation adopted*, 2020 WL 5939186 (E.D.N.Y. Oct. 7, 2020) (similar).  Therefore, this Opinion & Order relies on the record as a whole and the undisputed material facts from Plaintiffs' Rule 56.1 Statement,[5] (Pls' SOF), Defendants' Rule 56.1 Statement, (Defs' SOF), and the correspondingly numbered paragraphs in the parties' counterstatements, (Pls' CSOF; Defs' CSOF).

### B.    *Relevant Statutory and Regulatory Framework*

### 1.  The Rehabilitation Act

The RA was passed in 1973.  29 U.S.C.A. § 794 *et seq.*  "Section 504 of the RA prohibits a program or activity receiving federal funds from excluding or discriminating against persons based on disability." *Biondo v. Kaleida Health*, 935 F.3d 68, 73 (2d Cir. 2019).  "To establish a *prima facie* violation of the RA, a plaintiff must show that one is:  (1) a 'handicapped person' as defined in the RA; (2) 'otherwise qualified' to participate in the offered activity or to enjoy its benefits; (3) excluded from such participation or enjoyment solely by reason of his or her handicap; and (4) being denied participation in a program that receives federal financial assistance." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009) (quoting *Rothschild v. Grottenthaler*, 907 F.2d 286, 289–90 (2d Cir. 1990)).

Under Section 504 of the RA, Plaintiffs can establish discrimination by showing "disparate treatment, disparate impact, or failure to make a reasonable accommodation." *B.C. v.*

---

[5] As opposed to those adduced in its Rule 56.1 Counterstatement that were not responded to by Defendants, (Doc. 366), which I decline to deem admitted by Defendants as an exercise of my discretion.

*Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (citing *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009)).  However, "monetary damages [under the RA] are recoverable only upon a showing of an *intentional* violation."  *Loeffler*, 582 F.3d at 275  (emphasis in original).  This means that Plaintiffs cannot recover for claims that the non-State Defendants intentionally discriminated against them, as these claims have now settled.  (*See* Docs. 268; 274.)  In order to show intentional discrimination under the RA, a Plaintiff must show either discriminatory animus or deliberate indifference.  *See Loeffler*, 582 F.3d at 275.

Disparate treatment discrimination is sometimes referred to as "intentional discrimination," *see Brooklyn Ctr. for Psychotherapy, Inc. v. Philadelphia Indem. Ins. Co.*, 955 F.3d 305, 311 (2d Cir.), *certified question accepted*, 147 N.E.3d 1160 (N.Y. 2020), *and certified question withdrawn*, 171 N.E.3d 762 (N.Y. 2021) ("A plaintiff alleging disability discrimination 'can base [her] claim on any of three available theories:  (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation.'" (citing *Fulton*, 591 F.3d at 43 (internal quotation marks omitted))), but proof of disparate treatment discrimination is not coextensive with the necessary showing to make out a claim for monetary damages under the RA.  For example, failure to provide a reasonable accommodation may be "intentional" such that it can serve as a predicate violation supporting a claim for damages.  *See, e.g.*, *Thompson v. New York State Corr. & Cmty. Supervision*, No. 22-CV-6307, 2022 WL 4562318, at *1, 17–18 (W.D.N.Y. Sept. 29, 2022) (denying motion to dismiss claims for monetary damages predicated on "deliberate indifference in revoking certain reasonable accommodations"); *Wynne v. Town of E. Hartford*, No. 20-CV-01834, 2023 WL 7339543, at *12–13 (D. Conn. Nov. 7, 2023) (denying summary judgment motion as to damages when

19

Plaintiff raised a genuine dispute of material fact on a failure to train deliberate indifference claim centering on the denial of reasonable accommodations).

Further, the RA provides that "remedies, procedures, and rights," "shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title." 29 U.S.C. § 794(a). Plaintiffs allege that FHJC and John Doe are "person[s] aggrieved," within the meaning of the statute. (Pls' Mem. 6–7.)

### 2.   The Affordable Care Act

Section 1557 of the ACA prohibits discrimination and the denial of benefits on the basis of disability "under[] any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). "[A] Plaintiff suing a Defendant for discriminating in the denial of benefits under the ACA must essentially plead a corresponding civil rights statute predicate in order to make out a valid Section 1557 ACA claim." *Weinreb v. Xerox Bus. Servs., LLC Health & Welfare Plan*, 323 F. Supp. 3d 501, 521 (S.D.N.Y. 2018), *adhered to on denial of reconsideration sub nom. Weinreb v. Xerox Bus. Servs.*, No. 16-CV-6823, 2020 WL 4288376 (S.D.N.Y. July 27, 2020). Therefore, "discrimination claims [under the ACA and the RA] are analyzed pursuant to effectively the same framework, [and] my reasoning applies to Plaintiff's claims under each statute." *Fair Hous. Just. Ctr., Inc. v. Cuomo*, No. 18-CV-3196, 2018 WL 4565152, at *11 (S.D.N.Y. Sept. 24, 2018); *see also Forziano v. Indep. Grp. Home Living Program, Inc.*, 613 F. App'x 15, 18 (2d Cir. 2015) (summary order) ("Because of similarities in the three statutes, intentional discrimination claims under the ADA, [RA], and FHA are considered in tandem.").

C.     ***Plaintiffs Have Made a Prima Facie Case That the Original Regulations Discriminated Against the Disabled Within the Meaning of the Rehabilitation Act***

1.  **Jane Doe is a Handicapped Person and Defendants Receive Federal Funds**

"To establish a *prima facie* violation of the RA, a plaintiff must show that one is:  (1) a 'handicapped person' as defined in the RA; (2) 'otherwise qualified' to participate in the offered activity or to enjoy its benefits; (3) excluded from such participation or enjoyment solely by reason of his or her handicap; and (4) being denied participation in a program that receives federal financial assistance."  *Loeffler*, 582 F.3d at 275.

The parties do not dispute that Jane Doe is a handicapped person within the meaning of the statute, (Pls' Mem. 8), including that she has a "physical or mental impairment that substantially limits one or more life activities[]," 42 U.S.C. § 12102(1), and that "walking" is such a life activity, 42 U.S.C. § 12102(2).  "From June 2017 until her return to Village Care in October 2018, Jane Doe used a wheelchair and could not walk long distances or use stairs." (Pls' Mem. 8 (citing Pls' SOF ¶¶ 9, 17, 162, 171).)  The parties also do not dispute that Defendants receive federal financial assistance.  (*Id.* at 7 (citing Pls' SOF ¶ 26).)

2.  **Jane Doe is "Otherwise Qualified" for Residence at an ACF**

"The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2). Although Defendants do not appear to explicitly argue that Jane Doe and other individuals confined to wheelchairs are not qualified individuals within the meaning of the RA, (*see* Pls'

21

Opp'n 9 ("DOH has not contested the first, second or fourth prongs")), they do, in general terms, contest whether ACFs are an appropriate place for wheelchair-bound individuals to reside, (*see* Defs' Opp'n 15 ("Federal law permits states to design programs for particular classes of persons with disabilities."), 16 ("The admission and retention regulations were always meant to reflect legitimate safety concerns.")).

However, in 2013, the New York state legislature amended its laws to remove the exclusion of wheelchair-bound individuals from admission to ACFs. *See supra* § I. Therefore, arguments, like those made in Defendants' opposition brief, that ACFs are not "designed" for individuals like Jane Doe, are misguided. (*See* Defs' Opp'n § I.A.) Defendants cite an out-of-circuit non-binding case to support the argument that "[f]ederal law permits states to design programs for particular classes of persons with disabilities without incurring additional obligations to other classes of persons with disabilities." (*Id.* (citing *Easley by Easley v. Snider*, 36 F.3d 297, 301–06 (3d Cir. 1994)).) However, in that case, the court permitted the exclusion of those who were not "mentally alert[]" from a program for the physically disabled, as "mental alertness [wa]s a necessary requirement for receipt of the program's essential benefit." *Easley*, 36 F.3d at 303. The court went on to find that because creating different kinds of programs for people with different kinds of disabilities was "not a case of State discrimination against a subgroup of the group of people who are physically disabled," the program did not run afoul of the RA. *Id.* at 306.

Here, however, by excluding wheelchair-bound individuals from placement in ACFs for five years, even after the statute regarding such facilities was amended to include such persons within its ambit, the Original Regulations present an explicit "case of State discrimination against a subgroup of the group of people who are physically disabled." *Id.* Indeed, the Second

Circuit has made clear that recipients of federal funds may not escape liability under the RA merely by framing discrimination as a decision to "simply allocate limited state resources *among* disabled individuals" rather than "discriminat[ing] *against* the disabled." *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016) (emphasis in original). Many other courts across the country have held likewise. *See, e.g.*, *Jackson v. Fort Stanton Hosp. & Training Sch.*, 757 F. Supp. 1243, 1299 (D.N.M. 1990) ("Defendants' failure to accommodate the severely handicapped in existing community programs while serving less severely handicapped peers is unreasonable and discriminatory."), *rev'd on other grounds*, 964 F.2d 980 (10th Cir. 1992); *Martin v. Voinovich*, 840 F. Supp. 1175, 1192 (S.D. Ohio 1993) ("A strict rule that § 504 can never apply between persons with different disabilities would thwart th[e] goal [of the statute]. Such a rule would, in effect, allow discrimination on the basis of disability."); *Garrity v. Gallen*, 522 F. Supp. 171, 214 (D.N.H. 1981) ("[B]lanket discrimination against the handicapped, and especially against the most severely handicapped" violates the RA).

Defendants attempt to distinguish this in-circuit and out-of-circuit precedent by arguing that "[t]he cases only involved claims for injunctive relief." (Defs' Opp'n 16 n.11.) However, that argument is irrelevant to this prong of the test. Although Plaintiffs face the heightened standard of showing deliberate indifference in order to make out their claim for damages, *see infra* § IV.D, the fact that these cases did not require such showings does not change the fact that plaintiffs may be "otherwise qualified" for programs that are "designed for" them, and that discrimination against the more severely disabled under the guise of serving the less severely disabled is discrimination nonetheless.

The other out-of-circuit cases cited by Defendants in this subsection of their opposition, (*see* Defs' Opp'n 15–17), fare no better, as they involve the individualized determination that a

23

differently abled person is not otherwise qualified to play collegiate basketball, *Knapp v. Nw. Univ.*, 101 F.3d 473, 482 (7th Cir. 1996), or for employment as a construction inspector, *Chiari v. City of League City*, 920 F.2d 311, 319 (5th Cir. 1991), based on legitimate concerns about the appropriateness of participation in such voluntary activities based on the physical limitations presented by the plaintiffs' disabilities in those cases.  These cases cited by Defendants entail distinct factual circumstances that are not analogous to those presented here and are not binding on me.

Here, given the explicit intent of the legislature to include wheelchair-bound individuals within the scope of N.Y. Soc. Serv. Law § 461-l, I find that Jane Doe and other wheelchair-bound individuals who were excluded for five years by the Original Regulations from residing at ACFs were "otherwise qualified" within the meaning of the RA.

### 3. Plaintiffs Demonstrate that the DOH Excluded Jane Doe from Village Care Because of Her Disability

"A plaintiff may prove discrimination either by direct evidence of intent to discriminate or 'indirectly showing circumstances giving rise to an inference of discrimination.'" *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 270 (2d Cir. 2023) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015)).  Plaintiffs allege that both direct and circumstantial evidence support their allegations of discrimination.

<u>a. Direct Evidence</u>

Until 2018, the relevant regulations provided that operators of ACFs could "not accept nor retain any person who" "is chronically chairfast and unable to transfer or chronically requires the physical assistance of another person to transfer."  (Doc 331-20 (18 NYCCRR § 488.4(b)(9) as it appeared prior to 2018).)  At the same time, the operators of ALPs were not permitted to "accept []or retain any person who" "is chronically chairfast and requires lifting equipment to

24

transfer or the assistance of two persons to transfer."  (Doc. 331-21 (18 NYCCRR § 494.4(d)(3) as it appeared prior to 2018).)

These facially discriminatory regulations are direct evidence of discrimination, irrespective of what reasons that Defendants might profess for their implementation relating to safety.  (*See* Defs' Opp'n 16 ("regulations were always meant to reflect legitimate safety concerns"); Doc. 336-1 at 109:9-21, 111:12-20 (regulations designed to "maintain the health and safety of residents"); Doc. 336-2 at 35:12-20 (similar).)  "[E]xplicit facial discrimination does not depend on why" the Defendants "discriminate[] but rather on the explicit terms of the discrimination."  *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991); *see also Knox v. John Varvatos Enters. Inc.*, 512 F. Supp. 3d 470, 482 (S.D.N.Y. 2021) ("[T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy" (quoting *UAW*, 499 U.S. at 199)); *Sierra v. City of N.Y.*, 552 F. Supp. 2d 428, 430–31 (S.D.N.Y. 2008) (applying heightened scrutiny to a facially discriminatory policy).

Plaintiffs cite a litany of cases from this Circuit and other circuits that stand for the proposition that explicit discrimination on the face of an official policy suffices to make out a prima facie case of discrimination.  (*See* Pls' Mem. 10, 15–16; *L.C. ex  rel. Zimring v. Olmstead*, 138 F.3d 893, 902 (11th Cir. 1998) ("[M]otive does not lessen the discriminatory character" of a facially discriminatory policy (internal quotation marks omitted)); *Johnson v. State*, 49 F.3d 75, 79–80 (2d Cir. 1995) ("Regardless of the State's reasons for" facially discriminatory policy, it violated anti-discrimination statute as a matter of law); *Human Res. Rsch. & Mgmt. Grp. v. Cnty. Of Suffolk*, 687 F. Supp. 2d 237, 254 (E.D.N.Y. 2010) (finding that because a statute was "discriminatory on its face . . . the burden shifts to [Defendant] to provide adequate justification for the disparate treatment of this disabled class of individuals"); *Davis*, 821 F.3d at 264 (blanket

exclusion violates anti-discrimination statute); *Hargrave v. Vermont*, 340 F. 3d 27, 35 (2d Cir. 2003) (similar); *see also Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1050 (9th Cir. 2007) (finding that "plaintiffs have established a prima facie case of facial discrimination" when they showed they had been impacted by a facially discriminatory policy).)  In response, Defendants again fall back on the argument that in this case, unlike in *Olmstead* or *Davis*, Plaintiffs seek damages rather than injunctive relief.  (*See* Defs' Opp'n 25 ("[N]one of the case law cited by Plaintiffs indicates that the integration mandate entitles them to money damages").)  However, Defendants' argument is misplaced.

For the reasons that follow, I find that the cases cited by Plaintiffs are dispositive here.  In order for Plaintiffs to succeed they must make out:  (1) a prima facie case of discrimination, either through direct or circumstantial evidence; and (2) the separate and additional burden of showing that Defendants acted with at least deliberate indifference toward their rights, in order to demonstrate the intentional discrimination necessary to recover monetary damages.  *See infra* § IV.D.1.  Plaintiffs seeking only injunctive relief must make out a prima facie case of discrimination but not deliberate indifference.  Therefore, the fact that plaintiffs in these other cases referenced by Defendants were not required to show deliberate indifference is immaterial concerning whether explicit discrimination on the face of a regulation or policy suffices to make out a prima facie case of discrimination.  Ultimately, whatever remedy Plaintiffs seek, they must make the same prima facie showing of discrimination in order to support recovery under the RA and the ACA.  *See Naiman v. New York Univ.*, No. 95-CV-6469, 1997 WL 249970, at *5 (S.D.N.Y. May 13, 1997) (analyzing separately the plaintiff's prima facie showing of discrimination and his claim of intentional discrimination that would entitle him to damages); *Matagrano v. New York State Dep't of Corr. & Cmty. Supervision*, No. 19-CV-763, 2023 WL

5932943, at \*9 (N.D.N.Y. Sept. 12, 2023) (explaining the difference between "a technical violation of the statutes," which suffices to "recover nominal damages" and the requisite "pro[of of] an intentional violation . . . to recover compensatory damages."). The fact that the State Defendants for five years implemented a regulation that facially discriminated against wheelchair-bound individuals even after the state explicitly removed from the statute the bar on admission of such users suffices for Plaintiffs to meet their burden for such a showing. *See Epter v. New York City Transit Auth.*, 127 F. Supp. 2d 384, 387 (E.D.N.Y. 2001) ("This is not a case where an [] employee [with a protected characteristic] is fired or passed over for promotion, and a court is called upon to scour a complicated morass of facts for evidence that age may have motivated the decision. Rather, this case presents an explicit classification based on [a protected characteristic] and an employer who acknowledges treating employees [based on a protected characteristic] differently from their [] counterparts.").

Defendants argue that summary judgment is not warranted because the "DOH's admission and retention regulations" do not "segregate individuals in wheelchairs to nursing homes," (*see* Defs' Opp'n 24), that "Village Care had retained other chairfast residents pursuant to the 2014 DAL," (*id.*), and that "Ms. Doe *was* able to return to her apartment at Village Care, (*id.* (emphasis in original)). However, Defendants' first argument, that the regulations do not segregate individuals to nursing homes, is based on the Amended Regulations, not the Original Regulations. (*Id.* ("Only three of the eleven ACFs that were subject to FHJC's post-2018 testing indicated they did not admit individuals in wheelchairs.").) In contrast, it is undisputed that Village Care refused to readmit Ms. Doe in October and November of 2017, when the ALP said that it did not admit "chairfast" individuals because of the official policy promulgated by the DOH. (Pls' SOF ¶¶ 166–68.) The record also reflects that none of the three ACFs that FHJC

27

tested which were implementing the Original Regulations permitted wheelchair-bound individuals in any capacity. (*Id.* ¶¶ 51–80.) Finally, the undisputed facts demonstrate that these three ACFs told FHJC testers that they were not allowed to include wheelchair-bound individuals "by law," (Doc. 342-2 at 3), that the State "has it" in such a way that ACFs cannot admit wheelchairs, (Doc. 342-4 at 6), or that, in the case of Village Care, that it could not admit wheelchair-bound individuals because of "DOH regulations," (Doc. 342-9 at 2).

Second, Defendants cite Doc. 336-16 as support for the claim that Village Care "had retained other chairfast residents pursuant to the 2014 DAL." (Defs' Opp'n 24.) This document appears to indicate that Village Care retained one wheelchair user who was able to "get himself out of bed and into his wheelchair without assistance," and who could "self-propel w/one hand." (Doc. 336-16.) Therefore, the record does not reflect any instances in which Village Care retained residents who were chairfast, meaning that they "require[d] the assistance of two persons, one at either elbow, when transferring to or from a chair/sitting position," (Doc. 331-11 at 9), i.e., any wheelchair-bound individual. This was despite the fact that wheelchair-bound individuals were specifically removed from the list of those excluded by statute from residing at ACFs like Village Care in 2013 by the New York state legislature. (Doc. 331-22.) Therefore, Doc. 366-16 does not save Defendants from summary judgment on Plaintiffs' prima facie case of discrimination against those confined to wheelchairs without the ability to transfer, such as Plaintiff Jane Doe.

Defendants' third argument, that Ms. Doe was able to eventually return to Village Care after the implementation of the Amended Regulations, suffers from the same infirmity as their first defense. Defendants are free to argue at trial that some of Plaintiffs' conduct is covered by the Amended Regulations rather than the Original Regulations, but these defenses do not apply

to the Original Regulations and therefore do not dissuade me from my conclusion that the Original Regulations, in place at the time that Plaintiff Doe was refused readmittance to Village Care, barred wheelchair-bound individuals from residing at ACFs and ALPs and that this constitutes discrimination as a matter of law.  In addition, the Complaint included specific allegations that the Original Regulations, and not just the Amended Regulations, caused harm to Plaintiffs.  (*Compare* FAC ¶¶ 27–203 (discussing Original Regulations), *with id.* ¶¶ 204–25 (discussing Amended Regulations).)

b. *McDonnell Douglas* Framework

Even if there were insufficient direct evidence of discrimination for Plaintiffs to make a prima facie showing of discrimination under the RA and ACA, I find that they have adduced sufficient circumstantial evidence under the framework established in *McDonnell Douglas* to give rise to an inference that State Defendants discriminated against wheelchair-bound individuals as a matter of law.

"When only circumstantial evidence of discriminatory intent is available, courts use the *McDonnell Douglas* burden-shifting framework to assess whether the plaintiff has shown sufficient evidence of discrimination to survive summary judgment."  *Bart v. Golub Corp.*, 96 F.4th 566, 569 (2d Cir.), *cert. denied sub nom. The Golub Corp. v. Elaine Bart*, 145 S. Ct. 173 (2024).  "A plaintiff's first step under *McDonnell Douglas* is to establish a prima facie case of discrimination."  *Id.* at 570.

Plaintiffs have shown through uncontested evidence that Jane Doe's residency was terminated by Village Care's ALP in June 2017, prior to the issuance of the Amended Regulations.  (Pls' SOF. ¶ 155.)  Jane Doe was examined by a physician in October 2017 at a nursing home, "who determined that she was 'mentally suited for care' at Village Care, that her

condition was 'stable' and that she was 'medically appropriate to be cared for in an Adult Home, Enriched Housing Program or and ALP.'"  (Pls' SOF ¶ 157 (citing Doc. 331-55).)  When Village Care was assessing Ms. Doe for readmission, Riverside Nursing Home made a note explaining that Village Care had requested an update on Jane Doe's "ambulation status" prior to evaluating her readmission.  (*Id.* ¶ 170.)  Ms. Doe was not readmitted to Village Care until October of 2018. (*Id.* ¶ 189).

This is enough circumstantial evidence for Plaintiffs to meet their burden of making out a prima facie case of discrimination.  *Lyons v. New York Life Ins. Co.*, No. 20-CV-3120, 2022 WL 837202, at *15 (S.D.N.Y. Mar. 21, 2022) (explaining that "workplace comments" and "pattern of discharges" is enough to "clear[] the low bar required for a *prima facie* case of [] discrimination" under *McDonnell Douglas*"); *see also id.* at *15 n. 24 (collecting cases showing the "relative ease of meeting a *prima facie* burden"); *Cortese v. Skanska Koch, Inc.*, 544 F. Supp. 3d 456, 471 (S.D.N.Y. 2021) ("low bar for establishing the first element of a prima facie case" under *McDonnell Douglas*).  When Plaintiffs establish a prima facie case of discrimination under the *McDonnell Douglas* framework, Defendants are entitled to rebut this case with proof of a legitimate, nondiscriminatory reason for Jane Doe's exclusion from Village Care.  *Bart*, 96 F.4th at 569 (citing *Vega*, 801 F.3d at 83 ("Once the plaintiff has established a prima facie case, the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its adverse action.")).

"Upon that showing, the burden then shifts back to the plaintiff to prove that the employer's stated reason was pretext for discrimination."  *Id.* (citing *Vega*, 801 F.3d at 83.) However, under the *McDonnell Douglas* framework's third step, a plaintiff "has no obligation to prove that the employer's innocent explanation is dishonest, in the sense of intentionally

30

furnishing a justification known to be false." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 156 (2d Cir. 2010). Rather, a "plaintiff can prevail by proving that an impermissible factor was a motivating factor, without proving that the [Defendant's] proffered explanation was not some part of the [Defendant's] motivation." *Fields v. N.Y. State Off. of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997) (internal quotation marks omitted). Here, Defendants argue that their regulations are justified by "legitimate" "safety concerns" that "ensure the safety of residents during an emergency" and so legitimize their regulations under the *McDonnell Douglas* framework. (Defs' Opp'n 26.)

Even if I were to accept these concerns as legitimate *arguendo*, during the preliminary injunction hearing, Village Care Administrator Sandy Freeland admitted that "the fact that [Jane Doe] could not ambulate without the continuous use of the wheelchair" was a factor in her termination from Village Care. (Doc. 331–59 ("Preliminary Injunction Tr.")[6] at 311:12-20).)[7] Therefore, Jane Doe's status as a wheelchair-bound individual was an impermissible "motivating factor" in termination of her residency from Village Care and the circumstantial evidence presented by Plaintiffs, alone, would suffice to support judgment as a matter of law in support of their claims. *See Fields*, 115 F.3d at 120 ("[P]laintiff can prevail by proving that an impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation." (internal quotation marks omitted)).

---

[6] "Preliminary Injunction Tr." refers to the transcript of the preliminary injunction hearing held in this matter on June 12, 2018.

[7] Ms. Freeland also referenced an "incontinent status" as a factor in the termination of Ms. Doe residency at the hearing, (Preliminary Injunction Tr. at 311:12-20); however, it is undisputed that the visual assessment that prompted Plaintiff's termination did not reference Plaintiff's incontinent status, (Pls' SOF ¶ 169).

31

### D. *Plaintiffs Have Shown the Original Regulations Constituted Intentional Discrimination as a Matter of Law*

#### 1. Deliberate Indifference

"In certain circumstances, courts view actions of a third party as intentional violations by the funding recipient itself." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012). For example, a "school district may be held liable in damages in an implied right of action under Title IX . . . for the sexual harassment of a student by one of the district's teachers" when deliberate indifference can be shown, among other predicates. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998). "[I]n the context of the Rehabilitation Act, intentional discrimination against the disabled does not require personal animosity or ill will. Rather, intentional discrimination may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy . . . or custom." *Loeffler*, 582 F.3d at 275 (alterations adopted) (internal citations and quotation marks omitted).

Citing *Loeffler*, Defendants argue that I should apply the typical three-part deliberate indifference standard to their conduct to assess whether I can infer the requisite intent to find them liable for intentional discrimination under the RA and ACA. (Defs' Mem. 20 ("An intentional violation can be shown by evidence of discriminatory animus or a showing of "deliberate indifference to the strong likelihood [of] a violation."" (quoting *Loeffler*, 582 F.3d at 275)).) In general, "[a] defendant acts with deliberate indifference when it (1) 'ha[s] actual knowledge of discrimination against' the disabled person, (2) 'ha[s] authority to correct the discrimination,' and (3) 'fail[s] to respond adequately.'" *Berry-Mayes v. New York City Health & Hosps. Corp.*, 712 F. App'x 111, 112 (2d Cir. 2018) (summary order) (quoting *Loeffler*, 582 F.3d at 276) (brackets in original). The three-part deliberate indifference standard from *Loeffler*

is rooted in the Supreme Court's 1998 decision in *Gebser*, which applied this framework only to cases "that do not involve official policy of the recipient entity."  524 U.S. at 290.[8]

A 1998 Second Circuit decision set forth the legal reasoning that controls here, even though the case has been vacated and abrogated on other grounds.  *See Bartlett v. New York State Bd. of L. Examiners*, 156 F.3d 321 (2d Cir. 1998), *cert. granted, judgment vacated*, 527 U.S. 1031 (1999), *and abrogated on other grounds by Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999).  The Second Circuit has continued to cite the opinion in *Bartlett* for its holdings that were not vacated.  *See, e.g.*, *T.W. v. New York State Bd. of L. Examiners*, 996 F.3d 87, 92 (2d Cir. 2021); *Loeffler*, 582 F.3d at 275.  In *Bartlett*, the plaintiffs met the bar of showing deliberate indifference when they demonstrated that the defendant "implemented a policy of denying accommodations to any learning disabled bar applicant," and the court held that "implementing such a policy constituted deliberate indifference to a strong likelihood of violating [Plaintiff's] federally protected rights."  *Id.*  Although *Bartlett*'s holding was also predicated on the idea that self-accommodations should not be considered when determining whether a person can be considered disabled, *see id.* at 329 ("[H]istory of self-accommodations . . . do not take [Plaintiff] outside of the protective provisions of the ADA," (internal quotation marks omitted)), which was overturned by the Supreme Court in *Sutton*, 527 U.S. at 477, 494 (affirming Tenth Circuit's decision that had split with *Bartlett* in determining that self-accommodations could be considered in adjudicating a disability), the *Bartlett* analysis that deliberate indifference can be inferred on the basis of an intentional policy has not been disturbed and remains a correct principle of law.

---

[8] Although *Gebser* was a Title IX case, the same principles apply to the concept of "intentional discrimination" against the differently abled just as well as discrimination on the basis of sex.  *See Viera v. City of New York*, No. 15-CV-5430, 2018 WL 4762257, at *13 (S.D.N.Y. Sept. 30, 2018) (RA standard for deliberate indifference was created by "extrapolating from the Supreme Court's reasoning concerning an implied damages remedy in the Title IX context"); *Matagrano*, 2023 WL 5932943, at *9 ("The standard for deliberate indifference in [the RA] context is borrowed from *Gebser*").

*See Caballero v. New York State Dep't of Corr. & Cmty. Supervision*, 349 F.R.D. 45, 54 (N.D.N.Y. 2024) (finding deliberate indifference and intentional discrimination when the defendant "implemented a policy" discriminating against certain incarcerated individuals); *see also Fortin on behalf of TF v. Hollis Sch. Dist.*, No. 15-CV-179, 2017 WL 4157065, at *3 n.10 (D.N.H. Sept. 18, 2017) ("Several [] decisions require that a 'policymaker' act with deliberate indifference, or that the institution act with deliberate indifference that its 'policies' would violate a plaintiff's rights" (citing *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013) and *Bartlett*, 156 F.3d at 331)).

In other words, as a recent Second Circuit decision explained in the Title IX context, "claims for monetary damages" under statutes governed by the *Gebser* standard "fall into two categories.  First, damages are available if the funding recipient affirmatively discriminates through an official action or official policy," *Schiebel v. Schoharie Cent. Sch. Dist.*, 120 F.4th 1082, 1093 (2d Cir. 2024), or, second, damages may be available in cases that do not involve the official policy of the entity accused of discrimination, in which case, a court applies the three-part framework from *Loeffler* to determine whether deliberate indifference can be inferred, *id.* (citing *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 52 (2d Cir. 2023)).  This case clearly falls into the first of these two categories, as Plaintiffs show that discrimination that occurred against wheelchair-bound individuals between 2013 and 2018 was directly attributable to the regulations issued and maintained by the State Defendants, (Docs. 342-2 at 3–4; 342-4 at 5–6; 342-9 at 1–2.), i.e., an "official policy," *see Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500 (10th Cir. 1995) (finding that challenges to "statute and ordinance [that] treat the handicapped differently on their face" are "properly characterized as claims of intentional discrimination and should be analyzed in the established framework for such claims").

34

This is not a case where a court need inquire whether the DOH had knowledge of a risk that Plaintiffs' rights would be violated by a third party and shut its eyes to that risk.  Rather, it presents a risk of the DOH's own making.  *See Bartlett*, 156 F.3d at 331 ("[I]mplementing [] a [discriminatory] policy constituted deliberate indifference to a strong likelihood of violating [Plaintiff's] federally protected rights."); *see also Whittington v. City of Bangor*, No. 17-CV-00413, 2017 WL 5037457, at *4 (D. Me. Nov. 3, 2017) ("[T]he Supreme Court and the First Circuit have held that deliberate indifference [under the ADA] on the part of the entity must be evident, unless the harm results directly from a governmental policy."), *report and recommendation adopted*, 2017 WL 6210894 (D. Me. Dec. 8, 2017).

Here, it is undisputed that from 2013 to 2018, the "chairfast" regulations that barred wheelchair-bound individuals from residing at an ACF constitute a "policy."  Further, there is no genuine dispute of material fact as to whether this policy is the but-for cause of discrimination against Plaintiffs, as the ACFs tested by FHJC during this time period specifically stated in response to FHJC's testers that their decisions to discriminate against wheelchair-bound individuals was predicated on these regulations.  (*See* Doc. 342-2 at 3; Doc. 342-4 at 6; Doc. 342-9 at 2.)  Therefore, the three-part test laid out in *Loeffler* is inapposite and does not apply.  Because I find that the regulations promulgated by the DOH between 2013 and 2018 that both directly violated the RA and caused Plaintiffs injury affirmatively discriminated against wheelchair-bound individuals, I need not evaluate the Original Regulations under the three-part *Loeffler* deliberate indifference framework proposed by State Defendants in determining that Plaintiffs have proven intentional discrimination to support the issuance of monetary damages under the RA and ACA as a matter of law.  Rather, Plaintiffs can show deliberate indifference as

35

a matter of law by tracing their injuries to an official discriminatory policy of the State

Defendants.

### 2.  Regulator Liability

Defendants also argue that the Second Circuit has dictated that regulators cannot be held

liable for intentional discrimination in regulated industries.  (Defs' Reply 8–9 ("[A] regulatory

agency cannot be liable for failing to prevent discrimination by the entities it regulates under

*Noel v. N.Y. City Taxi & Limousine Comm'n*, 687 F.3d 63 (2d Cir. 2012).").)  However, this

argument relies on an incorrect reading of *Noel*.  Instead, the *Noel* court explicitly found that a

regulator could be liable for discrimination when its "administration of the [regulatory] program

discriminates against persons with disabilities."  687 F.3d at 70.  In *Noel*, the court found that

discrimination against wheelchair users in New York City was caused not by the licensing

scheme, but rather by the private local taxi industry.  *Id.* at 73 ("It may be that there is a failure to

provide meaningful access to taxis for persons with disabilities.  But if so, it is a failure of the

taxi industry in New York City.")  In *Noel*, the licensing regulations that applied to the industry

barred discrimination.  *See id.* at 69 ("A public entity may not discriminate on the basis of

disability in its licensing, certification, and regulatory activities." (quoting ADA TAM II–

3.7200*, available at* http://www.ada.gov/taman2.html#II-3.7200)); *see also* 28 C.F.R. §

35.130(b)(6)).  Because of this, the regulator could not be held liable for discrimination under the

ADA, but with an important caveat:  "unless the private industry practice results from the

licensing requirements."  *Id.* at 70.

Therefore, the Second's Circuit's holding in *Noel* is not that regulators can never be held

liable for the discrimination extant in industries they regulate, but rather that regulators can only

be held liable for the discrimination they cause.  This is a straightforward legal proposition that

Defendants seem to recognize since they devote several pages of their briefing to discussing causation.  (*See* Defs' Mem. 26–27; Defs' Reply 8–12; Defs' Opp'n 21–24, 27–28.)  Therefore, the "unremarkable" rule of *Noel* and its progeny, that regulators are not liable for discrimination that "they did not cause," (*see* Pls' Opp'n 11), does not bar liability here.  Indeed, it supports Plaintiffs' claims that the State Defendants are liable for damages, as the ACFs interviewed during the time period when the Original Regulations were governing justified their discrimination against wheelchair-bound individuals by directly referencing the Original Regulations.  (*See* Doc. 342-2 at 3; Doc. 342-4 at 6; Doc. 342-9 at 2.)

### E.    *Amended Regulations*

Before turning to the issues of damages and causation, I address the legality of the "Amended Regulations" promulgated in 2018, first on an emergency basis, (Doc. 331-39), and then formally through the notice and comment process, (Doc. 331-40–41).  Both sides muddy the waters between the Amended Regulations and the Original Regulations in their motions as befit their own positions.  For example, as I outlined above, Defendants attempt, in their opposition to Plaintiffs' motion for summary judgment, to argue that they should escape liability because the Amended Regulations were not facially discriminatory and that Jane Doe was eventually able to return to Village Care in 2018.  *See supra* § IV.C.3.a.  In Plaintiffs' motion for summary judgment, they, at first, appear to suggest that the Amended Regulations are discriminatory as a matter of law, (*see* Pls' Mem. 5 (arguing that there is "continued discrimination under the" Amended Regulation)), but then appear to walk that claim back later in their memorandum, arguing instead that continued discrimination under the Amended Regulations is merely proof of "intentional discrimination" writ large, (*see id.* at 16–17 (arguing that the Amended Regulations "evince[]" the state's intentional discrimination)).

37

However, there are important differences between the Original Regulations and the Amended Regulations, differences which both parties gloss over in their briefs.  The most important of these is that the Amended Regulations no longer require ACFs to facially discriminate against wheelchair-bound individuals.  (*See* Doc. 331-39 ("An operator shall not exclude an individual on the sole basis that such individual is a person who primarily uses a wheelchair for mobility, and shall make reasonable accommodations to the extent necessary to admit such individuals, consistent with the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 et seq. and with the provisions of this section.").)  However, the Amended Regulations do still continue to contain a subsection providing that ACFs may not admit wheelchair-bound users "unless assignment on a floor with ground-level egress can be made." (*Id.*)  Therefore, in order to make out any claim for damages under the Amended Regulations, Plaintiffs would have to either establish:  (1) disparate treatment under the *McDonnell Douglas* framework; or (2) that the provisions in the Amended Regulations requiring "assignment on a floor with ground-level egress can be made," do not constitute reasonable accommodations as a matter of law.[9]

Plaintiffs may face an uphill climb to make out these two showings at trial.  However, based on the papers, I cannot find that Defendants have shown as a matter of law that the Amended Regulations are not discriminatory.  Defendants' motion for summary judgment is DENIED to the extent it argues that the Amended Regulations are not discriminatory as a matter of law and so do not violate the RA and ACA.  However, Plaintiffs have not met their burden to show that the Amended Regulations are discriminatory as a matter of law and violate the RA and

---

[9] Plaintiffs could also theoretically attempt to proceed under a pure disparate impact theory of liability but do not appear to make any claims sounding in that theory of discrimination in this case.  Additional obstacles would likely stand in the way of a disparate impact theory, when disparate impact liability is explicitly predicated not on "proof of discriminatory intent," but rather on "practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another."  *Doheny v. Int'l Bus. Machines, Corp.*, 714 F. Supp. 3d 342, 364 (S.D.N.Y. 2024) (internal quotation marks omitted).

ACA.  Therefore, Plaintiffs' motion for summary judgment is also DENIED to the extent that Plaintiffs seek summary judgment for injuries caused by the Amended Regulations.  In other words, there exist genuine disputes of material facts concerning whether the Amended Regulations were discriminatory that preclude summary judgment for either party.

As with the Original Regulations, the Amended Regulations are an official policy of the State Defendants, which means that there is no actual knowledge predicate requirement in order to prove intentional discrimination and the three part *Loeffler* test does not apply.  *See supra* § IV.D.1.  Further, because regulators can be liable to the extent they "cause" discrimination in regulated industries, *Noel* is not a bar to liability.  *See supra* § IV.D.2.  However, unlike the Original Regulations, the Amended Regulations do not constitute, in and of themselves, direct evidence sufficient to make out a prima facie case of discrimination.  *But see supra* § IV.C.3.a. As opposed to the Original Regulations, which exclude wheelchair-bound individuals from ACFs altogether, the Amended Regulations provide that "[a]n operator shall not accept nor retain any person who . . . chronically requires the physical assistance of another person in order to walk; [or] chronically requires the physical assistance of another person to climb or descend stairs, unless assignment on a floor with ground-level egress can be made."  (Doc. 331-39.)

Moreover, Plaintiffs have only shown beyond a genuine dispute of material fact that four of the ACFs tested after the implementation of the Amended Regulations still refused to accept wheelchair-bound individuals (Frederick Fleming House, Lott Assisted Living, Castle Senior Living, and West 74th).  (Pls' SOF ¶ 96 (W 74th St.), ¶ 97 (Frederick Fleming House), ¶ 98 (Lott Assisted Living), ¶¶ 105–07 (Castle Senior Living).)  None of these ACFs attributed their refusal to admit wheelchair-bound individuals to state regulations.  Two ACFs tested stated that wheelchair-bound individuals were accepted, but that they needed to live on the first floor (Alma

Rangel Gardens, Ridge Street Gardens), (*Id.* ¶¶ 99–100 (Alma Rangel Gardens), ¶¶ 101–102 (Ridge Street Gardens)), and one facility stated that they accept people who use wheelchairs but that these individuals "ha[d] to be able to self-propel," (*Id.* ¶ 103 (W Assisted Living)).  There is also a triable dispute of material fact between the parties as to whether and to what extent Clinton Gardens and River View Gardens allow wheelchair-bound individuals, that is properly before a fact finder.  (Doc. 343–2 at 4–5.)

The Original Regulations mirror the situation that a court in the Eastern District of New York confronted in *Human Res. Rsch. & Mgmt. Grp.*, 687 F. Supp. 2d at 237.  There, the court granted summary judgment to Plaintiffs when a law in Suffolk County, New York facially discriminated against disabled individuals recovering from substance abuse by "impos[ing] restrictions and limitations" on these individuals without "impos[ing] *any* restrictions on a group of unrelated individuals who are not" in that protected class.  *Id.* at 254 (emphasis in original).  Thus, the law itself constituted direct evidence to meet Plaintiff's burden of showing discrimination against differently abled individuals.  *Id.*  Summary judgment was awarded to the plaintiffs.  *Id.* at 258.

The Amended Regulations are more similar to those challenged in *Rehab. Support Servs., Inc.* v. *City of Albany*, No. 14-CV-0499, 2017 WL 3251597, at *3 (N.D.N.Y. July 28, 2017).  There, plaintiff, a non-profit, sought to build residences for disabled residents in a district of Albany zoned for one and two-family residential homes.  *Id.* at *1–2.  The Albany Board of Zoning Appeals denied the plaintiff's application to build a residence because the zoning regulations in place barred "community residence[s]," which were "residence[s] for a disabled population," from being built absent a showing of "unnecessary hardship."  *Id.* at *2.  The record reflected that (1) plaintiff had not "offered any evidence to suggest that it is singled out or treated

40

differently from similarly situated residences," *id.* at *5, as the "unnecessary hardship" showing also applied to several other kinds of buildings that required special permits, *id.* at *2, *6; and (2) in spite of the additional showing, four community residences had still been built in the residentially zoned neighborhoods, *id.* at *3. Here, as there, the Amended Regulations, on their face, no longer act as a categorical bar against the chairfast or single them out for special treatment as compared to other groups whose admission to ACFs was limited. (Doc. 331-39.) Further, the undisputed evidence reflects that at least two of the ACFs tested after the implementation of the Amended Regulations (Jennings Hall and 129th Street Residence) did not appear to discriminate against wheelchair-bound individuals. (Docs. 336-27; 336-31.)

Therefore, Plaintiffs cannot rely on the same direct facial evidence of discrimination that sufficed for them to make out a prima facie case with respect to the Original Regulations. *See supra* § IV.C.3.a. However, this does not end the inquiry. Even though I do find that the Amended Regulations are not facially discriminatory as a matter of law, Plaintiffs may still meet their burden under the *McDonnell Douglas* framework to show that the Amended Regulations constituted disparate treatment discrimination. In the alternative, they may claim that requiring wheelchair-bound individuals to be confined to the first floor does not constitute a reasonable accommodation as a matter of law. Both these disputes present triable issues and are incapable of being fully resolved on the papers, as genuine disputes of material fact between the two parties remain.

With respect to the question of reasonable accommodation, *Brown v. County of Nassau*, 736 F. Supp. 2d 602 (E.D.N.Y. 2010) is instructive. There, both the plaintiff and defendant moved for summary judgment on the question of whether the Nassau Coliseum failed to provide reasonable accommodation to wheelchair users as a matter of law due to problems relating to

41

elevators, pedestrian ramps, and the locations of exit doors, among other things. *Id.* at 603, 605–08. The court there found that the mere fact that plaintiff was able to attend some games at the Coliseum did not show that there were not access issues or that the defendant had reasonably accommodated plaintiff as a matter of law. *See id.* at 615–16 ("Although physical presence by the disabled at a facility constitutes some evidence of accessibility, it does not necessarily equate with the facility being *readily* accessible and usable by the disabled under the law." (emphasis in original) (collecting cases)). However, the court also refused to grant the plaintiff summary judgment, holding that "under the circumstances of this case [] the factfinder must examine whether one or more specific barriers, if proven, are sufficiently severe to deprive the plaintiff of [] accessibility." *Id.* at 622. Here, as in *Brown*, the fact-intensive inquiry concerning whether limiting wheelchair-bound individuals to the first floor or requiring such individuals to be able to self-propel is a reasonable accommodation does not warrant summary judgment. Furthermore, disputes of material fact still exist concerning whether some of the ACFs that FHJC tested permit wheelchair-bound individuals at all. Therefore, whether the Amended Regulations were discriminatory is not ripe for summary judgment and should be decided at trial. Plaintiffs may proceed to trial with claims that the Amended Regulations caused Plaintiffs' injury through either a disparate treatment or reasonable accommodation theory.

### F.    *Causation*

In their motion for summary judgment, Plaintiffs argue that they have shown a sufficient "causal link between the specific violations and the injuries sustained" to warrant judgment as a matter of law. (Pls' Mem. 21–25.) Defendants claim in response that the "DOH regulations or policies did not require Village Care to refuse to let Ms. Doe back to her apartment because she used a wheelchair in 2017." (Defs' Opp'n 27–28, 30–31.) Defendants also argue that Ms. Doe's

economic damages could not have been caused in full by their conduct as a matter of law because the lien covered a time period that extended beyond that during which Ms. Doe was alleged to have been improperly excluded from Village Care.  (Defs' Mem. 15 ("The Medicaid lien represents funds *already* paid by Medicaid over the full term of Ms. Doe's receipt of benefits, and not just for the time period at issue here.") (emphasis in original).)  Finally, Defendants assert that FHJC's diversion of resources damages were not caused by the Original Regulations because "Plaintiffs failed to prove that the[] alleged discrimination and stated refusal to admit wheelchair users was caused by DOH."  (Defs' Opp'n 33.)  I find that Plaintiffs have not shown beyond dispute precisely what quantum of injury and damages is attributable to the Original Regulations.

The cases that Plaintiffs cite that they argue support awarding summary judgment on causation are inapposite where issues regarding damages remain in dispute.  First, the Second Circuit case that Plaintiffs cite, *Saulpaugh v. Monroe Community Hospital*, merely affirmed an award of damages that resulted from a bench trial.  4 F.3d 134, 138 (2d Cir. 1993).  There, the court, as the finder of fact, had to parse the facts relevant to the "causal connection" between the violative behavior and the injury suffered by the plaintiff before making rendering a decision concerning causation.  *Id.* at 141.  The same goes for *Worthington v. City of New Haven*, No. 94-CV-609, 1999 WL 958627, at *1 (D. Conn. Oct. 5, 1999).  If anything, these cases support abstaining from any definitive conclusions regarding causation until after the finder of fact has had an opportunity to determine the appropriate amount of damages and how much of this amount is causally connected to the unlawful regulations that the State Defendants maintained for five years between 2013 and 2018.  Here too, questions of causation are best adjudicated by the finder of fact after trial and there is insufficient evidence to grant judgment to either side as a

43

matter of law as to which damages were caused by the Original Regulations and which by the Amended Regulations (should the finder of fact conclude that the Amended Regulations are discriminatory).

### G.    *Damages*

Defendants make three principal arguments relating to damages in their briefing.  (*See* Defs' Mem. 26, 30–32; Defs' Opp'n 28–32.)  I address each in turn below.

#### 1.  *Damages for Emotional Distress*

First, Defendants argue that the damages brought by Plaintiff Jane Doe are precluded by the Supreme Court's decision in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022).  In *Cummings*, the Court found that "emotional distress damages" were not recoverable under "Spending Clause statutes" like the RA and ACA.  *Id.* at 222.  Plaintiff Jane Doe's estate seeks damages for "loss of civil rights, and other damages, including personal injury, emotional distress, and humiliation."  (FAC ¶¶ 294, 322(h)-(i).)  In the wake of *Cummings*, Plaintiff is entitled to "compensatory damages, such as expectation damages so that Plaintiff can be placed in as good a position as he or she would have been had had [Defendant] not violated § 504," with respect to her claimed injuries and harm.  *Johnson v. EAC Network*, No. 24-CV-5645, 2025 WL 3084098, at *18 (E.D.N.Y. Nov. 4, 2025) (internal quotation marks omitted).

To be sure, some courts in the Circuit have declined to find expectation damages available in suits following *Cummings* where Plaintiffs sought only "an award of emotional distress damages based on the expectations of Defendants' contractual relationship with the federal government when accepting federal funds."  *Hejmej v. Peconic Bay Med. Ctr.*, No. 17-CV-782, 2022 WL 5429675, at *8 (E.D.N.Y. July 5, 2022), *report and recommendation adopted*, 2022 WL 4551696 (E.D.N.Y. Sept. 29, 2022); *see also Fantasia v. Montefiore New*

*Rochelle*, No. 19-CV-11054, 2022 WL 20540940, at *3 (S.D.N.Y. June 16, 2022) ("[P]laintiff may not seek expectation damages at trial," because "plaintiff in this case has not offered sufficient evidence such that a factfinder could determine her expectation damages with reasonable certainty"), *but see id.* ("In theory, a plaintiff could pursue expectation damages as a remedy for violations of the RA or ACA."). However, this is not one such case. Instead, Plaintiff Jane Doe alleges compensatory damages from being worse off physically in a nursing home than she would have been in an ACF. (Pls' SOF ¶¶ 243–46; Doc. 331–16; Doc. 48.)

"[Q]uantifying the value of this loss of opportunity is a task more appropriately performed by a jury after trial than by a court on summary judgment." *Montgomery v. D.C.*, No. CV-18-1928, 2022 WL 1618741, at *25 n.38 (D.D.C. May 23, 2022). Therefore, like other courts in the wake of *Cummings*, I decline to dismiss this suit in its entirety just because one category of damages is no longer available to Plaintiffs. *See Gordon v. Niagara Wheatfield Cent. Sch. Dist.*, No. 22-CV-00172, 2023 WL 6520216, at *7 (W.D.N.Y. Aug. 22, 2023) (declining to dismiss claim that included "a general request for compensatory damages; a request for declaratory relief in the form of a statement acknowledging that defendant violated Title IX; attorneys' fees and costs; and nominal damages," as well as unavailable emotional distress damages in the wake of *Cummings*), *report and recommendation adopted*, 2023 WL 6227616 (W.D.N.Y. Sept. 26, 2023); *Raymond v. New York State Dep't of Corr. & Cmty. Supervision*, 749 F. Supp. 3d 290, 302 (N.D.N.Y. 2024) (Defendants' argument "that they are entitled to summary judgment on [Plaintiffs'] damages claims" "sweeps far too broadly" when Plaintiffs seek "ordinary contract damages based on their expectation interest."); *Simmons v. Mount Vernon City Sch. Dist.*, No. 19-CV-10388, 2026 WL 412120, at *7 (S.D.N.Y. Feb. 13, 2026)

45

("Although plaintiffs' claim [] may proceed, the Court notes any compensatory damages for emotional harm pursuant to this claim are not available.").

Defendants are "mistaken" to argue that all of Jane Doe's damages "claims are barred by the ruling in *Cummings*" because Plaintiffs "seek[] damages in addition to emotional distress." *Pierro v. Hudson City Sch. Dist.*, No. 22-CV-670, 2023 WL 2742245, at *4 n.5 (N.D.N.Y. Mar. 31, 2023). Jane Doe's claims for damages may proceed to trial to the extent they are based on physical injury and expectation interests rather than emotional distress.

### 2. Economic Damages

Second, Defendant argues that Plaintiff Jane Doe's economic damages are "unavailable" because "Plaintiffs did not disclose them." (Defs' Opp'n. 27–32.) Federal Rule of Civil Procedure 26(a)(1)(A)(iii) requires that parties disclose "a computation of each category of damages claimed by the disclosing party," and the "the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based," to the opposing party. Fed. R. Civ. P. 26(a)(1)(A)(iii). Federal Rule of Civil Procedure 37(c)(1) provides that, if a party fails to include damages in their disclosures, then that "party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

However, "despite the seeming 'self-executing' nature of the preclusion sanction contained in the Rule, imposition of the preclusion sanction remains within the trial court's discretion." *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 156 (S.D.N.Y. 2012) (internal citations omitted). Further, "[a]lthough authorized under Federal Rule of Civil Procedure 37, 'preclusion of evidence . . . is a harsh remedy and should be imposed only in rare situations.'" *Izzo v. ING Life Ins. & Annuity Co.*, 235 F.R.D.

46

177, 186 (E.D.N.Y. 2005) (alterations adopted) (citing *Update Art, Inc. v. Modiin Publishing, Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988)).  "Before granting the extreme sanction of preclusion, the Court should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses." *Cates v. Trs. of Columbia Univ. in City of New York*, 330 F.R.D. 369, 373 (S.D.N.Y. 2019) (alterations adopted) (internal quotation marks omitted).  "In determining whether preclusion or another sanction would be appropriate, courts should consider: '(1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of . . . the precluded evidence; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.'" *Id.* (alterations adopted and quoting *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)).  "Courts, in fact, have 'broad discretion' to determine the nature of any sanction that should be imposed under Rule 37, 'based on all the facts of the case.'" *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.*, 280 F.R.D. at 156 (collecting cases).  Therefore, preclusion under Rule 37 is only appropriate "when the failure to comply . . . is due to willfulness or bad faith, or is otherwise culpable." *Daval Steel Products v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir. 1991) (citations omitted).

Here, Plaintiffs explain in their reply brief that "Defendants were on notice from early in the case that Ms. Doe's unnecessary institutionalization in the nursing home caused her economic damages." (Pls' Reply 12; *see* FAC ¶ 44 ("Nursing homes are more expensive than ALPs.  According to the DOH, nursing homes in New York City cost approximately $405 per day per resident.").)  So, this is not a case where Plaintiffs disclosed a theory of damages for the first time belatedly or where its "flagrant non-disclosure[] of damages," warrants preclusion. *Patriarch Partners Agency Servs, LLC v. Zohar CDO 2203-1 Ltd.*, No. 16-CV-4488, 2026 WL

685730 at *6 (S.D.N.Y. Mar. 11, 2026).  Rather, this is a case more like *Zohar*, in which the prejudice suffered by Defendants "is not so great that exclusion would be appropriate," even though Plaintiffs' economic damages "represent[] a substantial share of [Plaintiffs'] damages case."  *Id.* at *6–7.  Here, as in *Zohar*, Defendants "knew the categories of damages," and "had access to all the underlying documents."  *Id.* at *7.  This is because the State Defendants themselves have access to the billing records for Medicaid recipients in New York.  (Pls' Reply 12).  The economic damages in question are based on a letter sent by the Department of Social Services to Plaintiff Doe's attorney in October of 2021, after the lawsuit commenced, relating to those billing records.  (Doc. 331-65.)  Thus, Defendants could have calculated these alleged economic damages independently, even though the basis for Plaintiffs' damages calculations was not part of Plaintiffs' disclosures, because the "DOH is aware of the cost differential between ALPs and nursing homes and maintains the billing records for Medicaid recipients in New York State," and had access to all of the records necessary to perform the underlying calculations. (Pls' Reply 12.)

"Because [Defendants] knew the types of damages at issue and had the evidence underlying these damages, and the calculation of these damages was straightforward, the preclusion of significant damages evidence is too 'drastic.'"  *Zohar*, 2026 WL 685730, at *7 (quoting *Cates*, 330 F.R.D. at 373).  Therefore, I decline to preclude Plaintiffs' economic damages.  The question of how much, if any, of these damages were caused by Defendants remains an appropriate question to go before the finder of fact rather than one to be resolved as a matter of law at the summary judgment phase of this litigation.

### 3.    Diversion of Resource Damages

Finally, Defendants argue that they are not liable to FHJC for diversion of resource damages for several reasons.  (Defs' Opp'n 28–35.)  First, they claim that *Cummings* precludes FHJC from recovering diversion of resources damages.  (*Id.* at 28.)  Not so.  *Cummings* made emotional distress damages unavailable in suits for recovery under Spending Clause statutes like the RA and ACA.  *Fantasia*, 2022 WL 20540940, at *1 ("On April 28, 2022, the Supreme Court decided *Cummings v. Premier Rehab Keller, P.L.L.C.*, in which the Court held that emotional-distress damages are not recoverable in private actions brought to enforce the RA or ACA." (citation omitted)).  It did not say anything about the recovery of diversion of resource damages, nor do any cases interpreting *Cummings* in the Second Circuit find that it precludes such recovery.  Defendants' briefing does not include any case law to the contrary.  Second, Defendants again argue that *Noel* bars recovery of damages against regulators.  As I found above, *supra* § IV.D.2, *Noel* only bars recovery of damages against regulators to the extent that the regulators did not cause plaintiffs' damages.  Defendants have not established that they did not cause Plaintiffs' diversion of resources as a matter of law.

Third, Defendants argue that, because the Amended Regulations are not discriminatory as a matter of law, any resources diverted by Plaintiff FHJC to test the Amended Regulations are not caused by Defendants' illegal conduct. (Defs' Mem. 29–30.)  This argument fails for two reasons.  First, as I found above, the Defendants have not put forth sufficient evidence to rebut the argument that the Amended Regulations were discriminatory to warrant summary judgment.  Because triable issues still remain concerning whether the Amended Regulations reasonably accommodate wheelchair-bound individuals or constitute disparate treatment under the *McDonnell Douglas* framework, *see supra* § IV.E, I cannot find that resources used to test the

49

Amended Regulations are not recoverable as a matter of law.  Second, because triable issues remain regarding which damages were caused by the Original Regulations and which by the Amended Regulations, *see supra* § IV.F, I cannot grant summary judgment to Defendants on whether testing of the Amended Regulations was caused by the illegal conduct of the State Defendants, i.e., promulgating and maintaining for five years the Original Regulations that facially discriminated against wheelchair-bound individuals.

Finally, Defendants argue that "diversion of resources" damages for the time spent litigating this case are not available as a matter of law because of two cases cited in their opposition brief.  (Defs' Opp'n 35 (citing *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)).) However, Defendant's citations to these cases are misplaced and their interpretation of them is incorrect.  As Plaintiffs correctly point out in their reply, (Pls' Reply 15), *Steel Company* merely held that litigation costs alone cannot provide a third party with standing to sue and recover damages.  523 U.S. at 107–08 ("The recovery of [] expenses unrelated to litigation would assuredly support Article III standing.").  *Equal Rights Center* held likewise.  633 F.3d at 1138 ("[I]f the defendant's allegedly wrongful action prompts an organization to increase the resources it must devote to programs independent of its suit against the defendant, the organization has shown an injury in fact." (alterations adopted and internal quotation marks omitted)).

Here, because FHJC "was forced to 'devote significant resources to identify and counteract' the defendants' [] practices," even prior to initiating this litigation, it had standing to bring suit.  *Ragin v. Harry Macklowe Real Est. Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  Therefore, the State Defendants'

50

final argument that FHJC cannot seek damages fails as a matter of law.  The question of what quantum of damages is recoverable by FHJC on account of Defendants' conduct remains one for the finder of fact to determine at trial.

### V.     Conclusion

For the reasons outlined above, Plaintiffs' motion for summary judgment on liability on the Original Regulations is GRANTED.  Defendants' cross-motion for summary judgment on liability on the Original Regulations is DENIED.

Plaintiffs' motion for summary judgment on liability on the Amended Regulations is DENIED.  Defendants' cross-motion for summary judgment on liability on the Amended Regulations is DENIED.

Both summary judgment motions are also DENIED insofar as they seek summary judgment on issues of causation and damages.

Defendants' motion to strike Plaintiffs' Counterstatement of Material Facts is DENIED, although I exercise my discretion and do not deem those allegations contained therein admitted by Defendants.

The Clerk of Court is respectfully directed to close the open motions at Docs. 328, 330, and 369.

SO ORDERED.

Dated: June 30, 2026
        New York, New York

_____
Vernon S. Broderick
United States District Judge

51